1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF FLORIDA
2                        OCALA DIVISION

3                 Case No. 5:08-cr-23-Oc-10GRJ

4                        April 24, 2008
                         Ocala, Florida
5

6    UNITED STATES OF AMERICA,

7                   Plaintiff,

8    vs.

9    ERIN SHARMA,

10                  Defendant.

11   ----------------------------------------------------

12               TRANSCRIPT OF STATUS CONFERENCE
              BEFORE THE HONORABLE GARY R. JONES,
13               UNITED STATES MAGISTRATE JUDGE

14

15   Appearances of Counsel:

16           For the Government:

17               Ms. Carolyn Adams
                 Mr. Jerry Hogan
18

19           For Defendant Sharma:

20               Mr. Michael Nielsen

21

22

23

24

25           Reported by:  Kelly Owen McCall, RPR, FPR

                    OWEN & ASSOCIATES
           P. O. BOX 157, OCALA, FLORIDA  34478
                       352.624.2258

1                    P R O C E E D I N G S

2           THE COURT:  Good afternoon, everyone.  This is the

3      United States versus Erin Sharma, Case Number 5:08-cr-23.

4      Michael Nielsen is present, representing Ms. Sharma.

5           Who is appearing on behalf of the Government this

6      afternoon?

7           MS. ADAMS:  Good afternoon, Your Honor.  Carolyn

8      Adam for the United States; and also Jerry Hogan, who is a

9      trial attorney with the Civil Rights Division, Department of

10     Justice.

11          MR. HOGAN:  Good afternoon, Your Honor.

12          THE COURT:  Welcome to Ocala.

13          MR. HOGAN:  Thank you.

14          THE COURT:  The reason I scheduled this hearing,

15     it's somewhat self-explanatory.  I did issue an order back

16     on the 31st of March detailing some issues I wanted to

17     discuss in this case.  And what I had in mind was to address

18     primarily three issues.

19          First, some schedule that makes sense.  And let me

20     footnote when I say "schedules," all schedules, of course,

21     are subject to amendment and modification, depending upon

22     changes in circumstances.  But to come up with a workable

23     schedule for a deadline before which the Government would

24     file its notice of intent to seek death penalty or its

25     notice that it did not intend to do so.

1           Also, to talk about trial scheduling.  As

2   Mr. Nielsen knows -- and I know, Ms. Adams and Mr. Hogan,

3   you were not at the arraignment.  The Court just sort of

4   went ahead as a knee-jerk reaction and set the matter for

5   trial before Judge Hodges in June.  And if, indeed, this

6   case was to proceed as a death-eligible case, that would be

7   very fast, to say the least.

8           And I have looked at some statistics across the

9   country as to how long it typically takes a death penalty

10  case to get to trial.  And, of course, those time limits

11  vary.  I know there have been cases that have taken years

12  and cases that have taken months.  And in my view, each case

13  stands or falls on its own facts.  Some cases may be more

14  complicated than other cases.

15          But, nonetheless, under any measure of how this

16  case is going to be prosecuted and/or defended, probably

17  June is an unworkable trial date in a case like this.  So I

18  also wanted to talk about that.

19          I also wanted to talk to counsel for the Defendant

20  about costs, budgeting.  And I don't want to get into

21  defense strategies on that, but I want to make sure we're --

22  I want to find out what page we are on, not to necessarily

23  make sure that we are all on the same page, but I am just

24  not sure what the defense has in mind at this point in terms

25  of bringing in experts, mitigation specialists and those

1    kinds of things.

2          And all of that sort of circles back to the issue

3    of timing, because I am operating under the assumption in

4    this case -- and y'all tell me if I am wrong -- although I

5    appointed counsel pre-indictment, the DOJ process of making

6    the decision on whether the Government will or will not seek

7    the death penalty, really not much was done on that

8    pre-indictment.

9          And I know in some of these cases the lion's share

10   of work really takes place before the individual is ever

11   indicted.  And as I understand it, under the DOJ procedures,

12   the Defendant's lawyer actually has an opportunity to

13   present information I think in a face-to-face meeting with a

14   committee of mitigating factors before the Department of

15   Justice -- well, I guess, ultimately, the Attorney General

16   makes a decision on that.

17         And I wanted to make sure that the Defendant is

18   given a full and fair opportunity to prepare and make an

19   appropriate presentation, assuming the case is going to go

20   in that direction.

21         So with those things in mind, the first thing I

22   would like to be educated on from the Government is give me

23   a thumbnail sketch of the process that you need to go

24   through to make the death penalty decision, where that's at.

25         And I recognize that the Government cannot and

1  will not tell me what you all sort of think is going to

2  happen, and I am not asking you to do that.  But I sort of

3  want to know what are the procedures; where are we at; and

4  assuming that process has not been completed, which I think

5  it has not, what would be a reasonable time frame that would

6  allow the Government to give full and fair consideration to

7  its decision-making process.

8          So having said that, let me first turn to the

9  Government, and either Ms. Adams or Mr. Hogan, you can come

10  up to the podium and educate me on those issues, and then

11  we'll see where we go from there.

12          MR. HOGAN:  Yes, Your Honor.  I think it's my job

13  to try to educate the Court about those issues.  You said a

14  second ago that it really is something that I can't comment

15  on.  Even if I had any indication, I couldn't comment on it.

16  But, frankly, I don't have any indication because at this

17  point it is completely out of our hands.

18          A memo was submitted on April 11th to the Capital

19  Crimes Unit, which triggers the process.  And from that

20  point on, we are being told that it is a minimum of 90 days

21  from April 11th before the Capital Crimes Unit is going to

22  be able to process the information that we have submitted to

23  them, schedule all the appropriate meetings, and forward

24  their own memos to the appropriate people for a decision to

25  be made.  So 90 days is the rough guesstimate that we are

1    getting from the Capital Crimes people.

2            I have been involved in a couple of other death

3    penalty cases, both of which involved memos that were

4    submitted right after the indictment, and it took at least

5    90 days in each of those cases for a decision to be made.

6            So 90 days is the estimate, but I think that

7    certainly is not necessarily the outside.

8            THE COURT:  I'll ask you this question.  If the

9    result is a declination to seek the death penalty, is the

10   process to accomplish that more abbreviated than the process

11   where, indeed, the death penalty is authorized?  Or they

12   essentially have to go through all of the same steps up to a

13   certain level within the DOJ?

14           MR. HOGAN:  Yeah, I don't mean to be evasive, but

15   the short answer is sometimes, but not always.  There are

16   apparently no hard-and-fast rules in these cases.

17           So I don't -- I can't say to the Court that if

18   there is a declination decision that it will take any less

19   time than if there is the other decision.  So --

20           THE COURT:  Now, that is 90 days for the -- I

21   guess we refer to it as the Capital Crimes Unit to review

22   the information.  And from there, is a final decision made

23   by the DOJ and that goes to the Attorney General and/or his

24   designee?

25           MR. HOGAN:  That's correct, Your Honor.  And --

1                    THE COURT:  And where along that 90-day process is

2        the Defendant permitted to present information either in

3        writing or to meet in a face-to-face meeting with DOJ people

4        to present mitigating factors?

5                    MR. HOGAN:  Again, Your Honor, that varies in my

6        experience.  Sometime, I would expect, towards the middle of

7        that time frame notice would go out to counsel.

8                    And we talked about that just before we came in

9        today.  I don't know exactly when that would go out.  But

10       that is a step along the way in this 90-day process.

11                   THE COURT:  Now, one of the things --

12                   MS. ADAMS:  Your Honor --

13                   THE COURT:  Yes, Ms. Adams.

14                   MS. ADAMS:  -- if I could just interject, I have

15       been told by the people at CCU that at any time they can

16       submit whatever they want to through us.  So if counsel

17       wanted to submit something, he could send it to us and we

18       would certainly forward it up.  So he is allowed to do that

19       at any time.

20                   Insofar as the face-to-face, they do not always

21       have an actual meeting with the parties, so that may not

22       occur.

23                   THE COURT:  Okay.  Did not know that.  I always

24       thought that was sort of how the process ended.  And I know

25       this is administrative, so there isn't any statutory right

1    of the Defendant to participate.  It's just under the DOJ

2    procedures.

3              MR. HOGAN:  If there -- I'm sorry.

4              MS. ADAMS:  I was just going to say, also, Your

5    Honor, that if there is a determination made not to have a

6    meeting at which counsel could be present, I think we could

7    assume that that would mean that they were leaning towards

8    not recommending seeking.

9              THE COURT:  Yeah, that makes perfect sense.  If

10   there is a meeting, counsel will get notice, ample notice of

11   that meeting.  And I would expect that would be closer to a

12   June time frame.

13             Now, one of the things I do intend to do is to

14   enter an order that will have a date for which the

15   Government will, on the court record, provide notice of what

16   it intends to do, again, subject to modification for good

17   cause.  I know certain things happen that could change

18   schedules.

19             In your view, Mr. Hogan, what would be a

20   reasonable and workable deadline from today's date or the

21   April 11th memo -- it's not too far off from today's date --

22   for the Government to have a deadline in this case to file

23   something on their notice of intention?

24             MR. HOGAN:  Well, again, you know, I am only

25   operating on what I am being told by the death unit, Your

1    Honor, the Capital Crimes Unit.

2            And to give you a little bit of background, we

3    made a promise in the last death case that I was involved in

4    in Nashville, and we then had to go before the Court, and

5    say:  We have broken our promise and we need more time

6    because we are being told that the Capital Crimes Unit is

7    not ready.  So I hesitate to give too short a time frame.

8            THE COURT:  That's why I use the word "workable"

9    and "reasonable;" based on your experience, something that

10   looks like a realistic target.  And then, of course, if

11   something happens in the case where the Government is unable

12   to meet that deadline, you can file something and tell me

13   why, and the Court can take into consideration whether

14   additional time is necessary.

15           MR. HOGAN:  Well, 90 days from April 11th would be

16   roughly July 11th.  I would think if we would go towards

17   late July, that would be -- Ms. Adams?  I would think maybe

18   August 1st would be --

19           THE COURT:  That would be a Friday.

20           Okay.  Now, you know, we have no idea what will be

21   the position of the Department of Justice.  Let's assume

22   that the Department of Justice files the notice of intent to

23   seek the death penalty sometime in the July time frame.

24           Based on your experience, what do you think would

25   be a reasonable period of time in a case such as this to get

1    the case to trial?

2          MR. HOGAN:  Well, again, you know, at that point

3    it really is more of a -- the burden -- I don't want to say

4    the burden shifts, but it is certainly the defense then has

5    certain considerations and certain steps that they have to

6    take.  I would think Mr. Nielsen would want probably until

7    middle, late fall at minimum.

8          THE COURT:  I am going to give Mr. Nielsen a

9    chance to chime in in a moment.  Middle, late fall; so

10   August, September, October.  You are thinking, very

11   generally, four months down the road from the date of the

12   notice of intent, assuming the Government was seeking the

13   death penalty, something like that?

14         MR. HOGAN:  That's correct, Your Honor.

15         THE COURT:  Okay.

16         MR. HOGAN:  Court's indulgence?

17         THE COURT:  Thank you.

18         (Conference between Government counsel.)

19         THE COURT:  That sounds like a workable time

20   frame.

21         MR. HOGAN:  It does, Your Honor.

22         THE COURT:  Okay.  Thank you, Mr. Hogan.  Let me

23   address Mr. Nielsen for a moment and then I will get back to

24   you.

25         Now, Mr. Nielsen, first, with regard to the

1   deadline that the Court is going to impose for which the

2   notice would be filed, what's your view on an August 1

3   deadline?

4        I mean, I am sure you wish they would make their

5   decision sooner as opposed to later.  But recognizing that I

6   believe the DOJ internal guidelines are now 90 days -- it

7   used to be 45 days, now it is 90 days.

8        And recognizing that from a defense viewpoint,

9   while this window is open, this is obviously the opportunity

10  for your client to make her case to the Department of

11  Justice as to why a death decision would be inappropriate,

12  you know, I want to make sure that you have got the time and

13  resources to prepare yourself to do that.

14       What I don't want to happen in this case is we all

15  sit here and sort of hold our breath waiting for the

16  Government to make a decision, and then the Government

17  decides to seek the death penalty in this case, and the case

18  spins out of control.

19       So I want the Defendant to operate under the

20  assumption, the way this thing is presently charged, it is

21  death eligible.  I have appointed two counsel.  I am going

22  to address with you appropriate resources and the case will

23  go forward.  And if it turns out that it is not a death

24  penalty case, then -- I don't want to say no-harm-no-foul,

25  but your client's rights have been protected.

1          And I just don't want to happen the flip side of

2   that.  But in any event, what's your comment on the August 1

3   deadline?

4          MR. NIELSEN:  Well, Your Honor, I guess that's

5   enough time.  I'm doing exactly what you said, and we are

6   operating under the assumption that they are seeking the

7   death penalty until we are told otherwise.  And in regard to

8   that, we have registered and contacted the Resource Counsel

9   Office.

10          THE COURT:  That was one of my questions.  I

11   wanted to make sure you, indeed, had done that.

12          MR. NIELSEN:  We have already registered with

13   them, Your Honor.  In fact, I talked to one of the lawyers

14   from that office at length.  And the only problem with that

15   is that he has already been working with the Federal

16   defenders office in reference to the inmate defendant, who

17   Mr. West represents.  So that lawyer told me yesterday they

18   are going to have to get me another lawyer to be my buddy in

19   the case, but --

20          THE COURT:  Let me stop you there.  And I did want

21   to address that issue.  Because this case does relate to

22   another investigation of Mr. McCollough (phonetic), which I

23   have appointed the Federal Public Defender's Office to

24   represent him pre-indictment.  They have been representing

25   his interest for well over a year, and the allegations

1   against your client, obviously, relate to the death that

2   resulted from that case.

3          And it was for that reason that I did not consult

4   with the Federal defenders organization with regard to

5   selection of counsel.  I know the statute -- I don't want to

6   say "mandates," but it said the Court should.  And I didn't,

7   and I put in my order why I didn't.  It just seemed to me a

8   bit of a conflict.

9          But having said all of that, certainly the Federal

10  defenders office, in general, you are allowed to talk to

11  them.  And use of the Federal Death Penalty Resource Counsel

12  I think is necessary and required.

13         And the situation where there is this kind of

14  conflict I don't think is really unusual.  There are

15  multiple-defendant cases where the Government seeks the

16  death penalty against multiple defendants, and each one of

17  those defendants can effectively use the resources of the

18  FDPRC, and that's what they are there for.  And, you know,

19  the whole idea behind all of that is to ensure that your

20  client receives effective assistance of counsel throughout

21  this case.

22         So don't be worried about that, that you talked to

23  a lawyer there, and then the lawyer says:  Oh, I have

24  chatted with the Federal defenders office here in the Middle

25  District, because they have other lawyers within their

1    office that can be of assistance.

2             And they do segregate the information.  So it does

3    not create a conflict and you shouldn't be reluctant in

4    relying on their services, because they are -- as the title

5    of the organization says, it is a resource.

6             MR. NIELSEN:  Yes, sir.

7             THE COURT:  They are not your co-counsel, but they

8    are a resource, and they have a great deal of statistical

9    information and forms, and also a tremendous amount of

10   information on current case law in that capital area, so --

11            MR. NIELSEN:  So the record is clear, Judge, we

12   only talked procedural issues.  We didn't talk about any of

13   the facts of the case.

14            THE COURT:  Okay.  Good.  So August 1 isn't the

15   kind of date that seems outside of what would be reasonable

16   in your view; is that right?

17            MR. NIELSEN:  Well, no.  I would like to try to

18   get potentially more time, because I think what I need to do

19   at this point is basically start getting my doctors

20   involved, which you never know where it is going to lead,

21   and potentially some other -- well, obviously, a mitigation

22   investigator and so forth to put a -- if I am going to go up

23   to make this presentation, I need to try to put something on

24   that's going to be effective.

25            And so I guess that date, Your Honor, is fine

1   right now.  I just don't want be noticed in the procedure

2   that the Government was stating earlier to the effect that,

3   you know, May 25th get up here and tell us why we are not

4   going to try to kill your client.  And so --

5          THE COURT:  Well, you know, that may happen.  The

6   one good thing about this, as Mr. Hogan and Ms. Adams

7   pointed out -- and, of course, it is not a requirement that

8   they meet with you personally, and there is probably -- it

9   makes common sense -- if they opt not to meet with you, that

10  may be a good thing.  No news may be good news for your

11  client.

12         But as the Government correctly offered, there is

13  nothing to prevent your side from giving information on an

14  ongoing basis --

15         MR. NIELSEN:  Yes, sir.

16         THE COURT:  -- so that the capital unit, the

17  Department of Justice can, you know, take that into

18  consideration, all of which --

19         Well, before we get into staffing on this case

20  from your view, what about a trial date?  Mr. Hogan said the

21  fall might be workable.  What is your view on that?

22         MR. NIELSEN:  Well, I think it's all going to

23  depend on their decision because, you know, as we all know,

24  death is different.  And so if they are seeking the death

25  penalty, it is going to make a difference in the amount of

1    work pretrial that the defense is going to need to get

2    ready, where if we are not having to worry about that whole

3    issue, obviously, it is a much simpler case.

4           I don't believe the factual pattern in this case

5    is extremely complex.  There's no -- I don't think I am

6    aware that there is any physical evidence, DNA or things

7    like that.  So on its face, not including the death penalty,

8    I would suggest that's probably reasonable.  But I don't

9    want to commit to that with this question hanging out here.

10          So I would have no problem with Your Honor setting

11   that time frame with the understanding that if they tell us

12   they're going to seek death, obviously, probably going to

13   need to move it.

14          THE COURT:  And, again, you know, any scheduling

15   date, of course, is subject to modification for good cause.

16   So if we set a date -- let's just say sometime late fall --

17   the Government by August 1 files its notice of intention to

18   seek the death penalty, by that point you are fairly well

19   educated on the case, you have got your resources involved,

20   experts, those kinds of things.

21          As you point out, I don't think this case is, on

22   liability, on guilt is a complicated case.  I mean, it is a

23   one-defendant case.  And as you point out, there isn't DNA

24   evidence and these kinds of things.

25          But my point is, if it turns out that the case

1   requires more time and it is more complicated because of all

2   of the issues involved in a death case, and we have got it

3   set for trial in the fall and you need more time, really all

4   you need to do is you file a motion, and you say:  I need

5   more time to do this, that and the other thing, and there is

6   a high probability the Court would be receptive to that.

7         You know, the goal here in this kind of case from

8   the Court's perspective is really two-fold.  One, I do want

9   to have a very active role in management of the case.  But,

10   also, as a part of that, I want to make sure that the

11   Government has full and fair opportunity to fulfill their

12   function and, most importantly, I want to make sure you,

13   your co-counsel and your client have a full and fair

14   opportunity to defend herself and to properly prepare, and

15   that no one gets caught short because of the schedule

16   imposed by the Court.

17         Let's do this, just on timing.  Let's set, as I

18   mentioned the guideline before, which the Government will

19   file its notice of intention under the statute, as under

20   3593A, as August 1 of 2008.

21         And then -- August, September, October -- I'm

22   thinking tentatively a November trial setting.  And I'm

23   thinking of November 3.  That's before Judge Hodges.  And

24   that would set this matter then for a final criminal status

25   conference on October 23.

1          And what might happen in this case is -- I think

2   all of you have been to one of Judge Hodges' criminal status

3   conferences.  They are fairly perfunctory.  Judge Hodges

4   himself may want to schedule before this date a more

5   thorough final pretrial conference, for lack of a better

6   word.  But I would suspect if he opts to do that, he'll do

7   that sometime in the October time frame, as well.

8          The other thing I would like to do is I would like

9   to schedule some status conferences in this case.  I don't

10  know if we need to do it every month, but some set period of

11  time and everyone knows we have got a status conference, any

12  issues can be aired out.  I find that can make a case like

13  this move along a little more expeditiously.

14         The other thing we can also do to accommodate the

15  Government -- I know, Mr. Hogan, you're, I guess, from

16  Washington.

17              MR. HOGAN:  Yes, Your Honor.

18              THE COURT:  This courtroom has telephone

19  facilities.  You don't have to worry about being heard.

20  Ms. Adams could be here personally in court and you could

21  participate telephonically, or anyone else from your office.

22  So having status conferences isn't going to involve a whole

23  day or two flying from Washington to Ocala.

24              MR. HOGAN:  Thank you, Your Honor.

25              THE COURT:  Although I guess you can't really fly

1   to Ocala, but flying to central Florida.  So that's one of

2   the things I would like to do.

3          And then the other thing I did want to address was

4   budgeting and costs.  And I don't want to go into the

5   details of that on the record, Mr. Nielsen.  And what I

6   would like to sort of hear from you is sort of, in general,

7   what you have in mind in terms of experts and resources that

8   you think you might need.

9          And then I am going to ask you to go ahead and

10  prepare a budget, setting forth -- and we'll really do it in

11  two phases; I guess from here to August 1, and then from

12  August 1 through trial.  And you can detail in that budget

13  who your experts might be and suggested fees and those kinds

14  of things.  And that should be submitted to the Court ex

15  parte.

16          MR. NIELSEN:  I was just going to ask you that,

17  Your Honor.

18          THE COURT:  And procedurally how you ought to do

19  it is file an original with the clerk's office in a sealed

20  envelope and deliver to my chambers a copy.

21          MR. NIELSEN:  But not the original to you?  A copy

22  to you?

23          THE COURT:  Yeah; a copy to me.  And the original

24  will be in a sealed folder, and it will be noted on the

25  docket as a sealed file, and will be available, obviously,

OWEN & ASSOCIATES
P. O. BOX 157, OCALA, FLORIDA  34478
352.624.2258

1    for a higher court to look at so they will have a record of,

2    you know, what is in the budgeting.

3           And then what I will probably do, after I receive

4    that, I may establish, if necessary, really an in camera

5    discussion between myself and the defense team as to

6    benchmarks for what I think certain things should cost, and,

7    you know, we can go into things in a little more detail,

8    because I just don't think we could have that kind of

9    discussion with the Government listening.  And I think that

10   will give you some guidelines for how you are going to be

11   able to proceed in the case.

12          But having said all of that, just give me a

13   general overview what you have in mind in terms of immediate

14   needs; investigator, mitigation specialists.  And I will be

15   honest with you, I am not quite sure what are the

16   educational qualifications of a mitigation specialist.  But,

17   anyway, why don't you tell me what you have in mind.

18          MR. NIELSEN:  Well, Your Honor, I mean, you are

19   hitting the general ideas.  Usually -- a lot of times the

20   mitigation specialist can also wear a dual hat as an

21   investigator.  A lot of these people are able to do both.

22   But definitely would need a mitigation expert.  We're going

23   to want some type of investigation.

24          Typically, you're talking about a minimum of two

25   doctors.  And if one of them thinks she needs some scan or

1    something, that could become an issue.

2         THE COURT:  Doctors?  Your psychologists,

3    psychiatrists and possibly a neuro doctor?

4         MR. NIELSEN:  Right.  Judge, in this regard, I

5    would like to make sure -- I think this is what you are

6    authorizing me, and I want to make sure that I don't violate

7    your order.  But when we ask the Court for money in this

8    case to defend Ms. Sharma, we want to be able to do this as

9    if she had all her own money and all her own resources and

10   could go out and hire any doctor she wanted without the

11   Government knowing.

12        And I believe we are on the same page in reference

13   to that.  So you are going to allow us, only on the limited

14   issues of costs, to proceed ex parte and under seal for all

15   our applications in reference to that?

16        THE COURT:  Yes.

17        MR. NIELSEN:  Okay.  And then if we ever intend to

18   use these people, then, obviously, at some point we would

19   have to disclose the information.

20        THE COURT:  And then under the appropriate rules,

21   obviously, you would have to disclose.  And if there is a

22   psychiatric/psychological issue, the Government would get a

23   chance to have their own doctor maybe examine her, or

24   conduct psychological testing, or whatever the issue might

25   be.

1          But at this point, these individuals are your

2     experts to assist you.  They may or may not ever provide

3     testimony at trial.

4          MR. NIELSEN:  All right.  Well, the way we would

5     get started then is typically one of the experts would be

6     involved in doing some testing, won't get into any detail.

7     Another one would be involved to do perhaps a historical

8     analysis of any prior hospitalizations or anything like

9     that.

10         Sometimes from the testing, then you are told,

11    well, we think we got a red flag here, maybe some frontal

12    lobe damage or something, we need to have a scan.

13    Obviously, we don't know any of that.  So usually there's

14    two, maybe as many as three doctors.

15         Then, of course, we talked earlier about the

16    mitigation specialist.  We have got then -- probably either

17    way, even if they are not going for death, the Court would

18    allow us potentially a jury consultant at some time.

19         THE COURT:  Well, that's something to talk about.

20    Without ruling on the issue, I will tell you I am probably

21    not a fan of jury consultants, and Judge Hodges probably is

22    not either.  I don't want to speak for him, but --

23         MR. NIELSEN:  Okay.

24         THE COURT:  I am openminded.  It may be the kind

25    of situation that it makes sense.

1          MR. NIELSEN:  The resource counsel told me to go

2     for that one, Judge.  They were very helpful.

3          But as far as the pre-August date, really I think,

4     budgeting-wise, you know, it's pretty much where I have just

5     kind of outlined it, and maybe some type of crime scene

6     analysis, also.  But that almost maybe is more for the trial

7     part, too.

8          To get to this hurdle of whether or not they're

9     going to seek death penalty and my ability to present what

10    we want in mitigation, I think I have pretty much laid it

11    out, what we would be looking for.  Now, I would have to go

12    back and crunch all the numbers and stuff.

13         THE COURT:  When do you think you would be able to

14    get something filed under seal with the Court so I could

15    address the details of --

16         And here is what I am looking at, just so we are

17    on the same page.  Mitigation specialist, for example, tell

18    me who it is, who it is, where he or she is.  Because my

19    knee-jerk reaction is going to be that you should use

20    someone locally within the state of Florida.  You know, you

21    don't need to go to Alaska for someone unless maybe because

22    of particular issues in this case you need to do that.

23         But who it is, the c.v. for the person, so I will

24    know something about them; what their charge is, what their

25    rate is; and then some reasonable estimate of what you think

1    the fees may be.

2         Because how I would like to proceed is take that

3    information, and then I would establish for each of these

4    individuals a ceiling.

5         MR. NIELSEN:  Okay.

6         THE COURT:  And that doesn't mean that if you

7    needed to exceed the ceiling, you couldn't.  But in my view,

8    it's Murphy's Law.

9         MR. NIELSEN:  I understand, Judge.

10        THE COURT:  You know, if you say:  Well, take as

11   much time as you want, someone will take as much time as

12   they want.  So I think that allows -- you know, in my mind,

13   it's like I remember when I was a lawyer having given an

14   associate an assignment.  And I found out very early on in

15   my career that unless I told the associate a budget or

16   range, what I thought it would take to accomplish the task,

17   they do a great job, but instead of spending 14 hours on

18   something, they would spend 140 hours on it.  And I think

19   the same applies here, as well, with experts.  So give me a

20   ballpark on that.

21        MR. NIELSEN:  Well taken, Your Honor.  That will

22   be no problem.

23        THE COURT:  And then also on staffing on the case,

24   you have been appointed, Mr. Dowdy has been appointed.

25        MR. NIELSEN:  Yes, sir.

1           THE COURT:  Do you have paralegals within your

2    office or intend to use paralegals or --

3           MR. NIELSEN:  Judge, the answer is "no."  And I

4    don't know -- I haven't really thought it through to that

5    point, but we don't have someone on staff.  You know, we

6    have the normal available resources to lawyers.

7           But I will tell you this resource counsel, too,

8    has a whole bunch of stuff in there that's going to be

9    useful.  But to answer your question, "no."

10          THE COURT:  Okay.  Well, typically, criminal

11   defense lawyers do not have paralegals in their office.  And

12   a lot of what needs to be done can be done by a qualified

13   investigator.  But that's something, obviously, to give some

14   thought or consideration to.

15          MR. NIELSEN:  Yes, sir.

16          THE COURT:  Now, what about the issue of the

17   deadlines that -- the sort of prophylactic deadlines the

18   Court included in the standard scheduling criminal order.

19          And as you all know, this order is a standard

20   order that the Court uses which sets certain deadlines for

21   certain events under Rule 16 of the Rules of Criminal

22   Procedure.  And some of these deadlines may need to be

23   altered simply because of the nature of the case.

24          When I say "altered" -- I am just picking this out

25   because I happened to turn to it -- the order requires that

1    Brady material is delivered 11 days prior to the first day

2    of the trial term.  And that might not be appropriate in a

3    case like this.  We may need to move that time frame back a

4    little more, maybe not.  I'm not sure.  But that's something

5    I would like to give certainly some consideration to.

6            MR. NIELSEN:  Judge, certainly I don't mean to

7    interrupt you, sir, but Paragraph B on page seven I think

8    definitely needs to be changed.

9            THE COURT:  Yeah.  Yes, we would need to move

10   that.

11           MR. NIELSEN:  And, Judge, as you know, there is a

12   whole slew of motions that the defense would be, you know,

13   obligated -- I don't know if that is the right word, but I

14   would certainly be filing if the decision by them is to go

15   for death.  So that whole side issue there.

16           THE COURT:  Well, we will change the deadline for

17   filing motions and notices.  Typically, I say that

18   happens -- I don't want to say at midpoint in the case, but

19   in a standard criminal case, that would be about the halfway

20   mark.

21           I would probably set that deadline, with a

22   November 23 trial date, probably make that the beginning of

23   October, with the expectation that there would be motions

24   filed well before that, but in terms of a deadline.

25           Let me ask the Government, what about a deadline

 1   of the beginning of October for filing motions?  Does that

 2   seem workable?

 3             MS. ADAMS:  Yes.  Yes, Your Honor.

 4             THE COURT:  And, Mr. Nielsen, does that seem

 5   workable from your end?

 6             MR. NIELSEN:  Yes, Your Honor, with the obvious

 7   condition that I might need to ask to extend it.  But, yes,

 8   that seems workable, Your Honor.

 9             THE COURT:  Okay.  We'll make that October 1 as

10   the deadline for that.

11             What about some of these other deadlines,

12   Mr. Nielsen, in the scheduling order?  Do any of them leap

13   out at you that would need material modification?

14             MR. NIELSEN:  Well, Judge, I think your initial

15   inclination that a lot of these may have to be extended is

16   just probably going to be the way this case is going to play

17   out with what we are dealing with.

18             And I know this order is for the lion's share of

19   cases, but if I could just have the Court essentially make a

20   standing order that these things are flexible as opposed

21   to -- but I don't know.  I could try to figure out a couple

22   of them.  Did Your Honor have another one --

23             THE COURT:  Well, here is what I think is the best

24   way to proceed.  Rather than just arbitrarily picking dates,

25   maybe what I ought to have the Government and you do is to

 1   talk about these dates, and then have the parties file

 2   modified dates that you can agree to.  And to the extent you

 3   don't agree, you can file what each side suggests would be

 4   an appropriate date.

 5          And I think that's a good procedure in this case

 6   because -- and certainly, in my experience, the U.S.

 7   Attorney's Office is fairly forthcoming with regard to -- I

 8   don't want to use the word "open file" discovery, but it is

 9   rare, if ever, that I am called upon to have to rule on a

10   discovery dispute in a case like this.

11          So I would think that if both sides got together,

12   you would be able to come up with some workable dates.  And

13   what I would do is I would take those dates, and then embody

14   them in another scheduling order like this, and we could use

15   that as sort of a template for how we're going to proceed.

16          Ms. Adams, let me ask you, do you think that's

17   something that is workable, that you all would be able to

18   work out some new dates for the scheduling order, if you

19   were to chat with Mr. Nielsen?

20          MS. ADAMS:  Yes, Your Honor, I feel sure that we

21   could do that.  When would you like to have that?

22          THE COURT:  How about within ten days from

23   today --

24          MS. ADAMS:  Yes, sir.

25          THE COURT:  -- to file -- I guess I will have the

OWEN & ASSOCIATES
P. O. BOX 157, OCALA, FLORIDA  34478
352.624.2258

1   Government, I will put the burden on the Government here to

2   file notice with the Court addressing each of the dates in

3   the criminal standing scheduling order, and advising the

4   Court of dates that the Government and the Defendant have

5   agreed to and dates that you have not agreed to.

6          And if you don't agree, you can say the Government

7   suggests September 15th for this deadline, the Defendant

8   suggests August 15th.  And then I can review that, and then

9   make a call as to which date is appropriate.

10          MS. ADAMS:  Your Honor, I am actually going to be

11   out of the district all next week.  Would it suit you if we

12   said May 9th?  I think that might be about just a couple

13   more days.  But May 9th, Friday, May 9th?

14          THE COURT:  That will work just fine.

15          MS. ADAMS:  Thank you.

16          THE COURT:  We will make that May 9th, and that

17   will give you an opportunity to talk and figure out what

18   makes sense.

19          The other thing I also will probably do that I

20   normally do not do in other cases, in those rare cases where

21   you have a discovery dispute over a document, you know, you

22   are asking for one of the FBI reports, whatever they are

23   numbered, the 302s or whatever, and if there is some dispute

24   on getting information, the Government says:  No, we are not

25   required to give it under Rule 16, and you say that you are

1    typically, I would just have the parties brief it, and then

2    I do an order.

3            In this case, I will probably overly err in the

4    side of making in camera inspection of documents, issue my

5    ruling.  And then the document I looked at that I said you

6    can't have or can have -- I guess it's really in the case of

7    you can't have it -- that will be in a sealed envelope, it

8    will be part of the record.  And down the road, if a higher

9    court wants to take a look at it, they won't be guessing at

10   what I said you couldn't have.

11           MR. NIELSEN:  Yes, sir.

12           THE COURT:  So -- but, hopefully, there isn't too

13   much of that.  Again, I just don't think this case is overly

14   complicated.  I know death penalty cases are complex, but

15   just the guilt part of this case does not seem to be all

16   that complex.

17           Now, Mr. Nielsen, did I give you a date for --

18           MR. NIELSEN:  No.

19           THE COURT:  -- submitting the budget?

20           MR. NIELSEN:  No.  Could I have 30 days, Your

21   Honor?

22           THE COURT:  Okay.  That -- today is the 23rd.

23   Well, how about we do this.  Could we make it May 16th?

24   That will give you one, two, basically three-and-a-half

25   weeks.  Let's make it Friday, May 16th.

```
 1              And as I mentioned, I will probably schedule some

 2   type of in camera conference --

 3              MR. NIELSEN:  Yes, sir.

 4              THE COURT:  -- to review that with you and your

 5   co-counsel.

 6              And then in terms of status conferences, I was

 7   thinking of setting a date once a month.  And if for some

 8   reason there is nothing to discuss -- you know, I mean, I

 9   like talking to the lawyers, but not that much.  I have

10   other things to do.  If there is really no compelling reason

11   for it, you know, I can always cancel it.

12              But that way everyone has a date certain on their

13   calendar, and to the extent issues are percolating between

14   the parties, disputes, the parties will know they are going

15   to get a chance to talk to the Court on X date.  And that

16   also might help to move things along.

17              So why don't we set a status conference, maybe the

18   first one for the -- I was going to say the end of May.  I

19   don't know what's going to be going on in the case, but that

20   would be --

21              Well, let me ask, what -- do you have a preference

22   for days?

23              MR. NIELSEN:  Mondays are the worst.

24              THE COURT:  Okay.  How about on a Friday?  I don't

25   seem to have a whole bunch of things on Friday.  I was going
```

1    to set May 30th.  Now, when is Memorial Day?

2              MS. ADAMS:  The Monday before that.

3              THE COURT:  It's the 26th?

4              MS. ADAMS:  Yes.

5              THE COURT:  So we will set a status conference on

6    May 30th.  And then a status conference on -- well, I am

7    going to set another one on June 27th.  I know that's less

8    than a month, but if I did it that last Friday, that takes

9    us to July 4th, and that's problematic for me.

10             And then the next one after that will be August 1.

11   And then September -- I'm sorry -- October 3.  And we will

12   leave it at that.

13             MR. NIELSEN:  Yes, sir.

14             THE COURT:  So May 30th, June 27, August 1, and

15   October 3.  And the Government is permitted to attend by

16   telephone.  And all you need to do, Ms. Adams, if Mr. Hogan

17   or someone else from Washington is going to attend, just let

18   my courtroom deputy know, and we will provide you with the

19   instructions, how to dial in.

20             But your voice comes through the loud speakers, as

21   if you are in court.  I just don't get to see you.  And it

22   is digitally recorded, so it's the closest thing to actually

23   being here in court.

24             Now, let's see if there are any other issues that

25   we ought to address.  Well, let me ask you, Mr. Nielsen, are

1    there any other case management issues or any other issues

2    that you have identified that you think we ought to chat

3    about now that might help you in your ability to effectively

4    defend your client?

5              MR. NIELSEN:  Not at this time, Your Honor.  So

6    you know, sir, I have received discovery and starting to

7    file through that.  And like I said, with the government

8    resources, I feel pretty good right now.

9              THE COURT:  Okay.  And, Ms. Adams, on behalf of

10   the Government, is there any issues the Government would

11   like to raise at this point?

12             MS. ADAMS:  No, no issues, but I do have one

13   question.  We presently have a status scheduled on May 22nd

14   before Judge Hodges.  Will that be cancelled?

15             THE COURT:  Yes.  Yes.  The -- what I will do is I

16   am going to enter an order memorializing what we have

17   discussed here.  That will continue the trial, that will

18   cancel the status conference.  And I will make sure I put a

19   finding in there that the reason I am doing this is because

20   of the nature of the case and I am doing this in -- with the

21   Defendant's approval, and that clearly the interest of the

22   public and the Defendant in a speedy trial are certainly

23   outweighed by all of these other things that we have chatted

24   about.

25             And then I will not be entering an amended

OWEN & ASSOCIATES
P. O. BOX 157, OCALA, FLORIDA  34478
352.624.2258

1    criminal standing scheduling order until I receive the

2    filing from the parties on May 9th.  And then from those

3    dates, I will issue another scheduling order and you will be

4    back on the calendar.

5                One other issue I did want to talk about,

6    Mr. Nielsen, is the issue of interim payment of fees, which,

7    obviously, in a case like this, the Court would authorize.

8                If you could address in your sealed filing that

9    you are going to make what you would request would be

10   appropriate for interim payment of fees and expenses.

11   Because that would be the only possible way that you could

12   adequately defend your client in this case.

13               I am just not sure exactly how I will do that and

14   what would be the time period.  And, most likely, expenses

15   could be submitted really as they are incurred, because you

16   shouldn't be required to fund the costs of the

17   representation.

18               And attorneys fees would be submitted on an

19   interim basis and a portion of those fees would be approved.

20   And there might be some hold-back, that kind of thing, but

21   some system that would allow you to be timely and adequately

22   compensated for the services.

23               And so if you would address that separately in the

24   sealed filing, that would certainly be of a benefit to the

25   Court.

```
1              MR. NIELSEN:  Sure.

2              THE COURT:  Okay.  Any other issues the other side

3    would like to raise?

4              MR. NIELSEN:  Not from the defense, Your Honor.

5              THE COURT:  Ms. Adams?

6              MS. ADAMS:  No, Your Honor.

7              THE COURT:  Thank you very much.  Thank you for

8    your time, and I look forward to receiving your filings, and

9    we will see each other, I guess, on the 30th of May.

10             MR. HOGAN:  Thank you, Your Honor.

11             MR. NIELSEN:  Thank you, sir.

12             THE COURT:  Thank you.

13             (Thereupon, the proceedings in this case for this

14   date were concluded at 3:04 p.m.)

15                        -   -   -

16                  C E R T I F I C A T E

17   I hereby certify that the foregoing is an accurate

18   transcription of proceedings in the above-entitled matter.

19

20   --------------------------------        -------------------
     Kelly Owen McCall, RPR, FPR              Date
21   Stenographic Court Reporter

22

23

24

25
```

OWEN & ASSOCIATES
P. O. BOX 157, OCALA, FLORIDA  34478
352.624.2258