```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF FLORIDA
 2                          OCALA DIVISION

 3                  Case No. 5:08-cr-23-Oc-10GRJ

 4                         August 1, 2008
                          Ocala, Florida
 5

 6  UNITED STATES OF AMERICA,

 7             Plaintiff,

 8  vs.

 9  ERIN SHARMA,

10             Defendant.

11  _____/

12

13

14

15        TRANSCRIPT OF DIGITALLY-RECORDED STATUS CONFERENCE
              BEFORE THE HONORABLE GARY R. JONES,
16               UNITED STATES MAGISTRATE JUDGE

17

18

19

20  Appearances of Counsel:

21       For the Government:

22            Mr. Gerard V. Hogan

23       For the Defendant:

24            Mr. Michael William Nielsen

25  Transcribed by:    Dennis Miracle, Official Reporter
```

*Dennis Miracle, Official Reporter (352) 622-7212*

<pre>
 1                    P R O C E E D I N G S
 2          THE COURT:  Good morning, everyone.  I apologize for
 3   keeping you all waiting.
 4          This is United States versus Erin Sharma,
 5   5:08-cr-23.
 6          Michael Nielsen is representing Ms. Sharma.  And
 7   who's appearing on behalf of the government?
 8          MR. HOGAN:  Your Honor, Jerry Hogan for the
 9   government.
10          THE COURT:  Okay.  Good to see you, Mr. Hogan.
11          I had scheduled a status conference for this morning,
12   and one of the issues, I guess, we were going to address was
13   the status of the government's notice of intention whether to
14   seek the death penalty.  I think I had suggested a deadline of
15   today -- I think it was today, August 1 -- for that.  So why
16   don't I turn to you, Mr. Hogan, and tell me the status of the
17   government's decision-making.
18          MR. HOGAN:  Your Honor, we were -- we were just
19   notified this very week by Attorney General Mukasey that we
20   were authorized to tell the Court that we were not seeking the
21   death penalty in this case.
22          THE COURT:  Now, will the government actually be
23   filing some notice of declination?  I know when you do seek the
24   death penalty, you are required to file the notice, and there
25   are certain things you have to put in it and maybe even amend
</pre>

1    the Indictment in some way.  But when you decline to do so, is

2    there something that is normally filed?

3           MR. HOGAN:  Your Honor, I checked with our Capital

4    Crimes Unit, and they said that the standard protocol is to not

5    file something when you have not in the original Indictment put

6    the special findings in the Indictment.  So there are no

7    special findings in this Indictment.  Accordingly, their

8    recommendation was that we not file anything.  But if the Court

9    would prefer us to file something, that's fine.

10          THE COURT:  Well, no.  And I think you answered my

11   question, because the Indictment does not have the particular

12   allegations.  I guess if they were there, then there would

13   be -- you would need to have something in writing and on the

14   docket.  But the Indictment obviously does not have that, and

15   that -- obviously that's probably the understatement -- changes

16   the complexion of the case.  And I don't want to say this is

17   just a standard criminal case now, but certainly a lot of the

18   things that would be done if the government had decided to seek

19   the death penalty will no longer be necessary.

20          Now, the trial date that I scheduled in this case --

21   I just don't have it in front of me.

22          MR. HOGAN:  November 3, I believe, Your Honor.

23          THE COURT:  November 3.  I assume we can still stick

24   with that trial date from the government's perspective?

25          MR. HOGAN:  From the government's perspective, that's

1   a fine date, Your Honor.

2        THE COURT:  Okay.  Well, let me talk to Mr. Nielsen

3   and see how this changes his view of the case.  And why don't

4   we start off with the trial date, Mr. Nielsen.  We've got it

5   set for November 3.  What is your view as to whether that is a

6   sufficient date?

7        MR. NIELSEN:  Your Honor -- good morning, sir -- with

8   the death penalty coming off the table, the defense does not

9   view that date as a problem.

10        THE COURT:  Okay.  And that would obviously give you

11   more than enough time to prepare for trial.

12        Since the government is not seeking the death

13   penalty, I guess there is no longer a reason under 18 U.S.C.

14   3005 for there to be two counsel in this case.  I know it's

15   discretionary with the Court -- really, in any case where there

16   is court-appointed counsel -- whether to have one or two

17   lawyers.  But do you see any reason why it's necessary in this

18   case to have two lawyers representing your client?

19        MR. NIELSEN:  Well, Your Honor, I -- I did -- we --

20   we got word from Ms. Adams, I think, on Tuesday that they were

21   not seeking the death penalty on Ms. Sharma.  And, of course,

22   the first person I told was my partner, because he was right

23   there, and we started thinking this through.

24        And, quite frankly, what I am prepared to do is

25   request that in -- at this time if Mr. Dowdy could stay on.

1  And I can tell you why I'm making this request.  We have had

2  some preliminary discussions with the government about certain

3  parameters that if, in fact, Ms. Sharma decided to not contest

4  the charges and reach some type of agreement, perhaps assist

5  the government, you know, penalties and so forth -- we're very

6  early in that process.  But right now we're not really close to

7  that.  And because there's still a very good chance this case

8  may be litigated all the way through a trial, I am requesting

9  on Ms. Sharma's behalf and my own behalf to keep Mr. Dowdy

10  available.

11        The -- there's voluminous discovery in the case,

12  Judge.  There's a lot of different players and factors going

13  on.  The government, you know, is going to have a really

14  well-represented team there and I'm just -- what I would --

15  this is what I would ask if it's -- if it's possible:  Until we

16  know that there's not going to be an agreement, I would -- I

17  would ask that he could stay on the case.  And if, in fact, we

18  did reach an agreement, obviously then, you know, he wouldn't

19  be needed.

20        But, Judge, this trial could be maybe a week or so in

21  length.  And just with the fact of -- I think she's still

22  facing a potential penalty of life in prison --

23        THE COURT:  Right.

24        MR. NIELSEN:  -- with no parole, and in an abundance

25  of caution, I would just feel more comfortable having my

partner with me.  But, you know, I understand the Court's
balancing decision here, so...

THE COURT:  Well, tell me generically what role you
see Mr. Dowdy adding to the mix if he stays on the case.  I
don't want you to tell me your defense strategy.  But I'll give
you an example:  If one of the issues in this case -- let's say
there were a host of potential witnesses that needed to be
interviewed, and a number of these witnesses were inmates
which, you know, you just can't get in your car and drive to
the prison and knock on the door and say, I want to talk to
Harry -- it's a little more difficult to get access to
individuals in the custody of the Bureau of Prisons.

If there's a necessity for two lawyers because of
that, and because of possibly some legal issues, as well as one
of the issues you've obviously raised -- even though this is
not a death penalty case, your client faces a very serious
penalty if she is convicted, as you pointed out, life
imprisonment.  So is there any particular role that Mr. Dowdy
is fulfilling, and is there a division of labor between you and
Mr. Dowdy in representing Ms. Sharma?

MR. NIELSEN:  Judge, this is the way we work it, and
this is based on him and I doing these cases for a number of
years together.  Essentially what we do is we both work them up
on our own but at the same time together.  We get to a point
where there is a division of labor after we both review the

1    discovery.  We literally will split up the witnesses, split

2    things, perhaps, like opening and closing, and just basically

3    we -- we share the responsibility together.

4            Now, I know I can do this on my own.  That's not the

5    problem.  It's just I -- I think this case is different than

6    the typical case that maybe comes in here, and I just feel with

7    the gravity of the situation to have him there as a sounding

8    board as my co-counsel in trial, coordinating -- here's a silly

9    example, but just coordinating witnesses can sometimes be very

10   problematic when you're in there by yourself.  And I do

11   anticipate, if we go to trial, we are going to have a defense

12   case to put on.

13           Just -- it could be something that seems kind of

14   silly like that, but, you know, the government normally would

15   have a support staff, and all of that, that kind of helps them

16   with that.  So I'm just maybe trying to level the playing field

17   a little bit, too, if that's another way to put it.

18           I can tell you this:  Now that the death penalty is

19   waived, you know, the earlier experts that you've appointed, I

20   guess, we're not going to really need anymore.  So, you know,

21   if there's budgetary concerns in reference to that, that maybe

22   could be considered.

23           But, Judge, you know, like I said earlier, I know I

24   can get through this on my own; but if it is possible to leave

25   him while it's still in the trial posture, that's -- that's our

1    request.

2           THE COURT:  Well, let me follow up on a point that

3    you just made.  You just told me that if the case goes to

4    trial -- who knows if it will or will not, but we operate under

5    the assumption that it would.  This is the kind of case where

6    there would be a defense case as opposed to a typical drug

7    case -- and I'm not saying there isn't a defense -- but it is

8    more attacking the government's evidence than putting on your

9    defense.  So you suggest there would be some type of defense

10   case if it went to trial.

11          And the other thing you mentioned is, there is a

12   fairly voluminous amount of discovery in this case.  And,

13   again, without telling me all the details of what's in the

14   discovery, generally what does discovery consist of?  I mean,

15   these are just all of the law enforcement reports of the

16   investigation that you've been provided with.  Are there audio

17   or videotapes?

18          MR. NIELSEN:  I've been made aware that there is some

19   tapes of some of the activity but by no means, Judge, is there

20   a lot.  Basically there's, like you said, a synopsis of

21   witnesses' testimony.  A lot of it is medical records about the

22   victim, which really don't play necessarily into our

23   situation.

24          There's reports of statements.  My client, for

25   example, three different times sat down and was interviewed.

1  There's all reports of that.

2       We did just recently, within the last two weeks,

3  receive an additional stack of witness statements, and I did

4  talk to the government before court, and I think it's fair to

5  say the vast majority of everything is in.  The only things, as

6  I understand it, that may still be coming is if they -- if

7  there's additional witnesses that they feel they may be using

8  and there's information pertaining to those people, they would

9  provide that, too.

10       You know, Judge, I don't want to misrepresent the

11 discovery as being overwhelming because, quite frankly, it's

12 not.  There's no -- it's not -- there's not physical analysis

13 of evidence.  There's not DNA, and so forth, in this case.  So

14 I'm not at all -- I'm not comfortable representing that that's

15 why I'm asking for Mr. Dowdy.  It's more the severity of the

16 case, the likelihood right now of the trial, and just all those

17 other factors I described earlier.

18       THE COURT:  Is it your understanding that the lion's

19 share of the case against your client may consist in part based

20 on testimonial evidence from other Bureau of Prisons

21 correctional officers?

22       MR. NIELSEN:  Yes, sir.

23       THE COURT:  Okay.  And what role, if any, do you see

24 from an evidentiary standpoint Mr. McCulloch would play --

25 would play in this case?

1          MR. NIELSEN:  Mr. McCulloch?

2          THE COURT:  Yes.

3          MR. NIELSEN:  I -- I don't think he'd play any role

4    in Ms. Sharma's case.

5          THE COURT:  Right.  I mean, I know you're not going

6    to -- well, I don't know if you're going to call him.  Do you

7    anticipate the government would involve him in this case?

8          MR. NIELSEN:  I don't know, Judge.  I mean, I -- I

9    would be a little surprised because my understanding is that

10   they very well may seek the death penalty on Mr. McCulloch.

11         THE COURT:  Right.

12         MR. NIELSEN:  But I guess that's a possibility.  I --

13   I don't know.  That's an interesting question.  That I don't

14   know the answer to.

15         THE COURT:  Okay.  I'm just throwing that out

16   because, I mean, the knee jerk reaction is I can't believe you

17   would list him as a witness, although you never know.  I

18   mean --

19         MR. NIELSEN:  Well --

20         THE COURT:  -- maybe he becomes an essential witness

21   for the defense in some way.  I have no idea.  We -- there's no

22   secret in saying he is also the target --

23         MR. NIELSEN:  Right.

24         THE COURT:  -- of a federal investigation.

25         MR. NIELSEN:  Well, if we had word, Judge, for

 1    example, that Mr. McCulloch was willing to step forward and

 2    exonerate Ms. Sharma, I'm sure we would try to use her.  His

 3    lawyers would probably try to block that.

 4            THE COURT:  Right.

 5            MR. NIELSEN:  But I'm not aware of at this point his

 6    willingness to do that, so --

 7            THE COURT:  Okay.  And there's all kinds of issues.

 8    I don't see the government dragging him in here as a witness

 9    against your client.

10            MR. NIELSEN:  Yeah.

11            THE COURT:  So anyway, the -- your view of where this

12    case is headed, it will -- the government's case will consist

13    partly based on testimonial evidence from other correctional

14    officers as well as I guess there will probably be information

15    your client provided during interviews.

16            MR. NIELSEN:  Right.  And then potentially there may

17    be some inmates that have some relevant information.

18            You know, there is going to -- there is going to have

19    to be a fairly lengthy evidentiary hearing if, in fact, we

20    can't reach an agreement in reference to three statements that

21    Ms. Sharma has made.  So that's a -- that's another thing that

22    needs -- that's, kind of, floating out there.

23            THE COURT:  So you anticipate there will be motions

24    to suppress as to some or all of those statements.  And also,

25    putting aside Mr. McCulloch, you anticipate that in the

1  government's case there could be one or more inmates that might

2  testify?

3           MR. NIELSEN:  That's my understanding from reviewing

4  the discovery, Your Honor --

5           THE COURT:  Okay.

6           MR. NIELSEN:  -- and conversations and so forth.

7           THE COURT:  Okay.  Well, let's do this.  With regard

8  to the status of counsel for Ms. Sharma, I'm going to think

9  about it.  Mr. Dowdy's still on the case.

10          You say something that catches my attention.  You say

11 you want the playing field to be level.  And, of course,

12 that -- you know, a court always wants to make sure that

13 everyone's interests are adequately represented.

14          I'm very sensitive to the fact that, although I'm

15 sure from your client's perspective there's a great burden

16 lifted from her shoulders, that she is not facing the death

17 penalty.  As we've mentioned several times, the statute does

18 provide, if she is convicted, for a life sentence, which is

19 certainly a very harsh and very severe sentence.

20          And I would not want in any way, if your client was

21 on the losing end of things here and was convicted, to be able

22 to make any argument that in some way she didn't have full and

23 fair and adequate and effective representation of counsel.  So

24 I'm going to give it some thought.

25          But I'm also reading between the lines that you and

1    Mr. Dowdy -- Mr. Dowdy's role in this case -- for lack of a

2    better word, he's not running up the hours and you're running

3    up the hours.  The two of you are working together and he's

4    assisting.  But this isn't a situation where you have two

5    lawyers doing the work of one, and that's essentially, I think,

6    what you're telling me.

7         MR. NIELSEN:  Well, Judge, I can't say that some of

8    our work doesn't overlap because I know that it does and -- but

9    we definitely would assign very specific tasks that the one

10   lawyer would do that the other one would just maybe kind of

11   know about and not -- not do.

12        The thing is, though, I think there's like -- the

13   case is going to have a life, and there's going to be a certain

14   amount of work that needs to be done.  Whether I'm doing it all

15   myself or I'm doing part of it and he's doing part of it, I

16   think there's a certain amount of time that's going to be

17   invested.

18        There's no doubt, Judge, if the two of us are in it,

19   it's going to be more costly than if we're not.  I...

20        THE COURT:  One of the other things that I think the

21   Court might be able to do that would make sense -- as things

22   stand now, I have not required, nor have you requested, for

23   permission to submit interim vouchers.  And we broached that

24   issue previously in the case.  That might be something that

25   makes sense, to have you all submit interim vouchers, and in

 1  that sense then the Court gets an idea of what's going on.
 2  It's certainly not my role to micro manage the defense of a
 3  case, but, you know, we can all agree how much time
 4  representing a defendant in a case like this would clearly be
 5  outside the bounds of reasonableness and excessive, and we all
 6  know a general range based on our collective experience what
 7  would be a reasonable range of time to provide effective
 8  representation.
 9          And, you know, if I was to require interim -- I'm not
10  saying I'm doing this; it's just a thought -- interim vouchers
11  and, you know, the Court gets some sense about what's going
12  on -- but if we have a trial date on November 3, there really
13  aren't going to be many interim vouchers.
14          MR. NIELSEN:  Well, Your --
15          THE COURT:  There are only two intervening months.
16  I'm not sure if that -- if that accomplishes anything.
17          Well, let's do this.  I -- Mr. Dowdy is still on the
18  case.  There's an order entered appointing him.  I'm going to
19  give this some thought and see what happens.  And if I conclude
20  that only one lawyer should be on the case, I may set another
21  hearing, we can come back and discuss it, I may issue an order,
22  or I may agree with you that at this juncture it probably is
23  the prudent thing to allow both of you to stay on the case.
24          I think I -- to be honest with you, I would have a
25  different view if trial was, you know, a year from now and

1   we're going to have two lawyers, it's not a death penalty

2   case -- I think I would have some problems with that.  But you

3   are actually at this point getting very close to trial, and

4   there's only so much two lawyers can do in a -- in a couple of

5   months on a case like this.  So I'll give it some thought.  But

6   as things stand now, Mr. Dowdy will stay on the case.

7            With regard to experts that I've approved, certainly

8   there are some of the experts that now might not be necessary.

9   Would you agree with that?

10           MR. NIELSEN:  Judge, I can tell you right now that

11  almost a hundred percent I'm not going to be using Dr. Golden

12  for anything.  That's the neuropsychologist.

13           And, in fact, if you remember our last status

14  conference, you wanted me to get started on that part of the

15  case.  She did have her appointment with Dr. Danzinger, but I

16  was waiting for today because it -- partly because the

17  scheduling -- Dr. Golden's schedule.  He's waiting for me to

18  get back to him and let him know that the government is or is

19  not seeking the death penalty.  And the way it was left with

20  him was if they're not, then he probably wouldn't participate

21  in the case.  He hasn't -- I don't think he's done anything at

22  this point.

23           THE COURT:  So you don't need Dr. Golden.  What about

24  the psychiatrist, Dr. Danzinger?

25           MR. NIELSEN:  I'm going to want to keep

1   Dr. Danzinger, Judge, because his testimony could become

2   relevant in some type of sentencing hearing.  I -- I don't

3   anticipate him -- he would not be a guilt -- well, there's only

4   one phase at this point.  He wouldn't be a trial witness.

5   We're not claiming insanity or competency or anything like

6   that, but there is some, perhaps, relevant information that a

7   judge at the time of sentencing would take into consideration.

8   But he wouldn't -- between now and if we get to there, I

9   don't -- there's nothing else that he would really need to do.

10          THE COURT:  Well, then, you can -- I've entered an

11  order on that.  Dr. Danzinger can -- I've given authorization

12  for that.  That will still apply.  But with regard to

13  Dr. Golden, there is now no further reason to use him as an

14  expert.

15          MR. NIELSEN:  I think that's a fair representation,

16  Judge.  I did -- I'm just thinking here, though.  I -- she --

17  we had a slight -- well, actually, I don't -- this is something

18  we need to talk to you about ex parte.  It doesn't really

19  change anything we just talked about.  But if you want me to in

20  a minute, I'll tell you but...

21          THE COURT:  Okay.  We can have an in camera

22  discussion on that --

23          MR. NIELSEN:  All right.

24          THE COURT:  -- in a moment.

25          And were there other experts authorized?

1    MR. NIELSEN:  You appointed an investigator for us,

2    which we would also like to keep available at this time.

3         THE COURT:  Well --

4         MR. NIELSEN:  Judge, we haven't given him -- I don't

5    think we've assigned him a major task even at this point yet,

6    so -- but he -- he -- he's going to be someone that's going to

7    help us in perhaps contacting some of these people like you

8    described earlier at the jail.

9         THE COURT:  Well, I think in a case like this, with

10   the potential penalty and because of the nature of the case --

11   it takes place in a prison setting -- that you would be

12   entitled, even without the death penalty, under the CJA to the

13   appointment of a private investigator, and I've issued an

14   authorization with a limit on that, so that will -- that will

15   continue.

16        Now, what other scheduling issues did -- did my order

17   scheduling the trial for November -- I know we all

18   contemplated, if the death penalty was sought, we may have to

19   go back to the drawing board and redo the deadlines.  But are

20   all of the other dates imposed by the Court -- are they still

21   appropriate?

22        MR. NIELSEN:  I think the only other date, Judge,

23   that you have set is an October 3 status conference.  I might

24   be wrong on that but...

25        THE COURT:  I'm trying to find my scheduling order.

1   There it is.

2           Okay.  Let's -- the -- okay.  The deadline for filing

3   motions was April 30, and obviously that date probably doesn't

4   make sense at this point particularly in view of the fact that

5   you've suggested that you may be filing a motion to suppress,

6   or motions to suppress.  So what I'd like to do is to schedule

7   a deadline for you to do that.

8           MR. NIELSEN:  Yes, sir.  I think that's appropriate,

9   Your Honor.

10          THE COURT:  Based on what you know about the case at

11  this point -- and we've got a November 3 trial date, we've got

12  a -- I think I'm looking at the wrong scheduling order.  I am.

13  Strike that.

14          MR. NIELSEN:  You know, Judge, I think maybe you

15  changed that to 10-1, because I somehow crossed out April 30

16  and wrote in 10-1 --

17          THE COURT:  Right.

18          MR. NIELSEN:  -- on my order.

19          MR. HOGAN:  That's the government's recollection as

20  well, Your Honor.

21          MR. NIELSEN:  Is that right?

22          THE COURT:  Yes.  Notice -- okay.  Here we are.  Yes,

23  I entered an order on May 12 and rescheduled the deadline for

24  filing motions as October 1.  You're correct.  So that is

25  certainly more than reasonable.

1        Yes, that should -- I suspect suppression issues

2   aren't going to be that complicated.  So if motions are filed

3   and there were suppression motions, in all likelihood I would

4   want to set the suppression hearings as early as possible in

5   October so that they could be addressed and resolved before the

6   status conference.

7        I would just urge you to file your motions to

8   suppress, if you intend to do so, sooner as opposed to later.

9   Try not to wait until October 1.

10       MR. NIELSEN:  I will, Judge.  What I'm going to do

11  is -- the month of August is going to be the month for -- we

12  either work something out or we don't.  And then from there on

13  out, I mean, I -- I can -- those motions are not hard to file,

14  and we'll get them filed well in advance of that October 1

15  date.

16       The only other motion I know about right now is a

17  motion in limine, and that's not going to be hard to do.  Now,

18  there may be some other things that come up during the rest of

19  the discovery, but that's where we're at with that.

20       THE COURT:  And then, lastly, while you're on the

21  issue of discovery, in your view is there any other discovery

22  that is outstanding under Rule 16?  In other words, is there

23  anything that you are aware of that you believe you're entitled

24  to that you've asked for that the government has said they'd

25  give you that you don't have?

1          MR. NIELSEN:  No, sir.

2          THE COURT:  Okay.  Are you aware of anything that

3  you've asked for that the government has said they have but

4  they're not going to give you?

5          MR. NIELSEN:  No, sir.

6          THE COURT:  Okay.  Okay.  So this -- I don't want to

7  say the case is easy.  Cases are never easy.  But certainly it

8  is much more narrow, and it doesn't look like we're going to

9  have discovery disputes.  So it appears that what will be

10  happening is there may or may not be a plea at some point.

11  There may be motions to suppress filed, which the Court will

12  try to address promptly.

13          I will give some thought to the issue of Mr. Dowdy

14  continuing on.  He is entitled to until you hear from me

15  otherwise.

16          Any other issues other than -- there's the one issue

17  you said you wanted to address with the Court in camera.

18          MR. NIELSEN:  Yes, sir.  No, Judge.  I just want to

19  make sure, though, that the record's clear, because all these

20  continuing education seminars and stuff that we attend, they --

21  they -- every -- they always encourage us, as much as we can,

22  to encourage the judges to please allow us to, you know, like I

23  said, even the playing field a little bit.

24          And I just know, Judge -- I'm thinking how this is

25  going to play out, because if we end up in trial, it -- it's

1  going to be a machine over here basically against me and little

2  Ms. Sharma other here.  And I'm not trying to, you know, sound

3  silly in a way, but you're going to have Ms. Adams, Mr. Hogan

4  in from Washington -- I'm sure Mr. Raby is going to be there --

5  they're going to have other support staff.  They're going to

6  have a big machine.  And I just would feel a lot better if I at

7  least had my trusty partner there that I could use as a

8  sounding board and so forth.  So whatever that's worth, Judge,

9  we -- we would ask that.

10         THE COURT:  Well, I think we all agree -- I think the

11  parties would not argue with me -- that although the death

12  penalty is not being sought in this case, from the government's

13  perspective this case is very serious because, you know, the

14  allegation is that it resulted in the death of an inmate.

15         So I suspect that the government will apply all of

16  its resources to this and -- to fulfill their

17  responsibilities.  And obviously from your client's

18  perspective, to the extent that, you know, this case goes to

19  trial, she will need to have a vigorous and well-thought-out

20  defense, because this could be a -- could be a battle.  And

21  it's -- you know, it's not just, you know, a typical kind of

22  drug case we get here in Federal Court.  I'm well aware of that

23  and --

24         MR. NIELSEN:  Thank you, Your Honor.

25         THE COURT:  -- I'll keep that in mind --

1      MR. NIELSEN:  Thank you.

2      THE COURT:  -- in making a decision on whether it is

3  appropriate to continue with two counsel.

4      Okay.  Mr. Nielsen, other than the one in camera

5  matter that you mentioned, anything else from a scheduling

6  standpoint on behalf of the defendant?

7      MR. NIELSEN:  No, sir.

8      THE COURT:  Okay.

9      MR. NIELSEN:  And all your points are well taken

10  about -- I'm not going to wait until, like, you know,

11  September 28 to --

12      THE COURT:  Yes.  And, Mr. Hogan, from the

13  government's perspective, are there any other scheduling issues

14  or any other issues that you need to raise?

15      MR. HOGAN:  The government has none, Your Honor.

16      THE COURT:  Okay.  Well, thank you very much.

17      What I ought to do, Mr. Nielsen, at the -- rather

18  than clearing the courtroom, at the conclusion of the hearing

19  why don't you come back in chambers; you can address the

20  in camera matter.

21      And so we have a clear record on this, the in camera

22  matter -- this relates to an expert or something that was

23  brought to my attention previously on an ex parte basis, is

24  that right?

25      MR. NIELSEN:  Specifically on the issue that you just

1  described.

2  THE COURT: Okay. Okay. Very good, then.

3  Okay. Court's adjourned. Thank you very much.

4  MR. HOGAN: Thank you, Your Honor.

5  (Thereupon, the proceedings in this case for this

6  date were concluded at this time.)

7

8

9

10

11

12

13

14

15  C E R T I F I C A T E

16  I, Dennis Miracle, Official Court Reporter, do hereby

17  certify that the foregoing proceedings were transcribed by me

18  from a digital record that was produced by the United States

19  District Court for the Middle District of Florida and is a true

20  and accurate record of said proceedings to the best of my

21  ability, based on the quality of the recording.

22

23

24  s/Dennis Miracle                    August 12, 2008
   _____          _____

25  Dennis Miracle                          Date