UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                                         5:08-cr-23-Oc-10GRJ

ERIN SHARMA

_____/

## REPORT AND RECOMMENDATION[1]

Pending before the Court is Defendant's Motion to Suppress Statements (Doc. 47) to which the United States filed its Response in Opposition. (Doc. 54.) An evidentiary hearing was held before the undersigned on December 18, 2008 and therefore the matter is ripe for review.  For the reasons discussed below, Defendant's Motion to Suppress Statements is due to be **DENIED**.

## I. Introduction

The Defendant is charged in this case in a two count indictment with conspiracy to violate the civil rights of a  federal prison inmate resulting in the inmate's death in violation of 18 U.S.C. § 241 and aiding and abetting in the deprivation of the civil rights of federal prison inmate in violation of 18 U.S.C. § 242. Defendant - who at the time was a correctional officer employed by the Bureau of Prisons at FCC-Coleman - seeks to suppress statements she made to investigators and prosecutors on three occasions in 2006 and 2007 as part of the investigation by federal authorities of the death of Richard

---

[1] Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

Delano, a federal inmate at FCC-Coleman. The first statement Defendant seeks to suppress was made to Federal Bureau of Investigation ("FBI") Special Agents, James Raby, Jr. and Jeffery Bolin at FCC-Coleman on January 9, 2006. The second statement, also made to Special Agents Raby and Bolin at FCC-Coleman, was made during an interview on June 19, 2007. The last statement Defendant seeks to suppress is her statement made to Special Agent Raby, Assistant United States Attorney (AUSA) Carolyn Adams, and Department of Justice Attorneys Gerald Hogan and Douglas Kern at the United States Attorney's Office in Orlando, Florida on June 29, 2007.

Defendant argues that all three statements were made and taken in violation of her rights under Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). Defendant further contends that the statements were not voluntarily made "in light of the totality of circumstances." Finally, according to Defendant, the statements were taken in violation of her constitutional right to counsel.

## II. Evidence And Testimony

Special Agent Raby testified as the primary witness for the United States. The Defendant, Erin Sharma, testified in support of her request that her statements be suppressed. The United States also offered Agent Bolin as a rebuttal witness.

Special Agent Raby, an experienced FBI agent, has been employed by the FBI for twelve years and is the resident agent at the FBI offices located at FCC-Coleman. In his capacity as the resident agent at FCC-Coleman, Agent Raby is in charge of investigating possible violations of federal law which occur at the prison. During the course of performing his duties, he initiated a criminal investigation into the homicide of Richard Delano, a federal inmate at FCC-Coleman, in March 2005. According to Special

Agent Raby, he decided to interview the Defendant, a correctional officer, because she was a possible witness to some of the events leading up to Mr. Delano's death. Agent Raby submitted a request through the Federal Bureau of Prisons (BOP) to have Defendant relieved from her duties early so that he could interview the Defendant on January 9, 2006, at  the FBI office located within the administrative building at FCC-Coleman. Special Agent Raby arranged for the interview to take place away from the prison's general population so that the Defendant would not be seen communicating with the FBI.  Special Agent Raby testified that he did not arrange to meet with the Defendant on a day when she was not on duty because she preferred not to come in on one of her days off.

Defendant arrived for the interview at approximately 7:45 a.m. and was brought into a room approximately 30 feet long and 15 feet wide with two doors and no windows. Defendant was seated in a chair with her back to the exiting door. Special Agent Raby and Special Agent Bolin were both present and seated in front of Defendant with their backs to a wall. There was no table in the room—only a rolling file cabinet that Special Agent Raby used as a writing surface. During the interview, both doors were shut but unlocked.

At the beginning of the interview, Special Agent Raby informed Defendant of the nature of the investigation and that her name had surfaced as a potential witness. Defendant informed Agents Raby and Bolin that she was not tired or otherwise impaired.

The January 9, 2006 interview lasted approximately one hour and there were no breaks during the interview. According to Special Agent Raby, at the time of the first

interview, Defendant was not a suspect or a target and was interviewed only as a potential witness to the homicide of inmate Delano. The Defendant was not compelled to appear by subpoena, she was not placed under arrest, and she was not in custody at any time before, during or after the interview.

Based upon information obtained in Defendant's first interview, as well as other witness statements subsequently obtained during the course of the investigation, Special Agent Raby decided to contact the Orlando Division of the United States Attorney's Office, Middle District of Florida in February 2006. He presented all of the information he had gathered to AUSA Adams. Pursuant to Special Agent Raby's conversation with AUSA Adams, he opened a parallel investigation to investigate the Defendant as well as other BOP employees for possible civil rights violations.

Between January 2006 and June 2007, Defendant initiated several telephone conversations with Special Agent Raby concerning rumors she heard circulating among BOP employees and FCC-Coleman inmates concerning her involvement in the death of inmate Delano. On June 18, 2007, Defendant called Special Agent Raby and asked to meet with him to talk about the investigation and about the rumors that were circulating because they were "not true" and "bothering her." She also expressed her desire to talk to Agent Raby because she "needed to get things off her chest" and wanted to "resolve her situation." Special Agent Raby agreed to meet with the Defendant following her shift the next day. As he done with the first interview, Agent Raby contacted the BOP to request that Defendant be relieved from her duties early so that she could meet with him.

-4-

At 6:45 a.m. on June 19, 2007, Defendant met with Special Agents Raby and Bolin at the same FBI office located within the administrative building at FCC-Coleman. Once again, the Defendant was not compelled to appear by subpoena, she was not placed under arrest, and she was not placed in custody.

At the beginning of the June 19 interview, Special Agent Raby informed Defendant that he needed to speak to her regarding the potential involvement of BOP employees in Mr. Delano's death. Agent Raby further informed the Defendant that her name had surfaced as an individual who may have been involved. Defendant was advised that she was not required to speak with Agents Raby and Bolin and that she was free to leave at any time. When asked whether she was tired or otherwise impaired, Defendant responded that she was not. Defendant told Agent Raby that she had been assigned to the same watch—midnight until eight in the morning—for the past three months and there was no other time that would be more convenient for her to meet with them. According to the Defendant, "now was as good a time as any" to meet. In addition, Defendant expressed her appreciation for Special Agent Raby arranging for her to get out of her shift early.

According to Agent Raby, at the end of the interview, as Defendant was walking out of the room, she began to cry and expressed her concern that based on the interview she thought she might be in trouble. She asked Agent Raby what was going to happen next and was told by Agent Raby that either the United States Attorney's Office or the Civil Rights Division of the Department of Justice would be making those decisions. According to Special Agent Raby, Defendant expressed an interest in speaking with them. Special Agent Raby informed the Defendant that he would contact

the appropriate individuals and advise them of her desire to talk to them. According to Agent Raby he never told the Defendant that if she did not cooperate with the investigation she would face the death penalty. Agent Raby also expressly testified he never threatened the Defendant that she would never see her child again if she did not cooperate.

Following the second interview, Agent Raby coordinated a meeting with the Defendant at the United States Attorney's Office in Orlando on June 29, 2007, with AUSA Adams, and two attorneys from the Civil Rights Division of the Department of Justice—Gerald Hogan and Douglas Kern. Special Agent Bolin did not attend the meeting. Agent Raby testified that he arranged to have the meeting on a day that Defendant was not working to accommodate her schedule.

The third interview took place at the office of the United States Attorney in Orlando in a small conference room with one large table parallel to a set of doors. Defendant was seated on the side of the table closest to the door. She was not compelled to appear by subpoena, she was not placed under arrest, and she was not in custody.

According to Agent Raby, extraordinary precautions were taken to ensure that Defendant was aware of her situation. Prior to questioning Defendant, Mr. Kern informed Defendant that based on the information they had gathered she was probably facing some criminal liability. Defendant was once again advised that she was not required to speak to them and she was free to leave at any time. In addition, the Defendant was advised that she could have an attorney present or have one appointed to represent her and that if she wanted, they could reschedule the meeting to

accommodate her. According to Agent Raby, in his view this was very unusual because he was trained not to inform suspects that they can have an attorney present during a noncustodial interview since there is no legal requirement to do so.

Agent Raby testified that even though the Defendant was told she could have an attorney present and was free to leave, she told Agent Raby and the prosecutors attending the meeting that she did not want an attorney and she was eager to speak with them because she wanted to go forward and "get the matter resolved." During the course of the meeting, Defendant told the interview team that the reason she wanted to meet with them was because she wanted to know what were the possible charges and penalties that she was facing. Agent Raby testified that Defendant was extremely cooperative during the interview. The interview lasted between two and three hours.

At one point during the interview, the interview team stopped questioning Defendant to give her a "bathroom break."  During the break, AUSA Adams told Agent Raby that the Defendant was in the copy room crying. Agent Raby and AUSA Adams subsequently located Defendant and asked her why she was crying. The Defendant told Agent Raby and AUSA Adams that she was thinking about how the situation may impact her daughter. AUSA Adams asked her if she wanted to continue the interview and again advised her that she was free to leave. According to Agent Raby, the Defendant was adamant about staying and completing her statement.

At the end of the interview, Defendant was advised that, at this point, she may be facing criminal charges and that at least one of the charges could involve the death penalty.  The Defendant was told, however, that the decision concerning whether the death penalty would be sought was not up to those present at the meeting and would be

decided by other officials at the Department of Justice. Defendant was advised that she needed an attorney to advocate on her behalf. When asked whether she could afford one, she replied that she could not. She was then informed that the United States Attorney's Office would submit a motion to have an attorney appointed to represent her.

There is no dispute that Defendant was not given <u>Miranda</u> warnings at any of the three interviews and that Defendant voluntarily appeared each time without legal representation.

Defendant testified on her own behalf. Her recollection of the configuration of the interview room at the FBI office in the administrative building at FCC-Coleman was similar to Agent Raby's description during his testimony. The Defendant testified that she did not know about the first meeting until half an hour before the meeting was scheduled to begin. According to the Defendant, the meeting lasted approximately two hours without any breaks. Defendant testified that at the end of the meeting, Agent Raby handed her his business card and asked her to call him if she thought of anything else or if she heard from Mr. Kennedy, another correctional officer who had information concerning the death of inmate Delano. Between the first and second interviews, Defendant admitted that she initiated several phone calls to Special Agent Raby but that she did so because she was following Special Agent Raby's instructions to contact him if she heard of anything else.

With respect to the second interview, Defendant acknowledged her desire to attempt to "clear up" rumors about her involvment. During a telephone conversation with Agent Raby the day before the second interview, Defendant asked if she should bring her union representative with her. Agent Raby told her that she could not. Defendant

testified that at some point during the interview, it occurred to her that she might be in trouble but she thought "if [she] shoved it out of [her] mind, it would all go away."

Defendant denied requesting the third interview. According to Defendant, at the end of the second interview, Agent Raby told her that AUSA Adams would like to talk to her. Defendant agreed to the meeting but informed Agent Raby that she had to work. Agent Raby told her "we will work it out" and would coordinate the meeting with her schedule. Defendant testified that she was supposed to work on the day the third meeting was held but her schedule was changed. Defendant believed that Agent Raby was involved in getting her schedule changed. Defendant testified that because she believed Agent Raby was behind her schedule change she was under the impression that the meeting was "secret" and so she did not tell anyone about it, including her husband.

According to Defendant, she was not advised to bring an attorney with her to any of the interviews and she did not bring one because she did not think she needed one. At the beginning of the third interview, Defendant testified that they began talking about "her situation."

Although Defendant testified that she "felt scared to leave," she, nonetheless, left the room unescorted on two occasions. Further, at one point during the interview she left the building and re-parked her car because the government agents told her she might get a ticket where she was parked.

During the course of the interview, Defendant became upset and emotional because she felt like no one believed her. Because she had become emotional the interview was stopped and she was given tissues and left the room to take a break from

questioning. During the break, AUSA Adams saw Defendant looking at pictures of her daughter and crying. Other than looking at the pictures of her daughter Defendant did not recall discussing her daughter with the agents during the third interview.

According to Defendant, she was not warned about the seriousness of the charges she was possibly facing until the end of the third interview. At that point, Defendant recalled someone telling her that "maybe it was time for [her] to get an attorney" and offered to assist her in getting one appointed.

With respect to discussions concerning the death penalty, Defendant testified that the subject of the death penalty came up during both the second and third interviews. During the second interview, Agent Raby told the Defendant that she might face the death penalty or life imprisonment and suggested that "she did not want to leave her child parentless." According to Defendant, the Agents also told her that if she cooperated, things would not be so bad for her. Defendant stated that she thought she might get probation instead of the death penalty if she cooperated. She testified that it was AUSA Adams who brought up the death penalty during the third interview.

On cross-examination, Defendant admitted that while Agent Raby discussed the possibility of the death penalty during the second interview, Agent Raby never told the Defendant she would be charged with the death penalty..

With respect to all three interviews, Defendant testified that she had no recollection of ever being told that she was free to leave. She also did not recall ever being told she could have an attorney present until the end of the third interview. According to Defendant, she agreed to attend each interview and continued to answer

questions because she wanted to cooperate in the investigation and "get everything resolved as quickly as possible."

The United States called Special Agent Bolin as a rebuttal witness. Agent Bolin has been employed by the FBI for thirteen years and is the resident agent at the Ocala office of the FBI's Jacksonville Division. He assisted Agent Raby in his investigation into the death of inmate Delano and participated in the first two interviews of the Defendant. For the most part, Agent Bolin's testimony largely mirrored the testimony of Agent Raby. In addition, Agent Bolin testified that the Defendant was "one of the most cooperative correctional officers he has ever interviewed" and that at the second interview Agent Bolin recalls the Defendant telling them that she was glad the Agents were talking to her. Agent Bolin confirmed that no threats or promises were made at either of the first two interviews.

Defendant was appointed counsel on July 5, 2007. (Doc. 47.) She was indicted on March 27, 2008. (Doc. 1.) She self-surrendered and was arraigned on March 31, 2008. (Doc. 6.)

### III.  Analysis of Issues

The Defendant raises three issues. The first issue is whether Defendant's statements were made and taken in violation of her Miranda rights. The second issue is whether Defendant's statements were voluntary in view of the totality of circumstances. Lastly, the Court must determine whether the questioning of Defendant during each of the three interviews without an attorney present was a violation of either Defendant's Sixth Amendment or Fifth Amendment rights. The Court will address each of these issues in turn.

**A.      The Agents Were Not Required to Provide Miranda Warnings**

There is no dispute that Defendant was not provided with Miranda warnings at any of the three interviews. See Miranda v. Arizona, 384 U.S. 436 (1966). Because a defendant is entitled to the prophylactic safeguards set forth in Miranda only when there is a custodial interrogation, the Court must first determine whether the Defendant was "in custody" for Miranda purposes during the two interviews which took place at FCC-Coleman and the third interview at the United States Attorney's Office in Orlando, Florida. Miranda, 384 U.S. at 444, 477. Miranda warnings are not required to be given during "general questioning of citizens in the fact-finding process." Id. Further, "[t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings." Minnesota v. Murphy, 465 U.S. 420, 431 (1984) .

Defendant argues that in view of the totality of circumstances her statements were obtained during the course of custodial interrogation. In particular, she points to her lack of legal representation at any of the interviews, the seriousness of the potential charges against her, and the "very intimidating environment" of the third interview. Defendant suggests that the "very experienced" Special Agents and "fancy attorneys" taking her statements should have known that Defendant was entitled to Miranda warnings before questioning her. Defendant's argument fails for multiple reasons.

First, the subjective knowledge or intent of government agents is not relevant to the Court's analysis of whether Defendant was subjected to custodial interrogation during one or more of the interviews. When determining whether someone is "in custody," the key inquiry is whether a person has been "deprived of his freedom of

action in any significant way." Miranda, 384 U.S. at 444. "[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave." United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (quoting Minnesota, 465 U.S. at 430); California v. Beheler, 463 U.S. 1121, 1125 (1983). The test is not subjective but rather is an objective test and, thus, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). Therefore, what the government agents thought or knew about Defendant's situation is wholly irrelevant in the absence of evidence showing that the circumstances were such that a reasonable innocent person would not have felt free to leave. Similarly, Defendant's argument that the third interview was conducted in a "very intimidating environment" is only relevant to the extent that it would have made a reasonable person feel significantly restrained.

With these concepts in mind, the Court must determine whether a reasonably innocent person in Defendant's position during the questioning on January 9, 2006, June 19, 2007, and June 29, 2007, would have believed that her freedom of movement was restrained to such an extent that the Defendant did not feel free to leave. See United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (observing that "under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person"). Therefore, neither the subjective mind set of the

Defendant nor the intent or knowledge of the government agents are relevant to the determination of whether the interrogation was custodial. <u>Id.</u>

Based upon the evidence presented, and taking into account the totality of the circumstances incident to the questioning of the Defendant, there is little, if any, evidence to suggest that the questioning of the Defendant during any of the three interviews was custodial for <u>Miranda</u> purposes.

The Defendant's movement was never restricted in any fashion during questioning at any of the interviews. She voluntarily appeared for each of the three interviews, including the first two interviews which occurred at her place of employment and before her shift ended so that she would not be inconvenienced.  Further, there is no disagreement that the Defendant was seated in close proximity to the exit while she was questioned and her path to the door was unobstructed. At the end of each interview, Defendant left the room unhindered by government agents.

Nor were there any overt actions by the agents which would draw into question that Defendant's movement was restricted. The Defendant was never restrained by handcuffs nor did Agents Raby and Bolin ever threaten to do so at any time.  Moreover, there is no suggestion that anyone yelled at Defendant or resorted to physical or psychological pressure of any sort in order to obtain the statements from Defendant. To the contrary, at the beginning of each of the first two interviews, Defendant was asked whether she would prefer to reschedule the interview for another time. Both times, Defendant declined the offer stating that there was no better time for her to meet with the Special Agents. In fact, Agent Raby testified that Defendant actually initiated two of the three interviews. Further, before each interview, Defendant was advised that she did

not have to speak to the government agents and that she was free to leave at any time, "a fact of substantial importance in determining whether a reasonable person would have felt free to leave." United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006). While Defendant testified that she did not recall being told she was free to leave, she acknowledged that she willingly appeared at each interview and continued to answer the questions of the Agents because she wanted to cooperate in their investigation and "get everything resolved as quickly as possible." Where, as here, the statements are volunteered Miranda's safeguards do not apply. United States  v. Satterfield, 743 F.2d 827, 849 (11th Cir. 1984).

In addition, there is no indication that the questioning of Defendant took place in an environment in which her freedom to depart was restricted in any way. To the contrary, several events highlight that Defendant's freedom of movement was not restricted. As an initial matter, the majority of the questioning occurred in the familiar setting of the Defendant's place of employment—FCC-Coleman. "'[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings.'" United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting 1 W. LaFave, Criminal Procedure § 6.6(e)); United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006). Further, and notably with respect to the third interview, Defendant was permitted to leave the interview room on two different occasions. On one of those occasions, she left the building -unescorted - to move her car upon being advised that she might get a ticket if she left her car where she initially parked it.

Finally, although Defendant takes issue with the "very intimidating environment" during the third interview that is not enough because a "noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because . . . the questioning took place in a coercive environment." <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977). This is so because nearly every interview of a criminal suspect is bound to have coercive aspects to it "simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." <u>Id.</u>

Accordingly, viewing the totality of the circumstances surrounding the questioning of the Defendant, a reasonable innocent person in the Defendant's position would not have felt a restraint on her freedom to a degree associated with a formal arrest. <u>See</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977) (finding interrogation to be noncustodial where suspect came voluntarily to police station, was immediately informed that he was not under arrest, and at the conclusion of the questioning was permitted to leave without hindrance). As such, the Court concludes that the interrogation of Defendant was not custodial and therefore did not trigger the obligation to provide <u>Miranda</u> warnings. Accordingly, the statements made by the Defendant should not be suppressed as violative of Defendant's <u>Miranda</u> rights.

**B.      *Voluntariness of Defendant's Statements***

Defendant also suggests that her Fifth Amendment rights were violated and her statements should be suppressed because the statements were not voluntary but instead were the product of coercion.

Defendant argued during the hearing that her "cooperation" with government agents was actually prompted by the coercive circumstances surrounding each of the

three interviews. However, the mere fact that Defendant's statements may have been inculpatory is not determinative of the issue. "Indeed, far from being prohibited by the Constitution, admissions . . ., if not coerced, are inherently desirable. . . . [and] [a]bsent some officially coerced [testimony], the Fifth Amendment privilege is not violated by even the most damning admissions." United States v. Washington, 431 U.S. 181, 187 (1977).

When assessing whether a statement was the product of coercion, the Court must look to the totality of circumstances to see whether a Defendant's will was overborne by government agents. Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973). Among the factors the Court should consider are: the age and intelligence of the accused; the accused's experience with the legal system; the character of the questioning; and whether the accused was deprived of food or sleep. Id. at 226.

Agents Raby and Bolin described Defendant as "extremely cooperative" and "one of the most cooperative witnesses I have ever interviewed." According to Agent Raby's testimony, Defendant was eager to speak with them because she wanted to "resolve her situation." Similarly, Agent Bolin recalled Defendant telling them, at the beginning of the second interview, that she was glad they were talking to her. During the third interview, Defendant became emotionally upset and she was advised that she was free to discontinue the interview at any time. However, according to Agent Raby, Defendant was, nonetheless, adamant about staying and completing her statement "to get it off her chest." The Fifth Amendment is not concerned with statements made as a result of "moral and psychological pressures to confess emanating from sources other than official coercion." Oregon v. Elstad, 470 U.S. 298, 305 (1985). Accordingly, to the extent

that Defendant's decision to continue talking to government agents was motivated by a moral desire to confess or based upon some oblique psychological pressure she may have felt, her statements for Fifth Amendment purposes are considered voluntary and not the product of coercion.

Nor did the Defendant's age or intelligence have much, if any, impact on her ability to voluntarily give a statement. While Defendant is not a trained lawyer and does not have a college degree, as a correctional officer, she was accustomed to interaction with law enforcement officers and through her training she was not completely unfamiliar to the legal system. Moreover, there was no evidence presented that the Defendant was deprived of food, sleep or any necessities over the course of any of the interviews. Neither of the first two interviews was unreasonably long—each lasting no more than a couple of hours. And during the third interview, which lasted approximately three hours, Defendant was offered—and did in fact take—breaks.

Defendant argues that she was tired during the first two interviews because she gave her statements immediately following an eight hour work shift. However, this argument is at odds with the testimony of Agents Raby and Bolin who testified that prior to questioning Defendant they asked her whether she was tired or otherwise impaired and she responded that she was not. Agents Raby and Bolin also testified that they offered to reschedule the interview if the Defendant wanted to come back at a different time but Defendant stated that "now was as good a time as any" to talk.

There is no evidence that any of the governmental agents, who questioned Defendant, engaged in intimidation tactics to elicit an incriminating statement from her. None of the government agents yelled at Defendant or threatened her with physical

harm. Defendant was always seated closest to the exit and her ability to end the interview and exit the interview room was never hindered in any fashion. Although Defendant testified that she "felt scared to leave" the third interview, she was permitted to leave the interview room unescorted on more than one occasion. In addition, when she became emotional, the questioning was stopped and Defendant was offered breaks.

In support of her argument that she was coerced, Defendant suggests that she was threatened with the death penalty if she did not cooperate and tell the Special Agents what "really happened" and that she was told that she would "probably never see her young daughter again" if she did not tell the truth. This argument, however, is inconsistent with Defendant's own testimony. According to the Defendant, discussion of the death penalty came up for the first time during the second interview and, at that time, she did not think she would actually be charged with a crime. In addition, she testified that she believed that if she cooperated, she would be shown leniency and that she might get probation instead of a stiffer punishment.

With regard to the third interview, Defendant testified that she was not warned of the seriousness of the potential charges against her until the end of the interview. Agent Raby testified that discussion of the death penalty during the third interview was limited to informing Defendant of the serious nature of the charges she potentially faced based on the evidence they had accumulated. Notably, the Defendant was not specifically threatened with the death penalty and was advised that none of the government agents in attendance at the third interview were in charge of making the decision whether to pursue the death penalty in a particular case.

With respect to the alleged threat concerning her daughter, Defendant testified that no such threats were made during the first and third interviews. According to Defendant, during the second interview, Special Agent Raby commented that Defendant "did not want to leave her child parentless" and advised her of the penalties she might face stating she could face life imprisonment and "never see her daughter again." This testimony contradicts Defendant's testimony that at the time of the second interview she did not think she would actually be charged with a crime and also conflicts with the testimony of Agents Raby and Bolin both of whom denied that such statements were ever made.

In sum, the evidence suggests that Defendant continued to cooperate, not because she was coerced, but because she was hoping for leniency and, accordingly, the Court concludes that the statements made by Defendant were not the product of coercion but were made voluntarily and therefore should not be suppressed.  See United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989).

**C.     *There Was No Fifth or Sixth Amendment Violation  Even Though the Defendant Did Not Have Counsel Present During The Questioning***

Lastly, Defendant argues that her statements should be suppressed because they were taken in violation of her Sixth Amendment right to counsel. Further - and even though the Defendant does not directly address her Fifth Amendment right to counsel in her Motion to Suppress - the Court will address this argument because the issue was touched on at the hearing

The sole basis for Defendant's argument that her constitutional rights were violated is that she was questioned by government agents without an attorney present.

According to Defendant, she did not bring an attorney with her to the first two interviews with Agents Raby and Bolin because she was never told that she could have an attorney present. Defendant testified that she appeared without legal representation at the third interview because she was not advised to bring an attorney with her and she "did not think [she] needed one." Whether couched in terms of the Sixth Amendment or the Fifth Amendment, Defendant's argument can be disposed of summarily.

The Sixth Amendment provides in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Tthe protections of the Sixth Amendment are, however, not triggered until formal criminal proceedings have been initiated. United States v. Wade, 388 U.S. 218 (1967); Gore v. Sec'y for Dep't of Corrections, 492 F.3d 1273, 1302 (11th Cir 2007) (citing United States v. Gouveia, 467 U.S. 180, 187-93 (1984)). More specifically, a defendant's initial appearance, where "[she] is told of the formal accusation against [her] and restrictions are imposed on [her] liberty,"  marks the point at which the Sixth Amendment right to counsel attaches. Rothgery v Gillespie County, Tex., 128 S. Ct. 2578, 2581-82, 2584 n.10 (2008).

It is undisputed that Defendant was represented by counsel prior to her initial appearance—and within days of the conclusion of the third interview. In fact, Defendant was not formally charged with a crime until approximately nine months after the third interview. Defendant's initial appearance occurred on March 31, 2008, shortly after the Grand Jury returned an indictment against Defendant. Consistent with Rothgery, "formal judicial proceedings" did not commence against Defendant until well after the third interview took place. Thus, the statements Defendant seeks to exclude were not taken

in violation of Defendant's Sixth Amendment right to counsel because her right to

counsel attached after the statements were made.

Defendant also alludes to the Fifth Amendment in support of her argument that

she was improperly questioned without the assistance of counsel. This argument also

must fail because, as discussed above, Defendant's statements were not the product of

custodial interrogation and the evidence clearly established that the Defendant never

invoked her Fifth Amendment rights.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any

criminal case to be a witness against himself." U.S. Const. amend. V.  This

constitutional protection against self-incrimination encompasses a right to the

assistance of counsel only *during custodial interrogation.* Miranda, 384 U.S. at 444-45

(emphasis added). Thus, noncustodial questioning does not implicate a defendant's

Fifth Amendment right to counsel. Id.; see also Oregon v. Elstad, 470 U.S. 298, 306-07,

315 (1985) (finding that testimony in response to noncustodial questioning is considered

"voluntary" for Fifth Amendment purposes and the prosecution is only precluded from

using *compelled* testimony).

Furthermore, even assuming *arguendo* that the interviews could be considered

custodial in some manner, the accused must express a desire to deal with government

agents through counsel in order for the right to attach. Michigan v. Mosley 423 U.S. 96,

104 n.10 (1975). Unless the privilege has been specifically and unambiguously invoked,

a witness cannot be said to have been compelled to testify against himself within the

meaning of the Fifth Amendment. Edwards v. Arizona, 451 U.S. 477, 481 (1981);

Michigan, 423 U.S. at 103-04 (citing Miranda, 384 U.S. at 474). Although Defendant

testified that she asked whether she should bring her union representative with her to the second interview, there is no evidence that Defendant ever specifically asked to have an *attorney* present during any of the interviews.[2] As such, because Defendant did not make an express and unambiguous request for the assistance of *counsel* during the questioning, Defendant failed to effectively invoke the privileges afforded by the Fifth Amendment. <u>Davis v. United States</u>, 512 U.S. 452 (1994); <u>see e.g.</u>, <u>Fare v. Michael C.</u>, 442 U.S. 707 (1979) (request to see probation officer insufficient).

Accordingly,  Defendant's statements were not taken in violation of Defendant's constitutional rights and, therefore, the statements made by the Defendant should not be suppressed.

## IV.  Recommendation

In view of the foregoing, it is respectfully **RECOMMENDED** that Defendant's Motion to Suppress Statements (Doc. 47) be **DENIED.**

**IN CHAMBERS** at Ocala, Florida this 31st  day of December, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:

Honorable Wm. Terrell Hodges
Senior United States District Judge

All Counsel

---

[2] In any case, Defendant is only entitled to have her union representative with her during administrative or civil matters—not during an interview that is part of a criminal investigation.