UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:09-cr-1-Orl-19GRJ

ERIN SHARMA

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by A. Brian Albritton, United States Attorney for

the Middle District of Florida, hereby submits this Sentencing Memorandum on the

following issues raised in the defendant's objections to the Pre-Sentence Report:

1.     Whether the base offense level for the Defendant's sentence in this case

should be 12 (for involuntary manslaughter, per U.S.S.G. 2A1.4(a)(1)) or 38 (for second

degree murder, per U.S.S.G. § 2A1.2).

2.     Whether the Defendant's sentence should receive a vulnerable victim

enhancement under U.S.S.G. § 3A1.1.

3.     Whether United States v. Booker, 543 U.S. 220 (2005), is controlling case

law for this sentencing.

4.     Whether the Defendant is entitled to a downward departure variance from

the sentence prescribed under the Sentencing Guidelines.

## STATEMENT OF FACTS

On February 28, 2005, the Defendant, Erin Sharma, then a corrections officer for

the Bureau of Prisons, conspired to have inmate Richard Delano moved into a cell in

the Special Housing Unit at FCC-Coleman with inmate John McCullah.  The Defendant

and the co-conspirator knew that Delano was widely reputed to be an informant, and that John McCullah was a notoriously violent inmate who hated informants.  The Defendant and the co-conspirator agreed that McCullah was likely to assault Delano if such a cell transfer were to occur.  At all times, the Defendant was aware that she had a duty of care to inmates in her custody, and that this duty forbade her from knowingly exposing such inmates to substantial risks of serious harm.  Nevertheless, the Defendant and the co-conspirator agreed to arrange for Delano to be housed in the same cell as McCullah.

Later on February 28, 2005, the Defendant and the co-conspirator spoke to their supervisor, Lieutenant Jeffrey James, in his office at FCC-Coleman.  The Defendant falsely represented to James that a new inmate with AIDS needed to be housed in a cell by himself, and that Delano had agreed to give up his solo cell if he could move in with McCullah.  At no time did the Defendant or the co-conspirator express any concern to James about the risks to which Delano would be subject as McCullah's cell mate, even though they knew of those risks and were obliged, by law and by training, to notify a supervisor of such risks.  James approved the move.

After the meeting with James, the co-conspirator told the Defendant that he would wait until the following day to move Delano, as the Defendant would not be present the following day.  The co-conspirator did not want the Defendant to be present during the move, as he felt that the Defendant's presence might alert Delano to the fact that his move was not routine.

Later on February 28, 2005, the Defendant spoke with McCullah about Delano. During that conversation, McCullah confirmed that he wished to harm Delano.  The

2

Defendant expressed her desire for Delano to be harmed.  The Defendant and McCullah discussed what kind of harm should be inflicted upon Delano, and when. During this conversation, McCullah proposed to kill or maim Delano.  By her own admission, the Defendant then told him: "No, don't do that - just break his leg."  The Defendant further instructed McCullah to attack Delano at a time when she was on vacation, so that she would not be implicated in the attack.  She told McCullah that she expected to take a vacation later that week.  Some testimonial evidence indicates that the Defendant expressly told McCullah to kill Delano.

Still later on February 28, 2005, the Defendant spoke to Delano when McCullah was not present.  Delano apologized for his attack on her.  The Defendant accepted his apology, and considered warning Delano about McCullah, but elected not to do so.  At that time, and by her own account, the Defendant was specifically aware that Delano was in serious physical danger from McCullah, but, contrary to the law and to her training, she took no action to stop the cell transfer, or to separate Delano from McCullah in any way, or even to warn anyone of the danger Delano faced.

The co-conspirator moved Delano to McCullah's cell on March 1, 2005, at a time when the Defendant was not present.  On March 4, 2005, McCullah attacked Delano in their cell.  Correctional officers apprehended McCullah while McCullah was kicking the unconscious Delano.  McCullah loudly complained that staff never should have housed him with a "rat."  After the assault, McCullah had bruises and contusions on his hands consistent with those that would be incurred while delivering a beating.  When apprehended, McCullah was covered in Delano's blood.  McCullah boasted and joked about beating Delano.  No other inmate had access to Delano at the time of the attack.

3

McCullah's identity as the person who assaulted Delano on March 4, 2005, is not in dispute.

Delano died as a result of injuries sustained during this attack on March 17, 2005. The Federal Bureau of Investigation opened an investigation into this murder. This investigation encompassed allegations that Bureau of Prisons staff played a role in Delano's death. On three separate occasions from January 2006 to June 2007, the Defendant gave voluntary statements to the FBI about this incident. In these statements, the Defendant made heavily incriminating statements about her involvement in Delano's death.

On March 27, 2008, a federal grand jury sitting in Orlando, Florida, returned a two-count indictment charging the defendant Erin Sharma with violations of 18 U.S.C. §§ 241 and 242.

On December 15, 2008, on the Defense's Motion to Suppress, Magistrate Judge Gary Jones held a hearing to determine the admissibility of the Defendant's statements to the FBI. The Defendant provided sworn testimony during this hearing. In the course of this hearing, she claimed that her statements to the FBI were not made voluntarily; that she was improperly threatened with the death penalty; and that her rights were not explained to her during at least one of the statements. Judge Jones subsequently denied the defense's Motion, finding that the government did not violate the rights of the Defendant by obtaining the statements in question.

On July 18, 2009, this matter was tried in this Court before a jury. On July 30, 2009, the jury returned a verdict of guilty on both counts of the Indictment. The jury further found the death resulted in regard to both counts of the Indictment.

4

On October 4, 2009, the Defendant submitted through counsel her objections to the Pre-Sentence Report.  The Defendant argued, among other things, that the statement of facts in the Pre-Sentence report was incorrect to the extent that it inculpates the Defendant; that the facts do not reflect any intention on the Defendant's part for Delano to be killed; that the underlying offense (for purposes of guidelines computation) is Involuntary Manslaughter, rather than Second Degree Murder; that the vulnerable victim enhancement does not apply to this sentence; that Booker does not or ought not control the sentence in this case; and that the circumstances of this case warrant a downward departure variance for the Defendant's sentence.  The government notes that the facts of the case as set forth in the Pre-Sentence Report are consistent with the evidence established at trial and with the unanimous verdict of the jury. Accordingly, the Defendant's objection to those facts is without merit.

## MEMORANDUM OF LAW and ARGUMENT

### A.    THE UNDERLYING OFFENSE FOR BOTH CHARGES IS SECOND DEGREE MURDER

The Pre-Sentence Report computes the defendant's sentence (under the Federal Sentencing Guidelines) using Second Degree Murder as the underlying offense, per §§ 2H1.1 and 2A1.2.  The Defendant objects as follows:

> "The question is, what is the underlying offense? It is *not* second degree murder. Second degree murder by definition requires an intent to kill.  *See Eleventh Circuit Pattern Jury Instructions (Criminal Cases)*, Pattern Instruction 45.3.
>
> "Instead, the underlying offense, *as to Ms. Sharma*, is *involuntary manslaughter.  See* Pattern Instruction 46.2.  The applicable guideline for involuntary manslaughter is U.S.S.G. sec. 2A1.4(a)(1), which provides a base offense level of 12."

5

(Defense Objections to Presentence Report, October 4, 2009, paras 7 and 8)(hereafter "Defense Objections") (emphasis in original)

This analysis is inconsistent with the actual text of the cited jury instructions and inconsistent with the text of the federal statutes defining involuntary manslaughter and second degree murder.  Accordingly, this Court should reject it.

18 U.S.C. § 1112(a) states in relevant part:

"Manslaughter is the unlawful killing of a human being without malice...Involuntary – In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a unlawful act which might produce death."

Eleventh Circuit Pattern Jury Instruction 46.2 states in relevant part:

"The Defendant can be found guilty of that offense [involuntary manslaughter] only if all of the following facts are proved beyond a reasonable doubt:

First: That the victim named in the indictment is dead;

Second: That the Defendant caused the death of the victim, or inflicted injury upon the victim from which the victim died, as charged;

Third: That the death of the victim occurred as a consequence of and while the Defendant was engaged in committing an unlawful act not amounting to a felony, namely [describe unlawful act], or in committing a lawful act in an unlawful manner or with wanton and reckless disregard for human life;

Fourth: That the Defendant knew that her conduct was a threat to the lives of others or had knowledge of such circumstances as could have enabled her to reasonably foresee the peril to which her act might subject others; and

Fifth: That the killing occurred within the territorial jurisdiction of the United States."

The Annotations and Comments to this instruction observe that "[t]he fact that distinguishes manslaughter from murder is the absence of malice."

6

The Sixth Circuit has found that second degree murder is the appropriate underlying offense when a corrections officer deliberately causes an inmate to suffer serious bodily injury leading to death.  United States v. Conatser, 514 F.3d 508, 523 (6th Cir. 2008), accord United States v. McDougle, 82 F. App'x 153, 158 (6th Cir. 2003) (second degree murder the appropriate underlying offense for caretaker who deliberately beat mentally handicapped man at state facility, causing death; second degree murder also the appropriate underlying offense for caretaker who deliberately failed to provide medical treatment to victim after said beating).

It is clear from this instruction and legal precedent that Involuntary Manslaughter does not reflect the scope of the Defendant's criminal behavior.  First, the Defendant's criminal activity is inconsistent with the third element of the offense of Involuntary Manslaughter, as set forth above.  As the jury's verdict indicates, the Defendant's unlawful acts did in fact amount to a felony.  By finding that the Defendant's violations of Delano's civil rights entailed the infliction of bodily harm, the jury found that the Defendant's crimes as set forth in the Indictment were felonies, not misdemeanors.  *See* 18 U.S.C. §§ 241 and 242.  It is self-evident that the Defendant's violation of Delano's civil rights cannot be considered a "lawful act."  To find otherwise would be to tacitly ignore the guilty verdict of the jury in this case.  Accordingly, the crime of Involuntary Manslaughter does not reflect the Defendant's criminal behavior.

By contrast, 18 U.S.C. § 1111(a) states in relevant part:

> "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing...is murder in the first degree.  Any other murder is murder in the second degree."

7

Eleventh Circuit Pattern Instruction 45.3 states in relevant part:

> "The Defendant can be found guilty of that offense [second degree murder] only if all of the following facts are proved beyond a reasonable doubt:
>
> First: That the victim named in the indictment was killed;
>
> Second: That the Defendant caused the death of the victim with 'malice aforethought,' as charged; and
>
> Third: That the killing occurred within the territorial jurisdiction of the United States."
>
> "To kill with 'malice aforethought' means an intent at the time of the killing to take the life of another person either deliberately and intentionally, or to willfully act with callous and wanton disregard for human life. ...[T]he evidence must establish beyond a reasonable doubt that the Defendant acted either with intent to kill or to willfully do acts with callous and wanton disregard for the consequences and which the Defendant knew would result in a serious risk of death or serious bodily harm."

The Annotation and Comments to this jury instruction note that "[u]nder both the common law and the federal murder statute, malice aforethought encompasses three distinct mental states: (1) intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life (*i.e.*, a 'depraved heart')."

The Eleventh Circuit has defined malice in this manner:

> "'Malice aforethought' is a legal term of art that describes the several mental states that are associated with murder. Aforethought is an element of both murder under section 1111 and conspiracy to murder under section 1117. Malice aforethought ordinarily describes several kinds of murder. [...]
>
> The intent-to-kill form of malice aforethought can be established, as it is here, by proof that the defendant acted with the desire that the death would occur or knowledge that such a result is substantially certain to occur, whatever his desire concerning that result."

8

United States v. Campa, 529 F.3d 980, 1009 (11th Cir. 2008) (internal citations omitted).

It is clear, then, that the Defendant's claim that "[s]econd degree murder by definition requires an intent to kill" is incorrect.  As noted above, second degree murder occurs when the victim is killed with malice aforethought, that is, the defendant had an intent to kill *or* an intent to do serious bodily harm *or* acted with extreme recklessness and wanton disregard for human life.  The intent to kill is *sufficient* but not *necessary* for a defendant to have acted with malice aforethought.  See, e.g., United States v. Kopp, 562 F.2d 141, 144 (2d Cir. 2009) (malice can be proven without evidence that defendant specifically intended to kill the victim); United States v. Sarracino, 340 F.3d 1148, 1162 (10th Cir. 2003) (approving of jury instruction: "[Y]ou may also find malice aforethought if defendants' disregard for human life is so extreme that it approaches but does not equal a mental state comparable to that of a person who deliberately and intentionally kills another."), United States v. Fleming, 739 F.2d 945, 948 (4th Cir. 1984) ("Neither does [malice] require proof of an intent to kill or injure."), United States v. Shaw, 701 F.2d 367, 393 n.20 (5th Cir. 1983) ("Malice does not require a subjective intent to kill..."); United States v. Black Elk, 579 F.2d 49, 51 (8th Cir. 1978) ("Malice does not require proof of a subjective intent to kill.").  The Defendant's arguments simply ignore the other mental states that may form the basis for second degree murder but which do not require the intent to kill.  Indeed, were the Defendant's arguments to prevail in this regard, the language in the jury instruction referring to "callous and wanton disregard" and "serious risk...of bodily harm" would be rendered nugatory.

9

In this case, the evidence demonstrates that Delano died as a result of the Defendant's conduct, and that the Defendant acted with an intent to do serious bodily injury and with wanton disregard for human life.[1]  As discussed earlier, the Defendant admitted to instructing McCullah to break Delano's leg in the course of assaulting him. Multiple witnesses confirmed that the Defendant arranged for McCullah to assault Delano while she was on vacation.  By instructing a convicted murderer with a history of violence against cell mates to break Delano's leg, the Defendant demonstrated an intent to inflict at least serious bodily injury on Delano, and thus her criminal actions should be considered as second degree murder for sentencing purposes.[2]  See Sarracino, 340 F.3d at 1163 ("The medical evidence and photographic evidence of the severity of the beating inflicted on the victim could have alone supported the malice finding.").

Moreover, the evidence at trial proved that the Defendant knew that McCullah hated informants, abused alcohol in his cell, aspired to join the Aryan Brotherhood (which requires prospective members to commit murder), and frequently assaulted his cell mates.  The Defendant also knew that Delano was widely believed to be an

---

[1]  The government maintains that the preponderance of the evidence in this case is sufficient for this Court to find that first degree murder is appropriate as an underlying offense in this case.  Testimony from at least one inmate witness indicated that the Defendant explicitly told McCullah to kill Delano.  As this evidence indicates that the Defendant premeditated the lethal assault Delano, the underlying offense is first degree murder.  The testimony in question was challenged only by the Defendant's unlikely and self-serving testimony to the contrary.  Nevertheless, at a minimum, the government only seeks to demonstrate here that second degree murder is the appropriate underlying crime for the sentencing of this case.

[2]  The Defendant is responsible for McCullah's assault upon Delano, both directly and through the theories of aiding and abetting and co-conspirator liability.  At the trial of this matter, the jury was instructed on all of the aforementioned theories.

informant.  As such, and by her own admission, she knew that Delano would receive an "ass-kicking and head-knocking" if he were to share a cell with McCullah.  Nevertheless, she engaged in deliberate and dishonest behavior to arrange for just such a cell transfer; she encouraged McCullah to maim Delano; and she conspired with another to accomplish the corrupt cell transfer.  Thus, the Defendant flagrantly, deliberately, and needlessly exposed Delano to a known risk of serious physical harm and/or death, in contravention of specific training that she received as a corrections officer.  At trial, the uncontroverted testimony of Lyn Bouchillion clearly established that all Bureau of Prisons corrections officers, including the Defendant, are trained that they have a legal obligation to alert their superiors to any substantial risks of serious harm to which inmates in their care may be subjected.

Additionally, the jury instructions for this case specifically instructed the jury that the victim's Eighth Amendment right was violated if the Defendant deliberately exposed the victim to a known risk of serious harm.  The jury rendered a guilty verdict on both counts, thereby affirming that the Defendant did indeed deliberately expose the victim to a known risk of serious harm, resulting in his death.  Such behavior constitutes extreme recklessness and wanton disregard for human life; it betokens a "depraved heart." Accordingly, for this reason also, the Defendant's criminal actions should be considered as second degree murder for sentencing purposes.

**B.    THE VULNERABLE VICTIM ENHANCEMENT SHOULD APPLY TO THE SENTENCE IN THIS CASE.**

U.S.S.G. § 3A1.1(b)(1) states:

> "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by two levels."

Application Note 2 to this section states that "'[V]ulnerable victim' means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under Section 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."

Inmates labeled as informants are at unique risk of injury at the hands of other inmates. Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984) (per curiam) (labeling of inmate as a "snitch" potentially violates the Eighth Amendment and thus constitutes a legitimate cause of action in a section 1983 suit); Northington v. Marin, 102 F.3d 1564, 1567-68 (10th Cir. 1996); Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995); Valandingham v. Bojorquez, 866 F.2d 1135, 1338 (9th Cir. 1989). Thus, inmates who have cooperated with investigations are entitled to reasonable protection, and the constitutional proscription against cruel and unusual punishment is violated when that reasonable protection is denied to such inmates. Gullatte v. Potts, 654 F.2d 1007, 1012-13 (5th Cir. 1981). See also United States v. McCall, 174 F.3d 47, 51 (2d Cir. 1998) (vulnerability determined by ability of victim to avoid crime, not vulnerability in comparison to other potential victims). This Circuit has previously recognized that, for purposes of sentencing, victims with no means of escaping from assailants in a

correctional environment meet the legal criteria for being vulnerable victims.  United States v. Tapia, 59 F.3d 1137, 1143 (11th Cir. 1995).  Other circuits have found that, given the great power that corrections officers wield over inmates, inmates who are victims of violent civil rights abuses at the hands of corrections officers should be considered vulnerable victims for sentencing purposes.  United States v. Lambright, 320 F.3d 517, 519 (5th Cir. 2003) (prison inmate beaten by corrections officer is a vulnerable victim for purpose of sentencing in a criminal civil rights/color of law case, as prison inmate is under the control of corrections officers); United States v. Hershkowitz, 968 F.2d 1503, 1505 (2d Cir. 1992) (same).

It is undisputed that Delano was reputed to be an informant among both staff and inmates at FCC-Coleman.  Evidence at trial confirmed that the Defendant was aware of Delano's reputation as an informant.  Evidence at trial also confirmed that the Defendant despised informants, and (by her own admission) had publicly identified such inmates in previous instances with the intention and expectation that such informants would be assaulted once their status as informants became known.  By the Defendant's own admission, she knew that McCullah hated informants.  Thus, the Defendant had knowledge that Delano would be especially vulnerable to an assault if he were to be transferred into McCullah's cell, yet she helped to execute that transfer anyway.  As such, the Defendant knew that the victim of the offense was a vulnerable victim, and thus the two-level sentencing enhancement should apply.

It is important to note that Delano had no legitimate means of resisting the cell move that the Defendant conspired to and did execute.  As established through the

13

testimony of multiple witnesses at trial, inmates incarcerated in the SHU of FCC-Coleman (as Delano was) have virtually no freedom of movement.  They must reside with their assigned cell mates for 23 hours a day in close quarters.  Moreover, as established at trial, inmates do not have "veto" power over their cell assignments; they must accept whatever cell mates are assigned to them, no matter how dangerous or disagreeable those cell mates might be.  Once the Defendant assigned Delano to McCullah's cell, Delano had no means of avoiding McCullah; moreover, as a known informant, Delano had no reason to believe that anyone would assist him if and when McCullah attacked him.  Thus, Delano was especially vulnerable to the Defendant's criminal actions against him, and as such he should be considered a vulnerable victim for sentencing purposes.

The Pre-Sentence Report recommended the application of this two-level enhancement to the Defendant's sentence.  The Defendant objected, citing case law in apparent support of the proposition that this enhancement applies only when the Defendant selected the victim due to the Defendant's perception of the victim's vulnerability to the offense.  Defense Objections, para 12.  The Defendant further alleges that the Defendant attacked Delano in retaliation for Delano's previous assault upon the Defendant, not due to his vulnerability.  Id.

These arguments are legally and factually incorrect.  The plain text of Section 3A1.1(b)(1) contains no reference whatsoever to any "targeting" requirement.  The Defendant's argument appears to turn upon an application of the pre-November 1995 Sentencing Guidelines.  Prior to November 1995, Section 3A1.1(b)(1) stated that the

14

vulnerable victim enhancement applied only when a defendant targeted a victim due to the victim's vulnerable status.  Amendment 521, effective November 1, 1995, omitted the "targeting" language from the Guidelines, and the Commentary for 3A1.1 indicated that there is no targeting requirement to this enhancement.  U.S.S.G. App. C, Amend. 521, at 430 (Nov. 1995); U.S.S.G. sec. 3A1.1, comment, n.2 (Nov. 1995).  The overwhelming majority of circuits subsequently abandoned the targeting requirement for the vulnerable victim enhancement, if those circuits had ever adopted that requirement in the first place.  United States v. Bolden, 325 F.3d 471, 501 n. 35 (4th Cir. 2003) (Amendment 521 removed targeting requirement); United States v. Zats, 298 F.3d 182, 188-89 (3d Cir. 2002) ("The Guidelines do not require that the defendant actually target his victims or otherwise seek them out because of their vulnerability."), United States v. Paneras, 222 F.3d 406, 413 (7th Cir. 2000) (no targeting requirement); United States v. McCaster, 2009 U.S. App. LEXIS 13597 (6th Cir. 2009) ("We noted that the [Sentencing] Commission's avowed purpose in amending the application notes was to clarify that there is no requirement that a victim have been 'made a target' because of his or her vulnerability.") (internal citations omitted); United States v. Brawner, 173 F.3d 966, 973 (6th Cir. 1999) (no targeting requirement); United States v. Burgos, 137 F.3d 841, 843 (5th Cir. 1998) (no targeting requirement); United States v. Cain, 134 F.3d 1345, 1351 (8th Cir. 1998) (no targeting requirement); United States v. Feldman, 83 F.3d 9, 16-17 (1st Cir. 1996) (acknowledging previous circuit split, but noting that Sentencing Commission had "removed all reasonable doubt" by deleting the targeting language); United States v. O'Brien, 50 F.3d 751, 755 (9th Cir. 1995) (no targeting requirement even prior to 1995 revision); Hershkowitz, 968 F.2d at 1506 (no targeting

requirement even prior to 1995 revision).  As the Defendant's argument turns upon an

interpretation of the Guidelines that has been repeatedly and explicitly repudiated, the

Defendant's argument fails.

The unpublished case that the Defendant cites to the contrary (United States v.

Hebert, 151 F. App'x. 797 (11th Cir. 2005)) merely cites language from United States v.

Arguedas, 86 F.3d 1054 (11th Cir. 1996) with no discussion as to the relevant changes

to the Guidelines.  Hebert, 151 F. App'x. at 799.  The holding in Arguendas relates to a

crime that was committed prior to the 1995 revision to the Guidelines.  Although some

cases in the Eleventh Circuit have cited Arguendas for the proposition that the

Defendant suggests, e.g. United States v. Day, 405 F.3d 1293, 1296 (11th Cir. 2005),

none of these cases have addressed the issue of the 1995 revision to the Guidelines.  It

is clear that Arguendas and its progeny reflect neither the current state of the Guidelines

nor the consistent interpretation of the Guidelines in other circuits.  Accordingly, the

Court should decline to find a targeting requirement for this enhancement.

Nevertheless, even if the Guidelines required evidence of targeting in order for

the vulnerable victim enhancement to apply, such evidence is clearly present in this

case.  At the trial of this matter, evidence proved that the Defendant hated informants;

that the Defendant knew that publicly identified informants were at great risk of assault;

and that the Defendant knew that McCullah, a notoriously violent inmate, hated

informants.  Evidence also established that, by the Defendant's own admission, she had

previously exposed the status of other informants in the SHU of FCC-Coleman with the

intention and expectation that such exposure would cause those informants to be

harmed.  Thus, the evidence proves that the Defendant knew Delano to be a vulnerable

victim in regard to an assault from McCullah, and that the Defendant's special antipathy

for such vulnerable victims influenced her decision to violate Delano's civil rights.  The

evidence also proves that the Defendant's plot to violate Delano's civil rights was

customized to take advantage of Delano's vulnerability.  Had the Defendant arranged to

have Delano transferred to the cell of an inmate with no special antipathy toward

informants, Delano would have faced no unusual risk of harm.  By moving Delano into

McCullah's cell, the Defendant knowingly moved Delano into a situation that was

dangerous for Delano precisely because of his vulnerable status as an informant.  Thus,

Delano's vulnerable status as an informant was not merely an incidental aspect of the

Defendant's crime.  Indeed, Delano's status as an informant was the catalyst to the

criminal conspiracy that the Defendant launched against him.  Accordingly, irrespective

of whether the pre- or post-1995 Guidelines are used in this case, the two-point

vulnerable victim enhancement should apply.

Assuming that the targeting requirement applies to the vulnerable victim

enhancement in this case (and it does not), the Defendant further argues that, as the

Defendant allegedly selected the victim as a result of the victim's assault upon her,

rather than his status as a vulnerable victim, the vulnerable victim enhancement should

not apply to the Defendant's sentence.  Defense Objections, para 12.  The Defendant's

argument turns upon the tacit assumption that the vulnerable victim enhancement

applies *only* when the Defendant's *sole* motivation for harming the victim is the victim's

vulnerable status.  Nothing in the Guidelines or in the case law supports this

assumption.  To the contrary: in Arguedas, 86 F.3d at 1059, the Eleventh Circuit ruled

17

that, where a defendant selected a victim while knowing of that victim's unique vulnerability to the crime in question, the vulnerable victim enhancement was correctly applied to the defendant's sentence, and "we need not consider whether [the defendant's] personal relationship with his victim justifies the vulnerable victim enhancement." Thus, in the instant case, Delano's previous dealings and relationship with the Defendant are irrelevant for sentencing purposes. The Defendant knew that Delano was vulnerable to the crime in question, and chose to violate Delano's civil rights in a manner that took the greatest possible advantage of that vulnerability. Whether the Defendant acted with mixed motives is not relevant to the question of whether Delano's known vulnerability influenced the Defendant's crime against him. Thus, as the Defendant targeted Delano for being an informant, the vulnerable victim enhancement should apply to the Defendant's sentence irrespective of the other motivations that may have impelled the Defendant to criminal activity.

### C.  UNITED STATES V. BOOKER IS THE CONTROLLING CASE LAW FOR THIS SENTENCING.

In paragraph 14 of the Defense Objections, the Defendant invites this Court to ignore United States v. Booker, 543 U.S. 220 (2005), in the sentencing of this case. Defense Objections at para 14. The government recommends that the Court affirm the Supreme Court's standing case law in this regard.

### D.  THE DEFENDANT IS NOT ENTITLED TO A DOWNWARD VARIANCE IN THE SENTENCING OF THIS CASE.

In paragraph 17 of the Defense Objections, the Defendant argues that she is entitled to a downward variance due to a) the Defendant's alleged lack of intent to kill Delano; b) the alleged fact that Delano provoked the attack; c) the Defendant's allegedly

18

exemplary record of service as a corrections officer; d) her status as the mother of a young child; e) her support from family and friends; and f) her clean prior record and lack of likelihood of recidivism.  In the final paragraph of the Defendant's Sentencing Memorandum of October 19, 2009, the Defendant also asks for a downward variance on the basis of the additional danger that the Defendant will allegedly face as a former corrections officer in a federal facility.

As the Defendant has set forth these arguments in a summary form, the Government shall respond in the same fashion:

a)    As noted earlier, the evidence indicates that the Defendant did in fact desire to kill Delano.  Moreover, the evidence overwhelmingly indicates that the Defendant intended for Delano to be seriously harmed in the commission of a felonious violation of his civil rights, and further that the Defendant acted with a depraved heart in arranging for Delano's move into McCullah's cell, and then asking McCullah to maim Delano. Accordingly, the Defendant's intent falls within the heartland of the intent that the second degree murder charge is intended to reflect, and thus a downward variance is not warranted.

b)    None of Delano's alleged actions justified his brutal assault and murder. Moreover, as Delano's alleged assault on the Defendant occurred five days before the Defendant violated Delano's civil rights, Delano's alleged assault on the Defendant was too remote in time from the instant offenses to constitute any kind of provocation.  Additionally, the Defendant testified

19

that she was not particularly angry with Delano after the alleged assault.
Accordingly, she cannot now claim that Delano's actions were provocative.
Further, as the Defendant maintains her innocence, the Defendant cannot
claim that the Defendant provoked her because she refuses to admit that
she took any illegal action as a result of the alleged provocation.

c)   Multiple inmate witnesses testified that the Defendant was a corrupt officer
who gave unfair rewards to favored inmates and unfair punishments to
disfavored inmates at FCC-Coleman.  By her own admission, the
Defendant moved contraband for favored inmates at FCC-Coleman, and
exposed disfavored inmates to public identification as informants with the
intention that such exposure would cause those inmates to be assaulted.
This behavior is far from exemplary.  Moreover, the Guidelines explicitly
disfavor the consideration of a defendant's employment record for
sentencing purposes.  U.S.S.G. sec. 5H1.5 p.s.

d)   Under the Guidelines, the Defendant's familial status is irrelevant to this
sentencing, per U.S.S.G. § 5H1.6.

e)   The Defendant's support from the community is irrelevant to this
sentencing, as no factor in 18 U.S.C. § 3553 or the Sentencing Guidelines
permits it to be considered.

f)   The Defendant has already been credited for her lack of a criminal history
through her assignment at Criminal History I for purposes of this

20

sentencing.  The Defendant is not entitled to further consideration in this regard.  U.S.S.G. § 5H1.8.

g)  The Defendant's perception that she will be endangered in the federal corrections system does not constitute a legitimate basis for a downward departure under any factor identified in 18 U.S.C. § 3553 or the Sentencing Guidelines.  It is extraordinary that the Defendant has asked this Court to consider her fear of abuse in the federal corrections system, given the Defendant's participation in such abuse.

In general, a downward variance in this case would send the message that the murder of a confined, helpless man is not deserving of the sanction that the Congress and the Sentencing Commission have deemed deem to be just punishment based on the federal courts' collective sentencing expertise accumulated over the decades. Similarly, a below-Guidelines sentence for a law enforcement officer who has abused the power of law to commit murder would fail to promote respect for the law because it would be interpreted as a statement that the justice system applies a more lenient standard to law enforcement officers than it does to others.  For similar reasons, a below-Guidelines sentence would not afford adequate deterrence of future similar conduct by other law enforcement officers.  Indeed, a below-Guidelines sentence would send exactly the wrong signal - that the abuse of inmates and prisoners is not deserving of serious sanction and the law does not apply with equal force to law enforcement officers.  Accordingly, the government asks for a sentence within the Guidelines range.

## CONCLUSION

The Defendant's objections should be overruled and the Court should calculate her Guidelines score as recommended by the Probation Office in its Pre-Sentence Report, and as adjusted per the objections that the Government has set forth under separate cover.  The government respectfully asks the Court to deliver a sentence within the Guidelines range.

Respectfully submitted,


A. BRIAN ALBRITTON                        THOMAS E. PEREZ
United States Attorney                       Assistant Attorney General



By:      *s/ Bruce S. Ambrose*                    */s/ Douglas Kern*
         Bruce S. Ambrose                    Douglas Kern
         Assistant United States Attorney    Trial Attorney
         USA No. 075                         Department of Justice
         501 West Church Street, Suite 300   Civil Rights Division, Criminal Section
         Orlando, Florida  32805             601 D. St. NW
         Telephone:   (407) 648-7500         Washington, DC 20004
         Facsimile:    (407) 648-7643        Telephone:    (202) 616-3954
         E-mail: Bruce.Ambrose@usdoj.gov     Facsimile:     (202) 514-8336
                                             E-mail: doug.kern@usdoj.gov

22

**U.S. v. Erin Sharma**                          **Case No. 6:09-cr-1-Orl-19GRJ**

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

William Mallory Kent, Esquire

> *s/ Bruce S. Ambrose*
> Bruce S. Ambrose
> Assistant United States Attorney
> USA No. 075
> 501 West Church Street, Suite 300
> Orlando, Florida 32805
> Telephone:    (407) 648-7500
> Facsimile:    (407) 648-7643
> E-mail:  Bruce.Ambrose@usdoj.gov