```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE MIDDLE DISTRICT OF FLORIDA
 2                          ORLANDO DIVISION

 3                  Case no.:   6:09-cr-1-Orl-19GRJ

 4   UNITED STATES OF AMERICA,        )      Orlando, Florida
                                      )      October 26, 2009
 5                   Plaintiff,       )      1:00 p.m.
                                      )
 6                        v.          )
                                      )
 7   ERIN SHARMA,                     )
                                      )
 8                   Defendant.       )
     ─────────────────────────────────)

 9

10

11

12                  Transcript of the sentencing

13              before the Honorable Patricia C. Fawsett

14               United States Senior District Judge

15

16

17
     Appearances:
18
     Counsel for Plaintiff:   C. Douglas Kern
19

20   Counsel for Defendant:   William Mallory Kent

21
     Court Reporter:           Diane C. Peede, RMR, CRR
22                             United States Courthouse
                               401 West Central Blvd., #4600
23                             Orlando, Florida  32801
                               (407) 615-0305
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

1                        **INDEX OF TRANSCRIPT**

2                                                       **Page**

3                    **Mary Ellen Siemers**
**Direct by Mr. Kent**                                     **73**

4

5                    **Rajesh Sharma**
**Direct by Mr. Kent**                                     **76**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                **P R O C E E D I N G S**

2         THE COURTROOM DEPUTY:  United States of America

3 versus Rosalyn Rhymer.

4         For the government.

5         MR. IRICK:  Good afternoon, Your Honor.  Daniel

6 Irick for the United States.

7         THE COURTROOM DEPUTY:  For the defense.

8         MR. BRODERSEN:  Good morning, Your Honor.  Daniel

9 Brodersen here on behalf of Rosalyn Rhymer, who is seated to

10 my left.

11         THE COURTROOM DEPUTY:  United States of America

12 versus Erin Sharma.

13         For the government.

14         MR. KERN:  Good afternoon, Your Honor.  Douglas

15 Kern for the United States.

16         THE COURTROOM DEPUTY:  For the defense.

17         MR. KENT:  William Kent for Ms. Sharma.  Ms. Sharma

18 is present.

19         THE COURT:  Thank you.

20         Mr. Brodersen and Mr. Kent, do you have a copy of

21 the Acknowledgment of Right to Appeal form?

22         MR. BRODERSEN:  Yes, Your Honor.

23         MR. KENT:  Yes, ma'am.

24         THE COURT:  You can be seated.  I'm going to go

25 over that with your clients right now to start the

1    proceedings, and then we'll have the case called individually

2    and we'll start with Ms. Rhymer.

3            Ms. Rhymer and Ms. Sharma, your attorneys have a

4    form that's called an Acknowledgment of Right to Appeal.  I'm

5    going to give you time to talk to your attorney, if you want

6    to, about this form.  This is a document that simply states

7    in writing what I'm going to try to explain to you now, and

8    that basically is that it's very important that you file your

9    notice of appeal timely.  If you do not file it timely, you

10   will waive and lose and give up your right to appeal.

11           Ms. Rhymer, you have a Plea Agreement and you have

12   limited your right to appeal.  The fact that I am talking to

13   you about this in no way changes the terms and conditions of

14   your Plea Agreement.

15           And to Ms. Rhymer and Ms. Sharma both, this

16   document is not a notice of appeal that you're looking at;

17   it's just an acknowledgment that you have read the contents.

18   And I'm going to ask you about that in just a moment.

19           First of all, I will conduct a separate sentencing

20   proceeding in your case, and when that is concluded, which

21   will include the sentence that is imposed on you, an order

22   will be prepared called a Judgment and Commitment Order.

23   It's usually prepared fairly quickly after the sentencing.

24   In this case, it may take about a week to be prepared,

25   because I have other matters on my schedule.  But the point

of this is once the Judgment and Commitment Order is filed in your case file, it starts the time to run to take an appeal.

You have ten days following the filing of the Judgment and Commitment Order that contains your sentence in which to file your notice of appeal, unless the government files a timely notice of appeal.  If the government files a timely notice of appeal, then you have ten days following the filing of the government's notice of appeal in which to file your notice of appeal.

I would suggest, however, that if you want to take an appeal, you not wait to see if the government is going to appeal.  The government may at the last minute decide not to file a notice of appeal or could file its notice of appeal untimely; and in that event, you would have lost your right to take an appeal.

If you do not file your notice of appeal timely, that is, within the ten-day period I've just explained to you, you will waive, lose, give up, forfeit your right to appeal.  It'll be gone.

Your attorney may file the notice of appeal for you or you can cause the notice of appeal to be filed yourself, and you can do that by personally contacting the Clerk of the Court and telling the clerk that you want to take an appeal. The Clerk will then prepare and file a notice of appeal for you; but, again, that notice of appeal has to be filed

1   timely, that is, within the ten-day time period that I've

2   explained to you.  So if you wait until the last minute to

3   contact the Clerk and the Clerk does not get the notice of

4   appeal filed within the ten-day time period, again, you will

5   have waived your right to take an appeal.

6          You do have the right to be represented by an

7   attorney, if there is an appeal; and if you cannot afford an

8   attorney, the court will appoint one to represent you on the

9   appeal at no charge or cost to you.  And the same with costs

10   and expenses of an appeal.  If you are unable to afford them,

11   they can be waived by the court.

12          Now, at the conclusion of your sentencing, I will

13   ask you if you have signed this document, and if you have,

14   ask your attorney to file it in the court records.

15          Please contact your attorney to ask your attorney

16   if you have any questions about the contents of this document

17   before you sign it.

18          If you will, call the first case.

19   *****

20          THE COURTROOM DEPUTY:  Case number 6:09-cr-1-Orl-

21   19GRJ, United States of America versus Erin Sharma.

22          For the government.

23          MR. KERN:  Douglas Kern for the United States.

24          THE COURTROOM DEPUTY:  For the defense.

25          MR. KENT:  William Kent for Ms. Sharma.

1          THE COURT:  Would you state your full name, please.

2          THE DEFENDANT:  Erin J. Sharma.

3          THE COURT:  Erin Sharma, on July 30, 2009, you were

4     found guilty in a jury verdict of Counts One and Two of the

5     Indictment, charging you with conspiracy to threaten and

6     intimidate a convicted federal prison inmate, in violation of

7     Title 18, United States Code, Section 241; and deprivation of

8     civil rights under color of law, in violation of Title 18,

9     United States Code, Section 242.

10          Have you read your Presentence Report?

11          THE DEFENDANT:  Yes, ma'am.

12          THE COURT:  And have you discussed with your

13     attorney, Mr. Kent, your Presentence Report?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  Mr. Kent, have you read Ms. Sharma's

16     Presentence Report?

17          MR. KENT:  Yes, ma'am, I have.

18          THE COURT:  And have you discussed with Ms. Sharma

19     her Presentence Report?

20          MR. KENT:  Yes, ma'am, I have.

21          THE COURT:  I received just moments ago letters,

22     some of which were not signed but many were.  That was

23     intentional?

24          MR. KENT:  Yes, Judge.  I got these letters -- you

25     know, with the modern age, they all came, almost all, by

1    e-mail; and with the Court's permission, I can authenticate

2    them.

3              THE COURT:  Well, no, I'm not worried about it.  I

4    just wanted to make sure you knew that I had copies that did

5    not have signatures on them.

6              MR. KENT:  Yes, ma'am.

7              THE COURT:  All right.  And so do you want those

8    filed with the Presentence Report?

9              MR. KENT:  Yes, please, Judge.  Judge, I did get

10   those earlier, though, to the probation officer.

11             THE COURT:  Well, in your memo, that said that they

12   were filed.  So I started making phone calls because I didn't

13   have them, and the probation officer didn't have them then.

14   So that's just the way that my work has stacked up, but I did

15   read them.

16             MR. KENT:  Thank you, Judge.

17             THE COURT:  All is not lost.

18             Let me ask Mr. Kern, in looking through some of the

19   objections, I tried to find identified in the record the memo

20   of June 29, 2007, and I could not find it.  Is it in the

21   record anywhere?

22             MR. KERN:  Your Honor, to which memorandum do you

23   refer?

24             THE COURT:  This is the third interview of Mr. Raby

25   and Ms. Sharma and others.

1          MR. KERN:  Your Honor, I'm not sure that particular

2     document was in the record.

3          THE COURT:  All right.  If you know that is the

4     case, I could not find it in the record, and I wanted to make

5     sure that that was the correct.

6          MR. KERN:  I don't believe it was there, Your

7     Honor.

8          THE COURT:  All right.  Let me start with the

9     government's objections.  The government has objected to

10    paragraph 22 under 3(d)1.2(D), to the grouping.

11          Mr. Kern.

12          MR. KERN:  That's correct, Your Honor.

13          THE COURT:  Is there any additional argument?  I

14    have read the sentencing memorandum that the defendant has

15    filed at docket 204 and the government's sentencing

16    memorandum at 206.  Do you have any further argument?

17          MR. KERN:  No, Your Honor.

18          THE COURT:  I am going to overrule the government's

19    objection.  I think the grouping is appropriate.  Both of the

20    counts of the Indictment involve essentially the same acts.

21          Under guideline 3(d)1.2, all counts involving

22    substantially the same harm shall be grouped together in a

23    single group, and there are four subsections defining when

24    counts involve substantially the same harm.  One involves

25    when counts involve the same victim and two or more acts or

transactions connected by a common criminal objective or
constituting a common scheme or plan.  That's 3(d)1.2(B).

Another is when the offense level is determined
largely on the basis of the total amount of harm or loss or
some other measure of aggregate harm, but that subsection
excludes all offenses in 2(h)1.1, which would include the
instant civil rights offenses.

The exclusions enumerated in Section D do not apply
to other subsections, including subsection B.

The fact that an offense cannot be grouped pursuant
to one subsection of 3(d)1.2 does not preclude the offense
from being grouped pursuant to another subsection.

I don't think there's a dispute that the conduct
underlying both counts involve the same victim in two or more
acts constituting a common scheme or plan, and therefore I
feel that the probation officer's grouping was appropriate.

Mr. Kern, please object so you're preserved, if
there's an appeal.

MR. KERN:  Your Honor, for purposes of record
preservation, the government objects.

THE COURT:  The government objects that the
probation officer did not score the defendant under 3(c)1.1
for perjury at trial.

Mr. Kern, do you want to argue anything in
addition?

```
 1            MR. KERN:  Your Honor, the government's position

 2    has been fairly amply set forth in previous filings.  The

 3    United States is aware that the obstruction of justice

 4    enhancement is not always favored when it relates

 5    particularly to the testimony of a defendant; but it is the

 6    government's position that in this particular case, the

 7    misstatements of truth the defendant offered were

 8    particularly egregious, not only to the extent that they were

 9    falsely exculpating, but to the extent that they essentially

10    suggested that a wide variety of individuals in the federal

11    government, investigators, attorneys, et cetera, actively

12    either perjured themselves or grossly abused her rights.  We

13    believe that the extent of the dishonest representations

14    warrant the obstruction of justice enhancement in this case.

15            THE COURT:  Mr. Kent.

16            MR. KENT:  Judge, I'll rest on the probation

17    officer's statement, our position.

18            THE COURT:  Well, I feel that the defendant did

19    obstruct justice in her testimony.  The obstruction of

20    justice guideline 3(c)1.1 is applied if, A, the defendant

21    willfully obstructed or impeded or attempted to obstruct or

22    impede the administration of justice with respect to the

23    investigation, prosecution or sentencing of the instant

24    offense of conviction and, B, the obstructive conduct related

25    to, (i), the defendant's offense of conviction or any
```

1    relevant conduct or, (ii), a closely related offense.

2        Note four gives examples of obstruction of justice,

3    and under note 4(b), committing, suborning or attempting to

4    suborn perjury, including during the course of civil

5    proceedings, if such perjury pertains to conduct that forms

6    the basis of the offense of conviction.

7        Note six describes what "material evidence" means.

8    Material evidence, fact, statement, or information as used in

9    this section means evidence, facts, statement or information

10   that, if believed, would tend to influence or affect the

11   issue under determination.

12       Ms. Sharma's testimony was a reconstruction of the

13   events in an attempt to absolve herself from her own actions

14   and to discredit the investigation that had occurred in this

15   case, particularly the testimony of Agent Raby of the F.B.I.

16   The focus of her testimony was to the effect that F.B.I.

17   Agent Raby had lied about what she had said and what had

18   occurred.

19       She testified at trial that she told her fellow

20   Officer Kennedy that Mr. Delano and Mr. McCullah should not

21   cell together because both were drunks and the evening shift

22   was too short to deal with that.

23       She testified that Mr. Delano apologized to her and

24   she was done with that incident.

25       She testified that she told F.B.I. Agent Raby she

did not ask McCullah to hurt Mr. Delano.  I believe that she said something to that effect in the first interview with Mr. Raby.

She testified that when Mr. Raby said she told Mr. Raby that she kind of knew Delano would be beaten up when put in McCullah's cell, she meant it was a risk that any inmate would take when put in a cell with another person.

She directly testified that she told Lieutenant James that if Mr. McCullah and Mr. Delano were put in the same cell, they probably would fight and the evening shift would have to deal with it, and that the prison shouldn't put two drunks together.

Then on cross-examination on July 27th, she testified that she told Lieutenant James not to cell McCullah and Delano together, that it was a bad idea, that they probably would fight, but she was not aware of a single reason for McCullah to assault Delano; and she said she told Lieutenant James they were both drunks, that they should not be put together because drunks fight and cause a problem.

She also testified that she had told Mr. Raby that she had told Lieutenant James this in all three of her interviews.

She testified that she told Raby that the "break his leg" statement to McCullah was a joke, and she said it while Mr. Delano and Mr. McCullah were in the cell together.

1      She testified, I think the record says, Tuesday,

2  May 1st, she said that -- I think she may have said March 1st

3  as opposed to May.

4      She denied that she was given Miranda warnings on

5  the third interview.  She testified that she was threatened

6  with the death penalty, she was threatened that her husband

7  would be investigated, her daughter would be parentless, and

8  she would get life in prison and not see her daughter again.

9  And she denied under oath that she was told that she could

10  end the interview at any time and get an attorney.

11      On July 27th, she also testified around 10:43 a.m.

12  that she was not involved in Mr. Delano's move to Mr.

13  McCullah's cell.  She testified again that in all three

14  interviews with the F.B.I., she told the F.B.I. that she had

15  told Lieutenant James not to cell Delano and McCullah

16  together.

17      The defendant made misrepresentations to the F.B.I.

18  agents in her interviews, but my focus here is on her

19  testimony at trial in which she misrepresented and lied and

20  committed perjury.  She lied about material facts concerning

21  the charges against her and, as I said previously, sought to

22  discredit Mr. Raby's testimony and have the jury believe that

23  he, not she, was lying.

24      Her testimony conflicted with the overwhelming

25  evidence to the contrary.  The jury obviously did not believe

her, and consequently I feel that the obstruction under

3(c)1.1 of justice should be applied.

Her testimony conflicted with the testimony of

Agent Bolin and Agent Raby.  On the January 9, 2006,

interview, they related that the defendant told them of the

incident in which Delano grabbed her arm and she screamed,

"Motherfucker, you're dead."

She said she knew McCullah was in the Aryan

Brotherhood and she had training on this.

She also said, according to their testimony, that

Mr. McCullah ran all the hootch and tobacco sales in the SHU

and with the help of staff.  She said she knew that McCullah

was violent, chronically intoxicated, and routinely set fires

in his cell; and that if assigned a roommate, would violently

assault the roommate, and therefore McCullah had to be in a

cell alone.

She denied doing favors for Mr. McCullah, and said

she did not know that Mr. Delano was a snitch until after the

assault.  That was in the first interview, and one or both of

the agents testified to these matters.

Defendant said in this first interview, January 9,

2006, according to the testimony, that she told Michael

Kennedy, the number one SHU officer, that it was not a good

idea to move Mr. Delano into McCullah's cell when Kennedy

suggested this, because both prisoners regularly got drunk

and McCullah had violent tendencies and would assault Delano.
She did not say in her interviews at any time that she told
Lieutenant James this.

Defendant, according to the testimony of the
agents, also told Mr. Raby and Mr. Bolin that there were no
separatee issues between these two prisoners; the paperwork
was clear; and that she and Kennedy met with Lieutenant James
on February 28, 2005, and told Lieutenant James that Delano
had asked to be moved in with McCullah, of course, which was
not true, and that no paperwork problems would prevent this
re-arrangement, and that Lieutenant James approved the move.

As to the January 9, 2006, interview, Mr. Bolin and
Mr. Raby or one of them testified that defendant told them
that no one had told James of the safety concerns, which was
a direct contradiction of her testimony at the trial.

Defendant said right after the meeting with James
and Kennedy, she met with Mr. McCullah and showed him her
arm.  She denied that McCullah made threats or that she
requested anything of Mr. McCullah in her testimony.  That
was contrary to her statements to the agents in the meeting
on January 9th or in the meetings that she had with them, not
necessarily on January 9th.

Mr. Raby and Mr. Bolin testified as to the June 19,
2007, interview.  Defendant in that interview stated that she
disliked Mr. Delano because he was a rat and a snitch and got

staff in trouble, when in the earlier interview she had said
she had no idea he was a cooperator until she heard rumors
after his death.

　　　　She told the agent she spearheaded an effort to get
Delano fired as an orderly, and it was a well-known fact that
Delano was a snitch and that he was detested by other inmates
because of this, and it was the reason that Delano could not
be housed in the general population.

　　　　She stated in that interview that she told Kennedy
that she would do all the talking with Lieutenant James, that
she broached Delano's move to McCullah's cell, said Delano
requested the move, and that all paperwork checked out and
there were no problems with the move, and she said to the
agents that she did not tell Lieutenant James of the safety
concerns.

　　　　She said she and Kennedy discussed not moving
Delano while she was at the prison; and she said that she
knew Delano would be harmed, if moved, and debated telling
him or Lieutenant James.

　　　　At the June 19, 2007, interview, she said her
conversation with Mr. McCullah was March 1st, and she said
she showed Mr. McCullah her injuries, and he asked if she
knew that Mr. Delano would be moved to his cell and, if so,
that he would kill him.  And she told the agents that she
told Mr. McCullah, "No, don't do that.  Just break his leg."

1    She said nothing about joking during these interviews.

2              The June 29, 2007, testimony of Mr. Raby and Ms.

3    Adams related that defendant had been given her Miranda

4    warnings, which defendant denied under oath; and Mr. Raby

5    testified that defendant stated she knew McCullah would

6    attack Delano when Delano was put in his cell.

7              Lieutenant James, who testified, stated that he

8    authorized Delano's move to McCullah's cell because he was

9    told there were to separation issues and that McCullah and

10   Delano wanted to room together.  He testified he would not

11   have approved this move if he had known of the dangerousness

12   or that Delano did not want to move.  That was in direct

13   conflict with defendant's testimony at trial and comports

14   with what the F.B.I. agents testified that Delano -- that Ms.

15   Sharma told them in her interview on June 19, 2007.

16             Mr. Williams testified that he heard Ms. Sharma

17   state, "You bitch, motherfucker.  You'll die for that.  You

18   motherfucker rat," to Mr. Delano and heard the food slot slam

19   around February 23, 2005.

20             He testified that he heard defendant open

21   McCullah's slot around February 28, 2005, and say, "Look at

22   what that motherfucker did to me.  Can you do something about

23   it?"

24             He testified Mr. McCullah responded, "Get him in

25   here, and I will motherfucker kill him."

Defendant said she was going on a vacation in two days and would try to get him in McCullah's cell before she went, which is testimony tending to show that Mr. Delano was not in Mr. McCullah's cell at the time.

Mr. Williams testified that defendant was not joking when she had this conversation.

On March 1st, he stated that -- Mr. Williams stated that he heard Delano being moved into McCullah's cell and warned Delano not to do this or tried to warn him not to do this.

Mr. Shaborn Emmanuel testified that he heard the altercation between Mr. Delano and defendant in February of 2005 and that defendant repeatedly told Delano that he was a dead man.  He testified that his cell was directly across from Mr. McCullah's cell, and that later the same day defendant talked to McCullah about what happened and said she wanted Delano dead and asked if McCullah could do it when she was off work, and that McCullah said yes.

Mr. Bell testified that he heard a fight between the defendant and Mr. Delano, and that the defendant said, "You're dead," and the next day that Delano was moved.

After the fight, he heard defendant tell McCullah that Delano hurt her and that she was mad.  She told McCullah to that care of Delano, but wait until she was on vacation, and McCullah stated that he would.

1      Mr. Wiggington testified that he wanted to have a

2  bed when he was being moved into the SHU and not sleep on the

3  floor; and when he arrived at Coleman, he had been there

4  before, he asked to move in with Mr. McCullah's cell because

5  he knew that McCullah was alone and that defendant told him,

6  "No," and did a motion in the manner of cutting her throat,

7  and told him not to go in there because something was -- at

8  least he understood that to mean not to go in there because

9  something was going on.

10      He also testified about McCullah's personal

11  belongings being moved to another prisoner, which he said

12  indicated that he knew that McCullah was going to hurt

13  Delano.

14      David Williams testified that he was in the cell

15  next to McCullah.  On February 23rd, 2005, he heard an

16  argument between defendant and Delano.  Defendant called

17  Delano a protective custody motherfucker and said, "I'm going

18  to get you killed," or words to that effect.

19      Later that day defendant opened McCullah's food

20  slot to show defendant -- to see her injury, and McCullah

21  said that he would get Delano for doing that, and defendant

22  said, "Don't kill him; just rough him up."

23      Marcus Connelly testified as to the beating of

24  Delano on March 4, 2005, by Mr. McCullah; and stated that out

25  of the blue one day, defendant told him she had nothing to do

1   with this assault.

2          Mario Solano described a conversation between

3   Delano and Kennedy in which Kennedy bribed and then -- tried

4   to bribe and then threaten Delano to get him to move into

5   McCullah's cell.  He testified that Kennedy told Delano that

6   Kennedy would take the three-man hold off Delano if he would

7   move into McCullah's cell; and then Kennedy said to Delano

8   that "'Animal,'" meaning McCullah, "has wine," which Delano

9   would like.  Then he said to Delano that he, Kennedy, would

10  give him cigarettes.

11         Mr. Solano testified that Mr. Delano said, no, that

12  he wasn't moving.  He wanted his job back as an orderly.

13         And then Kennedy threatened to have -- to suit up,

14  meaning to call in the brew squad.  Delano responded to bring

15  them.

16         And Kennedy left and then came back and gave Delano

17  cigarettes, and Mr. Solano testified that Mr. Delano was

18  negotiating because he wanted his job back.

19         Now, I have taken into consideration the testimony

20  of Martin Vore, Lenthell Rosemond, William Kerce, and Roy Lee

21  Smith; but it is obvious to me that the defendant lied during

22  the course of the trial on material matters, and therefore

23  I am going to sustain the objection as to the scoring on

24  obstruction of justice, that it should be applied.

25         Mr. Kent, please object so you are protected.

1     MR. KENT:  Of course, we think the obstruction

2 should not apply.

3     THE COURT:  All right.  Now, I think that is all of

4 the government's objections.  Is that correct?

5     MR. KERN:  As to the Presentence Report, yes, Your

6 Honor.

7     THE COURT:  All right.  Mr. Kent, there were four

8 objections on behalf of the defendant.

9     MR. KENT:  Yes, Judge.  That is applicable

10 guideline for the offense.  As to the vulnerable victim,

11 you're saying four.  Then I also had the -- what I call my

12 anti-Booker objections you've heard before, and --

13     THE COURT:  Well, I'll let you argue those to me

14 separately, but let me take these in order of the paragraphs.

15     You have an objection to paragraphs four and 21 on

16 an ex post facto argument.  I cannot understand -- I looked

17 at this, and it doesn't appear to me that there is any

18 difference if the 2004 guidelines apply or the 2006 -- I

19 mean, the 2008.  I think that's what it was.

20     Is that correct?  Is there some difference?

21     MR. KENT:  Honestly, not that I'm aware of, Judge.

22 What my thinking about or our approach is this:  Because the

23 guidelines are so complex, including all their commentary and

24 their history, and so its almost impossible to know for a

25 certainty that if you say, "Well, we're going to apply a set

1   of guidelines four years later," with the succeeding

2   commentary and history, that we're not in some way impinging

3   on what may end up being an interpreter issue at the Eleventh

4   Circuit.

5               THE COURT:  Well, it's sort of a protective

6   objection?

7               MR. KENT:  Yes, ma'am.

8               THE COURT:  Because it seems to me they would both

9   apply, unless you can identify something; and if you can

10  identify something that would be in the benefit of the

11  defendant, I would apply that.  In other words, you know, if

12  you told me the 2004 guideline would result in a lesser

13  penalty for some reason, I would apply that.

14              MR. KENT:  Well, I guess as you used the term

15  "protective objection," what I'm thinking, for example, Mr.

16  Kern very ably brought up this business on the vulnerable

17  victim, about the historical change in the guidelines.  I

18  think there was a 1995 or 1996 amendment.

19              Now, if one just looks at the guideline today, as I

20  look at my colored book, you can't tell that just from

21  looking at it, yet if it becomes an issue and you get into

22  research, Mr. Kern found that.  And you can't even tell it,

23  as Mr. Kern noted, by looking at the Eleventh Circuit cases.

24  The Eleventh Circuit cases seem to have continued along the

25  vein of my objection.  That's just an example.

1          So I don't know, particularly here where we're

2    getting into this application of 2(h)11, which is the real

3    meat and potatoes here, is the question of the governing

4    guideline.

5          I agree with the Court, there appears to be no

6    difference between 2(h)11 2004 versus 2008; but I can't say

7    with confidence that there hasn't been some intervening

8    commentary or annotation from the Sentencing Commission that

9    may end up impinging disadvantageously to my argument, once

10   we get to the Eleventh Circuit, that is, I'm not raising new

11   arguments, but we'll be getting into a much deeper level,

12   obviously.

13          THE COURT:  Well, I want you to have all the

14   benefit of an appeal; but since I can't see --

15          MR. KENT:  Judge, can I stop you there?  We want

16   the appeal, too; but that doesn't mean you have to sustain

17   the government's objections.

18          THE COURT:  No, I wasn't.  Certainly not.

19          MR. KENT:  You don't need to give me more appeal

20   than I need.

21          THE COURT:  No, of course not.  But my point here

22   is you've got language from the Eleventh Circuit that

23   normally the court should apply guidelines that are in effect

24   at the time of sentencing.  If they're more lenient

25   guidelines, then those should apply.

1    I don't know that there is more leniency, and I

2  just don't see the difference between the 2004 or the 2008

3  edition.  It seems that right now both apply.

4    MR. KENT:  As they both apply without any detriment

5  to the defendant is what you're saying.

6    THE COURT:  That's what I'm saying.  I was looking

7  for the detriment.

8    MR. KENT:  My concern is just Mr. Kern is such a

9  good lawyer, that once we get to the Eleventh Circuit --

10    THE COURT:  With sweet praise, but go ahead.

11    MR. KENT:  No, not damning -- no, not damning with

12  sweet praise.  It is simply a sweet praise.  He is what he

13  is.  He's a very good lawyer.

14    I'm concerned that when we get to the level that

15  one gets to in the appeal, which, you know, no disrespect to

16  this Court or what I do here at the sentencing, but

17  inevitably a level of intensity that gets into the research

18  at the appellate level is greater, Mr. Kern may find

19  something like he found in his response to my vulnerable

20  victim objection, which was a complete surprise to me, would

21  have been, I think, a surprise to the Court but for his

22  research, then I will be disadvantaged.

23    I'm just wanting, as you say, a protective

24  objection.  If we get to the Eleventh Circuit, if it would

25  make a difference, then I think I'm entitled under Miller

 1   versus Florida --

 2            THE COURT:  You are entitled to the application of

 3   the guideline either at the time of the crime or at the time

 4   of sentencing, which provides the greatest benefit to the

 5   defendant.  You are entitled to that.

 6            So as I say, I don't see any difference.  To me,

 7   they are both applied here.  They are the same.  But I

 8   understand the position that you're taking, and I just --

 9   I'll overrule the objection because I don't see any

10   difference in them now, but I do understand what you're

11   trying to do.

12            So let's go to the next one and that is the

13   objection to offense conduct, and I think that was also one,

14   paragraphs five through 16, to preserve the record for

15   appeal, correct?

16            MR. KENT:  Yes, ma'am.  And I just -- I think we,

17   that is, the probation officer and I and Mr. Kern all agreed

18   that it wasn't -- didn't serve any purpose to go word by word

19   through the statement of the offense conduct.  The Court's

20   aware of Ms. Sharma taking the position she was not guilty.

21            THE COURT:  All right.  I will overrule that

22   objection.

23            Then paragraph 23, the base offense level of

24   2(a)1.1, and this is the involuntary manslaughter, murder in

25   the second degree, do you want to argue that further?

1          MR. KENT:  Yes, ma'am, just briefly.  And I note

2     one of the -- the lead case, I guess, that the government

3     cited in their sentencing memo -- and I thank Mr. Kern for

4     putting that in writing, it is helpful -- is the Conatser

5     case, United States versus Conatser, 514 F.3d 508, Sixth

6     Circuit, 2008.  An interesting feature of that Conatser case,

7     because in Conatser, just to say what we're talking about

8     here --

9          THE COURT:  I've got it.  Go ahead.

10          MR. KENT:  Yes, ma'am.  It's a question, of course,

11     you've got -- or generally in our case, you've got a death

12     resulting from a civil rights violation.  There's a jury

13     verdict of guilty of the civil right violation, resulting in

14     death.  The question is, what is the underlying offense

15     conduct?  Is it second-degree murder or is it some form of

16     manslaughter?

17          Generally speaking, we're talking about then what

18     level of intent is there?  Is it the intent requisite for

19     second-degree murder or is it the intent or lack of intent

20     that applies to either voluntary or involuntary manslaughter?

21          So now the Conatser case, the facts were somewhat

22     similar in that -- but it was several correctional officers

23     who were involved in a beating of an inmate who then died at

24     the hospital.  They may have been struck blows to the head.

25          Now, the defendant -- I think the actual defendant

was Marlowe, I believe, where this question of second-degree

murder versus manslaughter was an issue in the Conatser case.

It was multiple defendants.

His position was, "Well, I didn't hit the inmate.

I tried to render some medical aid after he was beaten, and

perhaps I didn't render adequate medical aid," and then he

died.  It's only manslaughter.

The court pointed out in response, "Well, actually,

there was evidence that you personally beat the inmate in the

head, not just the other defendant; and that you told the

other defendant to go beat him, and the other correctional

officer came back and told you that he had done so.

"You also knew about his vulnerability in the sense

of his medical vulnerability.  He had had some serious head

injury in the past.  So he was more susceptible to a head

injury."

Now, there, what I want to note is I'm not sure

what the Sixth Circuit meant, but at the applicable point of

the decision, they refer to the district court as not acting

clearly erroneously.  Now, that's an odd turn of phrase.  I

don't know Sixth Circuit law, but "clearly erroneous" is

normally a standard review for a factual determination.

It was being argued that it was a misapplication of

guidelines as matter of law.  So I think what the court

meant, I think it was just an unfortunate mistake, I think it

was a plain error review case.  I think that's what they were saying, but they say the court didn't clearly err.

Now, when that case -- so that's first point.  It wasn't clear error.

So Conatser doesn't stand for the proposition that the defendant objects and makes the type of objection we're here at sentencing that on appeal that wouldn't be error.

Then when Conatser petitioned for cert -- or, actually, the defendant was Patrick Marlowe.  October of 2008 certiorari was denied, and that's Patrick Marlowe versus United States, number 07-1390.  It's 129 Supreme Court 450.

Justice Scalia dissented in a written dissent, and in Justice Scalia's written dissent, he said, quote, "Since Marlowe's jury had not been asked to determine his mental state in connection with the death, the facts resolved by the jury verdict convicted him of no more than involuntary manslaughter through criminal negligence."

Now, I know this is mixed -- I don't mean to at this point bring in what I call the anti-Booker, because that's part of what Justice Scalia is talking about; but the other part, I think, or the implication of that sentence is that this can be involuntary manslaughter, at least according to Justice Scalia, on the facts of that case, on the record that was in front of Justice Scalia, which is what I just told the Court.

1              So here, we've got, I think, a better record in

2      terms of supporting argument for a manslaughter.

3              And what is -- let me say, too, Conatser and the

4      other cases that the government cites -- Conatser cites a

5      couple of other cases, one of them published, two others

6      published from the Sixth Circuit.  I don't think there is any

7      case law from this circuit to guide the court.  Conatser, I

8      think, stands for the general proposition that when a court

9      is presented with circumstantial evidence and the court's job

10     at sentencing is to decide what the level of intent is, that

11     in this context of a correctional officer doing something

12     that results in a beating and death of an inmate, the court

13     can infer malice aforethought.  The court is permitted to

14     generically on circumstantial evidence.

15             That's the most, I think, Conatser says, again,

16     subject to the clearly erroneous standard as opposed to and

17     the distinction I tried to draw from the language in the

18     Indictment and the evidence presented.

19             And before coming here, over the weekend I reviewed

20     again the government's opening statement, the government's

21     closing argument, the Court's jury instructions, and the jury

22     was repeatedly told by the government and by the Court in the

23     jury instructions that they did not have -- the government

24     did not have to prove any intent -- that was the language,

25     "any intent" -- on Ms. Sharma's part that caused the death of

1   Mr. Delano.

2           Let me say, too, I know Mr. Delano's family is

3   here.  I don't mean to aggravate their suffering by anything

4   I say here today.

5           But that's what the jury was told.  I think that

6   was the law, at least as given to the jury.

7           So the special jury verdict on death resulting, the

8   Court can't take anything from that to support a second-

9   degree murder application.  And, in fact, the evidence was,

10  as presented again by the government, in the express language

11  of the Indictment that the intent of Ms. Sharma was to cause

12  an assault, not to cause a death.

13          Now, a quick aside.  I've been told that Coleman

14  Federal Correctional Complex is exclusive federal

15  jurisdiction property.  I learned that this morning -- or

16  this afternoon.  F.B.I. Agent Raby told me that, and then the

17  counsel for Coleman is here and he's told me that as well,

18  and I accept that representation.  I assume that's true.  I

19  didn't know that.  That was new to me.

20          And I did -- Mr. Kern and I spoke about this,

21  Judge, before court, and I suggested to Mr. Kern perhaps we

22  could -- to just make a complete record on that point,

23  because it may be important, that the government or I could

24  supplement the record after the sentencing, just for purposes

25  of the appellate record, to -- with some evidence, perhaps an

1 affidavit or something as to the exclusive federal

2 jurisdiction.

3        Why I'm bringing that up is because I started

4 thinking 2(h)11 tells the court to look to the applicable

5 guideline for the underlying offense.

6        Now, what is the underlying offense?  Is it some

7 form of murder manslaughter?  Is it -- because I myself

8 pointed the probation office and the government and the Court

9 in my sentencing memo to the federal jury instruction,

10 Eleventh Circuit pattern criminal jury instruction on murder,

11 second degree, and manslaughter.

12        And I started thinking, "But wait a minute.  Is it

13 a federal offense?"  Now, not knowing that it was exclusive

14 federal jurisdiction property, it's a state offense, murder

15 or manslaughter.  Instead, we should be looking at the state

16 jury instructions and the state elements, because if the

17 underlying offense is either murder or manslaughter, we look

18 to the elements of the state offense.

19        I think that still, even if it is still exclusive

20 federal jurisdiction, it's still instructive, because if -- I

21 believe Your Honor was a state court judge before you were on

22 the federal -- no.

23        Well, then, I do a lot of state practice.  I

24 brought the state jury instruction with me, and the state

25 jury instruction for manslaughter doesn't have the qualifying

language that the federal manslaughter instruction does, that
the government points to, that manslaughter can apply or may
not apply if the act that's committed that results in the
death is a felony.

Now, that felony concept isn't in the state
manslaughter; but be that as it may -- I hope I'm not losing
the Court here.

THE COURT:  No, no.

MR. KENT:  Be that as it may, Judge --

THE COURT:  It's not that dense an argument, but go
ahead.

MR. KENT:  No.  I told a friend recently, I've
gotten to the point where, at my age, I can only make simple
arguments.  I can't keep the complicated ones in my head
anymore.

That is a very simple argument.  Look at the jury
instruction, though.  And I'm only saying this, you know, to,
I think, make the point more clear, though.  The involuntary
manslaughter instruction, now, the government's opposition on
this point in part is that the involuntary manslaughter
instruction says as the third element that the death of the
victim occurred as a sequence of and while the defendant was
engaged in committing an unlawful act, not amounting to a
felony, namely described unlawful act, or in committing a
lawful act in an unlawful manner or with wanton and reckless

1    disregard for human life.

2         Well, first -- I have several points here.  I think

3    the Eleventh Circuit pattern instruction here is in error.  I

4    think the reference to felony didn't get articulated

5    correctly.  I think what the instruction should have said was

6    an enumerated felony.  I don't think it's the commission of

7    any felony that takes one out from under the umbrella of

8    manslaughter.

9         Look at the state?  Look at, I think, generic, the

10   definition of manslaughter.  It's only the enumerated

11   felonies that put one in the category of felony murder that

12   would take one out from under manslaughter.

13        So I think this is actually just not stated well.

14   We're not in an enumerated felony category.  The enumerated

15   federal felonies or enumerated state felonies, this is not

16   one of them, either Count One or Count Two.

17        Whether that's so or not, but I think it's clearly

18   so, let me say the enumerated felony concept in Florida can

19   be a third-degree felony as well as a first-degree death

20   felony murder, or in committing an unlawful act -- committing

21   a lawful act in an unlawful manner, and that's what we have

22   here.  Count Two, for example, very specifically says what

23   she did wrong, and it says she caused the move.

24        Well, that's not unlawful, but she's doing it in an

25   unlawful manner, unlawful objective or with wanton and

1    reckless disregard for human life.  I'd say that's the gist

2    of the government's case.  That's the evidence in this case.

3              Now, the second -- the government points to the

4    second-degree murder jury instruction, which says. . .

5              THE COURT:  The state instruction is for

6    manslaughter.

7              MR. KENT:  Yes, ma'am.

8              THE COURT:  Is there anything with reference to

9    malice aforethought?

10             MR. KENT:  Let me just get that in my hand so I can

11   give you a copy and then answer it.

12             Judge, I did not bring the state second-degree

13   murder instruction, but I believe that's where one finds the

14   malice aforethought comparable to the federal.

15             THE COURT:  Isn't that a distinction, though,

16   between?

17             MR. KENT:  No, ma'am.  I think they're parallel,

18   that is, the malice aforethought is what brings us into

19   second-degree murder.  In a nutshell, I think the

20   government's argument is this is malice aforethought.  This

21   is second-degree murder.

22             Malice aforethought, looking at Conatser, a

23   correctional officer has a duty to protect the inmates.  It's

24   a known dangerous situation, as some of the evidence you were

25   reciting.

1      THE COURT:  In the state elements, since you've

2 gotten into the state jury instructions, where does malice

3 aforethought fall?  Isn't it in second-degree murder and not

4 an involuntary manslaughter?

5      MR. KENT:  Yes, ma'am.  That's my understanding,

6 which is the same in the federal.  The federal -- the malice

7 aforethought is the second degree.

8      Now, if we look at the -- this is pattern

9 instruction 45-3 of the Eleventh Circuit's pattern criminal

10 jury instructions.  And let me say I think the malice

11 aforethought is in the commentary, because the actual

12 instruction for second degree says, "The victim named in the

13 indictment was killed, element one.  Second, the defendant

14 caused the death of the victim with" -- excuse me, here it

15 is -- "with malice aforethought," the second element of

16 second degree; "and, third, that the killing occurred within

17 the special maritime territorial jurisdiction of the United

18 States."

19      So, in a nutshell, the government's argument is

20 that under these circumstances, the court infers malice

21 aforethought; but I don't think we can.  I think that we

22 instead, from the government's evidence -- and I've made a

23 note when you're reciting the evidence on the obstruction.

24 One of the things you recited is the basis for the

25 obstruction enhancement, something that was true versus

something she testified at trial, was that the truth was

"Don't kill him; just rough him up."

Judge, I'm not defending that statement, but that's not malice aforethought.  That's not -- one doesn't infer from that, and another -- when one looks at the jury instructions, the jury instruction was given, what I call, a principle type or agency instruction in this case, that is, there were alternative legal theories that the jury could convict Ms. Sharma under.  There was Pinkerton-type liability for a co-conspirator.  There was reasonable foreseeable, but there was also agency.  So we've got multiple legal theories in front of the jury.  We don't know which theory the jury convicted on.

One could have been agency.  And this is a page of the jury instructions, I believe it's page 1417, one thousand four hundred and seventeen, of the transcript of the jury instructions.  It says, "So if the acts or conduct of an agent, employee or other associate of the defendant are willfully directed or authorized by the defendant". . .

So that was the legal theory the jury was given, agency.

Then we come back then to our express direction to Mr. McCullah, "Just rough him up.  Don't kill him."

Now, I think this case is unique because of that aspect.  This isn't like Conatser, where the Court could

point and say, "But wait a minute.  The evidence was you actually threw two blows to the head of the man who died, Mr. Marlowe."  Instead, this is an agency prosecution where the defendant said, "Don't kill him; just rough him up."

Now, on the serious bodily injury, that's another aspect, another sort of point that the government makes in their sentencing memo; but I looked carefully at the jury instructions as well as the language in the Indictment, and neither the Indictment nor the jury instructions -- what I'm saying here -- I'm segueing into another point -- the intent to cause serious bodily injury could take one out from under, so the government argues, involuntary manslaughter.

Let me say I think all that argument gets the government to, if it's correct, is to a voluntary manslaughter, which the guideline range here would be around 15 years, subject to your obstruction enhancement as opposed to the guideline range I suggest for the involuntary; but that requires, though, that the jury had made a finding of serious -- intent to cause serious bodily injury, and that was not in either the Indictment or the jury instructions.

Instead, the jury instructions said, "only a substantial risk of physical assault."  This is at page 1408 of the transcript of the jury instructions, and that concept was repeated throughout the jury instructions, not that she had intent to cause serious bodily injury.

1      I think the government's own take on the statement,

2  "just break a leg," was that was facetious.  That was not

3  meant to literally say, "Go break his leg."  Rather, it says

4  the court -- what the court cited, "Just rough him up," that

5  was the concept, I think fairly taken from the evidence in

6  this case that Ms. Sharma's intent was that this man be

7  roughed up for bruising her.

8      More than that, I think, really defies common

9  sense; that this lady would want a man murdered for a bruise

10  and knowing the inevitable investigation and everything that

11  would follow on a murder of an inmate as opposed to a

12  roughing up, which I think the Court can take judicial notice

13  is an everyday event in a penitentiary.  There would be no

14  investigation.

15      So I think that's a fair reading of the evidence.

16  I don't think it's a strained construction of the evidence.

17  I'm sure the government has a different view, but I do think

18  this is a fair reading; and I think it supports our argument

19  for the application of involuntary manslaughter or,

20  alternatively, the voluntary manslaughter.

21      Judge, I think I've made my point on that.

22      THE COURT:  What are the voluntary manslaughter

23  elements?

24      MR. KENT:  Let me see.  Just one second, Your

25  Honor.

1          THE COURT:  Well, you've given me the elements for

2    manslaughter.

3          MR. KENT:  I've got the voluntary here, Judge, at

4    the table.  That's 46.1 of the Eleventh Circuit pattern.

5          THE COURT:  Well, no.  I'm asking for your argument

6    on the state -- you're arguing the state.  So I'm trying to

7    understand --

8          MR. KENT:  I see.

9          THE COURT:  Is it what you gave me, 7.7?  That is

10   voluntary manslaughter?  And if it is, then what is

11   involuntary?  How does involuntary differ from this?

12         MR. KENT:  Well, no.  My argument is that it is

13   involuntary manslaughter.

14         THE COURT:  I know, but you're saying, even if it

15   was voluntary manslaughter, the range would be in the 15-year

16   category.

17         MR. KENT:  Oh, yes, ma'am.

18         THE COURT:  I'm trying to understand the difference

19   between the two.

20         MR. KENT:  Well, the intent was to cause serious

21   bodily injury as opposed to --

22         THE COURT:  Culpable negligence?

23         MR. KENT:  Yes, ma'am.  And that's why I think it's

24   important to look to the jury instructions, which simply

25   don't track -- as would be required to apply serious bodily

1    injury, don't track that language, but allow the jury to

2    convict on something less.

3         The intent to cause an assault put them at

4    substantial risk of physical harm, was the language in the

5    jury instruction.

6         THE COURT:  For purposes of your argument, and I

7    will hear from the government and give you the opportunity to

8    respond, Mr. Kent, also, it wasn't negligence.  It wasn't

9    culpable negligence.  So involuntary manslaughter, to the

10   extent you're arguing the state elements, really doesn't fit.

11        There was an intent to cause serious bodily injury,

12   to teach him a lesson; and if that falls under voluntary

13   manslaughter, then I need to understand your argument on the

14   distinction between voluntary manslaughter and murder in the

15   second degree, and does that get into the malice element of

16   the felony element.

17        MR. KENT:  Well, two responses, Judge.  I'm only

18   pointing to the state instruction now as sort of a guidance

19   to interpret or understand the federal instructions, because

20   I accept the -- what I've been told:  There was exclusive

21   federal jurisdiction.

22        And the guidance that I'm looking to the Court to

23   take from that instruction is that we're not concerned about

24   whether the action that she took was or was not a felony; and

25   I think that that's a bit of a red herring, because I think

1   that really means the enumerated felonies.

2          I don't agree that there was intent to commit

3   serious bodily injury, but, rather, just this intent that he

4   be roughed up, and that's not to the level of serious bodily

5   injury.

6          THE COURT:  Counsel, I understand your argument,

7   but I'm giving you the chance here to argue in anticipation

8   of the government.  Perhaps I should then hear from the

9   government and let you respond.

10          MR. KENT:  Well, Judge, I think their argument

11   would be that that takes her into second-degree murder, if

12   there's intent to do serious bodily injury; and then the man

13   dies, that's second-degree murder.

14          THE COURT:  Well, that is why I asked you the

15   question about the elements for voluntary manslaughter

16   vis-à-vis second-degree murder and to distinguish the two.

17          MR. KENT:  Well, I think that it may be, being most

18   intellectually honest about this, that none of this is an

19   exact fit, and that's why I was pointing to the voluntary

20   manslaughter, because you pointed to negligence, although I

21   think involuntary manslaughter can either be by intentional

22   act or by negligence.

23          There's two forms of manslaughter:  Intentional act

24   or negligence.

25          So I it was thinking more -- there is an

1    intentional act.

2           THE COURT:  Well, the elements you just handed me,

3    which I have not looked at incident to this hearing before,

4    says that the statements prove the following two elements

5    beyond a reasonable doubt:  One, the victim is dead; and,

6    two, it says give 2(a), 2(b) or 2(c).

7           So this means in the alternative to me.

8           MR. KENT:  Right.

9           THE COURT:  2(a) is defendant intentionally caused

10   the death of the victim; 2(b) is defendant intentionally

11   procured the death of the victim; and 2(c) is the death of

12   the victim was caused by the culpable negligence of the

13   defendant.

14          I assume -- perhaps I'm in error -- that you would

15   go under 2(c) in making your argument.

16          MR. KENT:  Yes, ma'am.

17          THE COURT:  All right.

18          MR. KENT:  That's why I say under -- again, that's

19   just for some guidance under the federal jury instruction.

20   Right, it's involuntary manslaughter.  It's this wanton and

21   reckless disregard.

22          THE COURT:  And then that's why I didn't asked you

23   the question about the elements for voluntary manslaughter.

24   And instead of the 2(c) provision under voluntary

25   manslaughter, I believe you said that there needs to be an

 1    intent to cause serious bodily injury.  That's what

 2    distinguishes voluntary manslaughter from involuntary

 3    manslaughter, correct?

 4              MR. KENT:  Well, if I said that, I misspoke.  What

 5    I'm trying to say, Judge, is, because -- no.  The intent to

 6    cause serious bodily injury, I think, if I look at the second

 7    degree, the federal, the second-degree murder instruction --

 8              THE COURT:  Well, this is voluntary manslaughter

 9    I'm asking you about now.

10              MR. KENT:  Right.  I'm saying if I said that, I

11    misspoke.  What I'm -- I was trying to say more precise, I

12    don't think any of these instructions are an exact fit.  I

13    think what the Court's really called upon to do is the

14    generic advice of the guidelines or requirement when there's

15    a guideline -- you're to apply the guideline most applicable.

16              And what I was trying to say, and I apparently

17    misspoke there, was we've got a voluntary act here, that

18    is -- according the government the evidence, she's directing

19    Mr. McCullah to rough him up.  So this isn't like negligence.

20              In that sense, it's not -- so in that sense, it

21    doesn't fit 2(c) of the state instruction.  In that sense, it

22    doesn't fit perhaps 46.2 of the federal instruction, but it's

23    closer to that, because we don't have anything, in my view of

24    the evidence here, anything like an intent to cause a death

25    or even an intent to cause such a beating that you know it's

1    very possible he's going to die.  I don't think that's a fair

2    reading of the evidence in this case.

3         THE COURT:  Have you exhausted your argument for

4    the time being?

5         MR. KENT:  I think for this Court, yes, Judge.  And

6    thank you for listening.

7         THE COURT:  I would point out, however, that Mrs.

8    Sharma denied that she had anything to do with this at all.

9    So in saying she said, "Just rough him up," you're picking

10   from one. . .

11        MR. KENT:  From the Court's finding that you just

12   made on obstruction.

13        THE COURT:  Well, I didn't make that as a finding.

14   I was going through the overwhelming evidence to the contrary

15   of Ms. Sharma's testimony.  Not all of those people said the

16   same thing, as you heard when I went through them.  Some said

17   that she said that he was going to be killed and so forth.

18        MR. KENT:  I think there -- wasn't it just one

19   inmate witness who said she said to kill him?

20        THE COURT:  Correct.

21        MR. KENT:  And he was the outlier, because the

22   preponderance of the evidence was to the contrary.

23        THE COURT:  My point being that the defendant

24   denied that she said anything of the nature that you're

25   arguing.

1           MR. KENT:  Judge, unfortunately, I'm here at the

2    sentencing.  So I have to take the case as it comes to me,

3    you know.

4           THE COURT:  That's all right.

5           Mr. Kern.

6           MR. KERN:  Yes, Your Honor.  Thank you.

7           THE COURT:  Since voluntary manslaughter has not

8    been argued to me by either side, can you tell me the

9    elements of voluntary manslaughter?

10          MR. KENT:  Judge, may I just withdraw the whole

11   voluntary manslaughter?

12          THE COURT:  No, not now.  I'm interested in this.

13          MR. KENT:  I may just be confusing the matter.

14          MR. KERN:  Your Honor, as a threshold matter, I

15   can't speak to practically anything involving Florida law.  I

16   admit I'm not conversant in that.

17          My understanding about voluntary manslaughter in

18   the federal system -- and I'm going off of memory -- is that

19   it is the same elements as second-degree murder, but heat of

20   passion takes the place of malice aforethought.

21          THE COURT:  All right.  You don't really know, is

22   what you're saying?

23          MR. KERN:  I -- that's my recollection.  I don't

24   know.

25          THE COURT:  Don't give me an argument, then, if you

1    don't really know, because I'd like to know.

2              All right.  Let me hear your argument, then, in

3    response to Mr. Kent's argument.

4              MR. KERN:  Yes, Your Honor.  Thank you.  I guess

5    I'd first like to address the law and then perhaps some of

6    the facts as Mr. Kent has represented them.

7              First, turning to the law, it is, of course, the

8    government's position that the correct underlying offense

9    here, as indicated in the Presentence Report, is

10   second-degree murder.

11             In essence, Your Honor, the federal system defines

12   second-degree murder using some fundamental concepts that

13   come from English common law, specifically malice

14   aforethought.  And the jury instructions for the Eleventh

15   Circuit define this relatively clearly, both in the

16   instructions themselves and the commentary.  It can be found

17   by either finding an intent to kill, an intent to do serious

18   bodily injury or extreme recklessness and wanton disregard

19   for human life, i.e., a depraved heart.

20             It is the government's position that there's

21   sufficient evidence to make a finding that second-degree

22   murder applies here under any of these three criteria.  As to

23   the first intent to kill, there was in fact, to my

24   recollection, one inmate witness who explicitly testified

25   that the defendant did in fact ask Mr. McCullah to kill Mr.

1    Delano; and in light of this, combined with the broader

2    context of the conversation, that could be enough.  But we

3    prefer to focus our argument on the latter two prongs.

4           The intent to do serious bodily injury, I don't

5    mean to jump ahead to my factual discussion, but even taking

6    what the defendant said at face value, I think that the exact

7    line was, "No, don't do that.  Just break his leg," I don't

8    know exactly where the "roughing up" language came from, but

9    the specific words out of the defendant's mouth involved

10   breaking his leg.

11          Breaking someone's leg, in the government's

12   estimation, is a far cry from just a little slapping around

13   in a cell, particularly when the individual being solicited

14   is a convicted murderer with a long history of violence

15   against cellmates who wishes -- and in fact it was

16   well-known, hated informants and wished to join the Aryan

17   Brotherhood, a prison gang when one can only be admitted by

18   killing an enemy of the gang, such as informants.

19          In light of the broader context of this combined

20   with the words that this defendant set forth, it seems very

21   clear that serious bodily injury is what was intended.

22          I would further add that the preface to that

23   remark, "No, don't do that," would seem to suggest, as Mr.

24   Kent sets forth, some kind of exculpatory mind set on the

25   part of the defendant, but there's really very little

evidence to support it.  We have the defendant's own
representation that's what she said to Mr. McCullah.  We have
nothing else.  I'm not aware of any other individual who
provided any testimony or any form of evidentiary support
that the defendant actually said that, and it seems to the
government there's no reason why the Court should credit that
obviously exculpatory and self-serving statement on the part
of the defendant when there is simply no support for it and
ample reason to think that representation was just another
act on the part of the defendant to minimize her own
involvement in this matter.

        But even apart from that, we think that this is
second-degree murder based on the third prong:  The extreme
recklessness and wanton disregard for human life, which is to
say a depraved heart.

        It seems to the government that engaging in lies
and dishonesty, to put a known informant into the cell of a
man who notoriously hates informants, who is notoriously
violent, who commits murders, who wishes to join a murderous
prison gang, the mere act of doing that, knowing what the
consequences would be, having discussed it with a
co-conspirator, this unto itself would seem to the government
to be a textbook example of what a depraved heart is all
about.

        Anyone would see that this particular situation

1    would certainly end in catastrophe, yet this particular

2    defendant arranged for that environment, knowing the

3    violence, knowing the danger, having discussed the violence

4    and the danger, without even the slightest regard for this

5    man's future, his well-being or his rights.

6            This seems to the government, even if nothing else

7    succeeds, to be indicative of a depraved heart and falling

8    exactly within the heartland of the kinds of cases that the

9    depraved heart language was intended to encompass.

10           Again, I can't comment as to what Florida state law

11   suggests.  I admit that until that piece of paper was put in

12   front of me, I simply hadn't seen it before.  I would propose

13   to the Court, to the extent that Coleman is a federal

14   facility and that the defendant was a federal corrections

15   officer, the appropriate place for us to look would in fact

16   be federal law.

17           It was brought to my attention prior to this

18   sentencing that the particular area of Coleman is uniquely

19   within the federal jurisdiction.  The local police do not

20   have jurisdiction to deal with crimes that take place there.

21   It is a federal facility.  Therefore, it is federal law and

22   federal guidelines that ought to control.

23           I believe I really have already addressed the

24   evidentiary questions I had.  Mr. Kent has made the

25   representation that, in his mind, it's just not clear how

much abuse Mr. Delano was intended to suffer at the hands of

Mr. McCullah.  Again, it's the government's position that

both based on the words that the defendant set forth, to

"break his leg," based on the context of great violence,

great wrath, alcohol addiction and contempt for informants

that Mr. McCullah possessed, taken altogether, there's just

no way any reasonable person could assume that anything but a

terrible beating would ensue; and there's plenty of case law

to suggest there where an individual is subjected to a

terrible beating that ultimately leads to death, second-

degree murder is the appropriate standard.

         Therefore, Your Honor, both based on the facts as

they were set forth in trial and fully substantiated and

based on the pretty clear law as it applies to the

application of second-degree murder in the federal system and

based on the other statements set forth in our various

filings, we would ask that second-degree murder be found as

the underlying offense for both crimes in this matter.

         THE COURT:  All right.  Thank you.

         Mr. Kent, do you want to respond?

         MR. KENT:  Briefly, Judge.  The government is

coming in part from the annotation to 45.3, the jury

instruction on second-degree murder; and the annotation is

citing the Sheffey case, United States versus Sheffey,

S-h-e-f-f-e-y, 57 F.3d 1419, Sixth Circuit, 1995; and the

annotation says about Sheffey, the Sixth Circuit adopted the

same -- essentially the same definition of malice

aforethought, calling malice aforethought may be established

by, one, evidence of conduct which is reckless and wanton,

et cetera, et cetera.

That -- Sheffey, in turn, is cited by Conatser.  So

we're getting in a circle here.

That, I think -- I'm not sure what that -- the

significance of that annotation, because that is the same

language, though, that is the third element of involuntary

manslaughter in the Eleventh Circuit.  So that may be good

law in the Sixth Circuit and may be interesting to put in an

annotation, but it's inconsistent with the jury instruction

itself, because the third element of involuntary manslaughter

is that self-same reckless disregard for human life.

It can't be both.  It can't support second-degree

murder and support involuntary manslaughter, or if it

supports both, then the Court has to go with the lenient

application.  But it's involuntary manslaughter.

On the depraved heart, I do a lot of murder

appellate work.  I agree in concept of what depraved heart

is.  That is the beating that Mr. McCullah inflicted on the

victim, Mr. Delano, that would satisfy a depraved heart; but

that's not the intent that Ms. Sharma had nor can she be

charged with that intent.  This gets back to the -- again, I

1   just point to the jury instruction, the principle theory that

2   the jury was charged under, her instructions.

3            On the comment that this was a self-serving

4   statement about, "Don't kill him," I think the government

5   can't have it both ways, because it seems to me from reading

6   the government's opening and closing that the government

7   relied heavily upon that statement and turned it against Ms.

8   Sharma.  Instead of being self-serving, it was incriminating.

9   That was the government's view of the case to the jury.  And

10  I don't think they can have it both ways.  It can't be the

11  foundation for the incrimination, because that was the

12  foundation for the conspiracy, in large part, on Count One,

13  and then you pull it back when she wishes to assert it to

14  mitigate the intent.

15           A small point:  I think on the break her (sic) leg,

16  of course, there was -- and I think -- my recollection -- I

17  didn't bring the opening with me, but I think this reference

18  to the "rough him up," Mr. Kern will probably remember better

19  than me, I think it was his opening, but I thought that the

20  government actually used that very expression in their

21  opening, anticipating some evidence.  And there was the

22  evidence which this Court then referred to on the obstruction

23  finding.

24           But on the "break a leg," that clearly is not meant

25  as a literal.  That's an expression that people use, whether

it's for various applications; but it wasn't meant to be like the football player, "Let's break Mr. Washington's leg." This is a euphemism.  It was "rough him up," is what that meant.

So -- then a small point on the -- Mr. McCullah, that one would know he's going to kill, because he wants to become a full-fledged member of the Aryan Brotherhood, and a condition precedent in joining the Aryan Brotherhood is that one must kill an informant, but that wasn't the evidence. Special Agent James Raby testified that one could get one's credentials to join the Aryan Brotherhood by either killing or beating someone up.  That's all, Judge.

Judge, I would withdraw my --

THE COURT:  I have done a quick study here of voluntary manslaughter -- I asked my law clerk to get the elements under Florida law -- and it appears that the distinction is voluntary manslaughter upon a sudden quarrel or the heat of passion.  Well, actually, this is under -- this is not state law that you've got me, but there are cases here.

MR. KENT:  Judge, I'll withdraw that whole voluntary manslaughter.  I'm just confusing the issue, I think.  I'll withdraw that argument.

THE COURT:  Well, voluntary manslaughter is a crime of intent, and involuntary manslaughter is not.

1          MR. KENT:  All I was trying to say there, Judge, is

2    we're somewhere in between, I think.

3          THE COURT:  All right.  Gentlepeople, this is the

4    best I can do with these arguments.  I've looked at -- or had

5    researched some of these cases involving analogous situations

6    to see the guidelines that were applied.  The Conatser case,

7    514 F.3d 508, the Sixth Circuit, 2008, affirmed the

8    imposition of a life sentence using a base offense level

9    applicable to second-degree murder.

10         In United States versus McDougal, which is a Sixth

11   Circuit case in 2003, the Sixth Circuit affirmed the

12   imposition of a life sentence on each employee using a base

13   offense level applicable to second-degree murder, although

14   the employees there were not correction officers, but they

15   exhibited a gross deviation from the applicable standard of

16   care.

17         A depraved heart and extreme recklessness and

18   wanton disregard for human life in a state facility for a

19   mentally retarded patient.

20         Then in the sentencing court in United States

21   versus Livoti, L-i-v-o-t-i, 22 Fed Supp.2d 235, Southern

22   District, New York, 1998, applied the base offense level

23   applicable to involuntary manslaughter rather than second-

24   degree murder for a violation of 18, U.S. Code, Section 242,

25   where a police officer used an illegal sleeper hold to subdue

a suspect who was resisting arrest, resulting in asphyxiation and death.  The sentencing court found involuntary manslaughter to be appropriate because the defendant's police training led him to reasonably believe that the sleeper hold would result in the victim merely becoming unconscious and that death from a sleeper hold was rare.

Under the law that was presented to me previous to the arguments today, the second-degree murder is the killing of another with malice aforethought under 18, U.S. Code, Section 1111.  Malice aforethought may be inferred when the defendant grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury. That's from the Conatser case.

There's also language of similar nature in United States versus Black Elk, 579 F.2d 49, at page 51, an Eighth Circuit, 1978 case.  "Malice may be established by evidence of conduct which is reckless and wanton and a gross deviation of a reasonable standard of care of such nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or of serious bodily -- or serious bodily harm.

"Malice aforethought may also be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences,"

United States versus Milton, 27 F.3d 203, at page 207, Sixth
Circuit, 1994.

The annotations and comments to Eleventh Circuit
pattern jury instruction 45.3 note that under both the common
law and the federal murder statute, malice aforethought
encompasses three distinct mental states, including, third,
extreme recklessness and wanton disregard for human life, in
other words, a depraved heart.

The defendant knew that McCullah was in prison for
murder, that he had beaten up cellmates, that he made alcohol
in his cell, that there was testimony that she provided the
elements for the construction of the alcohol to him from time
to time, that he caused fires in his cell, that he was an
aspirant to the Aryan Brotherhood and hated snitches or
informants.

She was aware of the serious risk of serious bodily
injury to Mr. Delano when she participated in a scheme to
have Mr. Delano moved to Mr. McCullah's cell.  She grossly
deviated from the standard of care of a corrections officer
in participating in this move.  She lied to her supervisor
about why Mr. Delano should be housed with Mr. McCullah, and
she instructed Mr. McCullah to inflict serious bodily harm on
the victim.

The testimony was she said to kill him and to break
his leg, and then Mr. David Williams testified that she said

to Delano that she was going to get him killed, but then said

to McCullah, "Don't kill him; just rough him up."

        If the defendant said, "Don't kill him, and don't

rough him up," in view of what she knew about Mr. McCullah

and his testimony, it was simply whistling in the wind.  She

put this man and participated in a series of events that

placed Mr. Delano in the cell with a man who was known to be

a drunk, a fire-starter, and a very violent person; and

having done that, for her to then take the position that she

didn't want Delano killed, she didn't want him -- his leg

broken, she didn't want him seriously harmed is just closing

her eyes to the reality of the situation that she inflicted

on Mr. Delano.

        Once Mr. Delano was in Mr. McCullah's cell and Ms.

Sharma then left the prison and took a vacation so she

wouldn't be there for whatever occurred, there was simply no

way of controlling the situation; and death, as the jury

found, was the result of the defendant's actions.  And to me,

from listening to this evidence, it was an expectable result,

whether the defendant ordered or told Mr. McCullah to kill

Mr. Delano or she put Mr. Delano in the cell just to have Mr.

Delano taught a lesson.

        I don't think that the voluntary manslaughter

calculation would apply, the elements of that crime, because

this was thought out and the defendant -- it wasn't in the

heat of passion or on a sudden quarrel.  The defendant
thought this out and took actual steps over a period of time
to see that this move occurred.

I don't think that it's culpable negligence.  It
was intentional.  So involuntary manslaughter would not
apply, and the case from the Southern District of New York is
distinguishable.

So I will overrule the objection of the defendant
and apply the second-degree murder comparison and analysis
for determining the base offense level.

Mr. Kent, if you will, please object so your record
is clear.

MR. KENT:  Judge, I renew my objections then as
stated previously.

THE COURT:  And I think the second-to-the-last
issue is the vulnerable victim under 3(a)1.1(B), paragraph
25.  Is that correct?

MR. KENT:  Yes, ma'am.

THE COURT:  All right.

MR. KENT:  Judge, I think I'll draw a page from Mr.
Kern's book and say I'll stand on my pleading, except to say
this.  I think that Mr. Kern's sentencing memo really takes
my argument even further, because he cites some further
Eleventh Circuit cases, which have continued to apply without
consideration, apparently.

1          My position, that is, that there has to be evidence

2     that Ms. Sharma specifically targeted him because he was

3     vulnerable and because that's not there under the Eleventh

4     Circuit case that I cited, I think the Court's bound by the

5     Eleventh Circuit's ruling on this, right or wrong.

6          THE COURT:  All right.  Mr. Kern, do you want to

7     say anything further?

8          MR. KERN:  Just very briefly, Your Honor.  It is,

9     of course, the government's position, first of all, that even

10    if there was a targeting requirement, that requirement is met

11    in this case.

12         The victim's status as an informant was not

13    incidental to this crime or something that happened by

14    accident.  It is at the very core of the fact that the crime

15    took place.  The defendant was aware of that status and took

16    the maximum possible advantage of it to execute what she

17    desired.

18         Of course, as this Court is aware, the government

19    has set forth a wide variety of cases to support the

20    proposition that the targeting requirements, if indeed it

21    ever existed, is no longer applicable under the guidelines.

22         THE COURT:  Mr. Kern, I can't see you, and your

23    voice doesn't carry well.  If you will, just step over to the

24    side, or maybe they'll let you share this microphone.

25         MR. KERN:  Your Honor, I'll just try and keep my

1  voice up.

2           THE COURT:  No.  Come on up.

3           MR. KERN:  Your Honor, as we set forth in the

4  sentencing memorandum, just about every circuit I could find

5  that has examined this matter after November 1, 1995, has

6  determined that Amendment 521 to the sentencing guidelines

7  from November 1, 1995, removed any even hypothetical

8  targeting requirement that attached to that particular

9  provision.

10          Further, the plain text of the enhancement doesn't

11  say anything about targeting, it hasn't for a long time.

12          It is true that there is case law in the Eleventh

13  Circuit that suggests that there should still be some kind of

14  targeting requirement.  However, just about every citation

15  I've found that speaks to that keeps referring back to the

16  same case, United States versus -- I believe it's Argutus,

17  something to that effect, which is a case that deals with the

18  crime that took place prior to the November 1, 1995,

19  guidelines.

20          Further, every case in the Eleventh Circuit I've

21  found that speaks to that found that that enhancement ought

22  to apply.  So it's not at all clear that there's any

23  consideration given to the changes that have taken place

24  since November 1, 1995.

25          Given that there is no textual support for this

1 targeting requirement and given that every circuit that's

2 looked at it has found the amendment means exactly what it

3 meant, I would certainly encourage the Court to find that

4 there is in fact no such requirement.  But, of course, even

5 if the Court disagrees, we believe that Mr. Delano was

6 targeted precisely because he was an informant.  That was key

7 to the defendant's plan and key to her motivation; and for

8 that reason as well, the enhancement ought to apply.

9     THE COURT:  All right.  Thank you.

10    Mr. Kent.

11    MR. KENT:  Just, Judge, that there was evidence of

12 targeting, I dispute that.  I think Mr. Delano had been in

13 the SHU.  He was in the SHU when Ms. Sharma was first

14 transferred there; and he had been there for at least two or

15 three years, however long a period of time that was; and he

16 had been as a trustee under Ms. Sharma.

17    So -- and yet he was there in the SHU because he

18 was an informant.  No.  I'm sorry.  Correction.

19    She tells me he came into the SHU for disciplinary

20 reasons, but he was known as an informant.

21    So I think if that was so, there wouldn't have been

22 a delay of two or fully years.  So that wasn't -- clearly,

23 the cause of this was the -- at least according to the

24 government's case, was the bruising, the assault in the SHU

25 at the door and nothing more.

1          THE COURT:  All right.  Gentlepeople, I do not see

2     this in the same way that the two sides are arguing to me.

3     There was ample evidence that Mr. Delano was disliked because

4     he was a snitch; and that defendant participated in an effort

5     to have him removed from his position as an orderly because

6     he was causing problems with his information-giving; and that

7     Mr. McCullah, because he wanted to be a member of the Aryan

8     Brotherhood, particularly disliked snitches and therefore

9     would be prone to assault Mr. Delano in his cell.

10          It seems to me that Mr. Delano was a vulnerable

11     victim because he was a prisoner in a federal institution and

12     he was subject to the care and custody of his corrections

13     officers, of which Ms. Sharma was one.  Mr. Delano harmed Ms.

14     Sharma.

15          And Mr. McCullah had a special relationship with

16     Ms. Sharma, from the evidence.  Ms. Sharma provided him

17     favors.  She denied providing him contraband, but there was

18     other testimony that she provided him things with which he

19     could make his hootch there.  He had sales going on.

20          And because Mr. Delano harmed his correction

21     officer, the correction officer took advantage of her

22     superior position and her unique ability to cause harm to

23     this prisoner, who was under her control, and she used the

24     system to cause him to be moved in with a prisoner whom she

25     knew would cause serious bodily harm to him, not only because

1    she had incited him to do that, but because of the

2    relationship that she and Mr. McCullah had previously, to me,

3    that is what makes Mr. Delano the vulnerable victim.

4            But, in any event, this case can be argued from

5    many different positions, and the fact that Mr. Delano was a

6    snitch certainly is one.  It's just not the one that rings

7    true with me for why this provision should apply.

8            I will overrule the objection to paragraph 25 and

9    apply the vulnerable victim upward adjustment.

10            Mr. Kent, please object.

11            MR. KENT:  I'll renew my stated objections, Judge.

12            THE COURT:  All right.  And the last matter

13    involves the anti-Booker factors.

14            MR. KENT:  Yes, ma'am.  I -- I guess I was harkened

15    to see that Justice Scalia hasn't abandoned his principle

16    when he wrote the dissent to the Marlowe case that I've cited

17    the Court before.

18            I'll just rest on my pleadings before; but I think

19    this is, as Justice Scalia pointed out in the Marlowe case,

20    that the guidelines, according to Justice Scalia from

21    Marlowe, would have been 51 to 63 months.

22            Now, of course, my highest is from 27 to 33, plus

23    we get the obstruction, if that were applied, plus the

24    vulnerable victim, plus the color of law.  So we've got six,

25    eight, ten.

1        And I don't remember if I did that -- how I did

2   that in my math there, but, in any event, we've got another

3   one of these examples that the Court's familiar with, if the

4   Court, you know, is guided by the guidelines, where we're

5   getting a sentence in the mandatory life category, mandatory

6   in the since it's the only sentence available under the

7   guidelines, based on a finding that's not made by the jury.

8        And, in fact, as I've noted here in my argument

9   this afternoon, the jury was given legal theories that would

10   have allowed a conviction, no matter what our view of the

11   evidence might be, yours or mine or Mr. Kern's, would have

12   allowed the jury to convict on no more than involuntary

13   manslaughter.

14        So I think it's a perfect case to demonstrate the

15   problems with the Booker remedy, that is, if the Booker

16   constitutional opinion was correct that it's a Sixth

17   Amendment violation and a Fifth Amendment violation, because

18   the elements are not charged by indictment before a grand

19   jury, a Fifth Amendment violation because it's not required

20   to be proved beyond a reasonable doubt and the due process

21   concerns that go with that, and the Sixth Amendment because

22   we don't have the unanimous jury verdict and so on.  We don't

23   have here at sentencing proof beyond a reasonable doubt; we

24   have hearsay and so on.

25        So it's a textbook case of the problems of the

1    remedy provision of Booker.  I think -- so I would just renew

2    my written objections there, just for the record.

3         THE COURT:  All right.

4         MR. KENT:  Although, Judge, if I may, I think

5    there's still -- I had an oral argument in the D.C. Circuit.

6    This past Thursday I was in front of Judge Cavanaugh, Judge

7    Rogers and Judge Garland, and we were talking -- if you can

8    imagine at the D.C. circuit, I was given oral argument on my

9    repeated anti-Booker objections, and half the argument was

10   spent on talking about ex post facto.  We don't have that

11   here.  That was the ex post facto application of Booker to a

12   case that arose before Booker, but the other half was talking

13   about the Sixth Amendment problem.  Judge Cavanaugh in

14   particular was interested in whether there's any vitality

15   still to this.

16        I think there is.  Of course, the makeup of the

17   court's changed, the Supreme Court, and it'll be revisited.

18        THE COURT:  All right.

19        MR. KENT:  Thank you, Judge.

20        THE COURT:  Mr. Kern.

21        MR. KERN:  Your Honor, we'll stand our on pleadings

22   and take the position that Booker can be left alone today.

23   Thank you.

24        THE COURT:  All right.  There is a Fifth Circuit

25   case, United States versus Teal, 299 Fed Appendix 387, Fifth

1    Circuit, 2008.  The panel affirmed a sentence under the base

2    offense level of second-degree murder for a violation of 18,

3    U.S. Code, Section 241 and Section 242, even though the jury

4    was not asked to find whether the victim possessed any

5    particular mental state pertaining to the homicide.

6         The defendant in Teal was a prison guard who was

7    convicted of violating 18, U.S. Code, Sections 241 and 242,

8    for an incident which resulted in a prisoner's death.  The

9    court in Teal disposed of the issues without discussing the

10   underlying facts of the crime.

11        And it appears to me it's appropriate under Booker

12   to make factual findings by a preponderance of the evidence

13   to determine the applicable guideline range, and I believe

14   that is what has been done here with the application of these

15   guidelines by the probation officer, except for the one which

16   I have -- or for the two which I have overruled -- except for

17   the two objections which I have sustained.  So I will stand

18   by what we've done so far.

19        Is there anything else to be argued now?

20        MR. KENT:  No, ma'am.

21        THE COURT:  Mr. Kern?

22        MR. KERN:  Not from the government, Your Honor.

23        THE COURT:  We'll need to go through and make the

24   changes.

25        THE PROBATION OFFICER:  Yes, Your Honor.  Paragraph

1  27, there would be a plus two levels for obstruction of

2  justice.  That would bring paragraph 28 to an adjusted

3  offense level of 48.

4          THE COURT:  Just a minute.  Let me get caught up

5  with you here.  All right.

6          THE PROBATION OFFICER:  Sure.  Paragraph 30, a

7  total offense level of 48.

8          THE COURT:  Okay.

9          THE PROBATION OFFICER:  Then we drop down to

10 paragraph 54, a total offense level of 48.  And there would

11 be no other changes to the guidelines.

12         THE COURT:  The Court then will adopt the factual

13 statements contained in the Presentence Report as to which

14 there is no objection; and as to controverted factual

15 statements, the Court adopts the position of the Probation

16 Office as stated in the addendum, except as I've noted on the

17 Presentence Report and ruled here during this proceeding.

18         Therefore, the advisory guidelines are a total

19 offense level of 49, criminal history category I, which

20 provides for life in prison followed by three to five years

21 of supervised release.  There is no restitution.

22         The fine range is $25,000 to $250,000, and a $200

23 special assessment.

24         Is there a victim present, Mr. Kern?

25         MR. KERN:  Yes, Your Honor, the victim's family is

```
 1    present.

 2              THE COURT:  Mr. Kent and Ms. Sharma, if you would

 3    like to take a seat over there.

 4              Mr. Kern, I'll let you present this.

 5              MR. KERN:  Yes, Your Honor.  Thank you.  It is my

 6    understanding that the brother of the victim, Mr. Rick

 7    Delano, would like to make a statement to the Court.

 8              THE COURT:  All right.

 9              THE PROBATION OFFICER:  Your Honor.

10              THE COURT:  If you will, just come to the podium

11    right here.  Would you state your name, please.

12              MR. MICHAEL DELANO:  My name is Michael James

13    Delano.  Your Honor, I'm the twin brother of Richard.  And I

14    have my sister, Paula; my fiancee, Brook; and her husband

15    (sic), George, with me.

16              Through all this listening, the thing I want to get

17    through here is Rick was a good man.  He was not just an

18    inmate.

19              I don't want to do this.

20              THE COURT:  Well, first of all, I can get you water

21    and you can take a break.

22              MR. MICHAEL DELANO:  No.  I'll be fine.

23              THE COURT:  Okay.

24              MR. MICHAEL DELANO:  He told me that he was going

25    to -- or that -- no.  I'm sorry.  He didn't tell me was going
```

1   to be a snitch; but through the phone calls and the letters,

2   I knew.  And he told me if it didn't kill him first, he

3   wanted to live a life like mine, and it was tough.

4        He was so good with kids.  He was a natural

5   athlete.  He was a hunter.  He did everything.  And what got

6   him in trouble was he wanted to do good, and if the wrong

7   people came, he just did what they wanted, and that's what

8   got him started in problems and ultimately that's what got

9   him killed.

10       I guess I can't go on -- I could go on and on

11  about, you know, I couldn't wait until he got out.  I was

12  going to give him a job.  I was going to teach him to be a

13  firefighter, like myself.

14       What I don't understand in the family is, how can a

15  person under -- how would I say this?  She took an oath to

16  protect and serve, and I know this.  How do you obtain the

17  thought of so much power that you can eliminate somebody as a

18  number and not a person?

19       I think that throughout the readings on the

20  Internet and talking to people, he was an inmate.  No.  He

21  was a person.  He was my twin brother.  And for the

22  sentencing part of it, I hope that whatever you give her, she

23  will never and can never forget what happened, what she's

24  done to a family.

25       I know he was trying so hard to get out and be

1    straight; that now, he's out and he never has to worry about

2    any more politics.

3              It's frustrating to think of how the federal

4    government system, especially like this prison, is being run.

5    I sit and listen to how they talk about they were drunks.  So

6    we allow this?  We feed this, and we make money off this.

7    That's what our guards are doing, and Rick spoke about this.

8              If this is a federal facility being run like this,

9    how do we expect these people to become reformed to be able

10   to get out and live like us when they're being taught by the

11   guards, who knows who all, that this is what you need to live

12   like, that this is how you prosper?

13             Money and greed and power is getting to the point

14   where we just eliminate people like they're numbers, and it's

15   frustrating.  It's hurt the family a lot.

16             So whatever sentence you give, I hope you take it

17   in mind of what the family is going through.  Thank you very

18   much.

19             THE COURT:  Thank you, Mr. Delano.

20             Is there any other victim who wishes to be heard?

21             (No response.)

22             MR. KERN:  No, Your Honor.

23             THE COURT:  All right.  Mr. Kent, if you will, come

24   forward, please, and Ms. Sharma.

25             Mr. Kent and Mr. Kern, is there any reason I should

 1    not proceed to imposition of sentence?

 2              MR. KENT:  Judge, I was going to call, with the

 3    Court's permission, two character witnesses.

 4              THE COURT:  I'm going to let you do that, but I'm

 5    going now to the next phase.  Is there any impediment to

 6    proceeding to imposition of sentence?

 7              MR. KENT:  No, Your Honor.

 8              THE COURT:  Mr. Kern?

 9              MR. KERN:  Not known to the government, Your Honor.

10              THE COURT:  Ms. Sharma, do you want to make a

11    statement to me yourself?

12              THE DEFENDANT:  No, ma'am.

13              THE COURT:  All right.  Mr. Kent.

14              MR. KENT:  Ma'am, if I could, I would like to start

15    with two character witnesses.

16              THE COURT:  Ms. Sharma, I'll let you stay there,

17    because if you want to talk to your attorney at any time,

18    you're close; but I know you've been standing there a long

19    time.  So if you want to be seated, you can do that, too.

20              THE DEFENDANT:  No.  I'm fine.  I've been sitting

21    all day.

22              MR. KENT:  The first witness would be Mary Ellen

23    Siemers.

24              Ms. Siemers, would you come forward, please.

25              THE COURT:  Were you intending to question her?

```
 1              MR. KENT:  Just to lead her, yes, ma'am.
 2              THE COURT:  If you are, we'll place her over here.
 3    She'll be placed under oath, if you're going to ask her
 4    questions.
 5              MR. KENT:  Yes, ma'am.
 6                        MARY ELLEN SIEMERS,
 7    having been first duly sworn, was examined and testified as
 8    follows:
 9              THE COURTROOM DEPUTY:  Please state your full name
10    and spell your last name.
11              THE WITNESS:  Mary Ellen Siemers, S-i-e-m-e-r-s.
12              THE COURT:  Mr. Kent.
13                        DIRECT EXAMINATION
14    BY MR. KENT:
15    Q.   Ms. Siemers, where do you live?
16    A.   I live at 15122 Southwest 38th Circle, Ocala, Florida,
17    right across the street from Erin and her husband and child.
18    Q.   Do you know Erin Sharma?
19    A.   Yes, I do.
20    Q.   How long have you known Ms. Sharma?
21    A.   I knew of her just before my dad died in 2004.  We
22    became friends after my dad passed away in 2004.
23    Q.   And what was her relationship -- was there some
24    relationship between Ms. Sharma and your father?
25    A.   No.  It's just that she lived across the street; and
```

 1    after my dad died, I moved in with my mom across the street.

 2    Q.    Okay.  And have you had an opportunity to get to know

 3    Ms. Sharma?

 4    A.    Yes, I have.  I introduced Erin to the church that I go

 5    to, also her daughter.  We had been going to church together.

 6            Every time there was something that needed to be

 7    done around the house, because my dad wasn't there anymore,

 8    Erin or Roger would come over and volunteer to help out, do

 9    whatever they could.  So I got to know her pretty well.

10    Q.    What church do you go to?

11    A.    Maranatha Baptist Church.

12    Q.    Does -- Ms. Sharma, did she when she was -- before she

13    was taken into custody, did she regularly attend church with

14    you?

15    A.    Yes, she did.  She joined the church and so did her

16    daughter.

17    Q.    Were you around Ms. Sharma enough to know does she have

18    any bad habits that you've seen, bad character habits?

19    A.    No.  I was not here at the court.  And sitting here this

20    morning listening to everything that was being said, it's

21    like two different people.  I don't know this Erin.  I only

22    know the Erin that has always been the first one to greet

23    somebody new in the neighborhood, to go out of her way to do

24    whatever she could to help, brought up a daughter that was --

25    or was bringing up a daughter that just has wonderful values.

1      I've taking care of her quite a bit of the time

2  while Erin is here.  I -- to me, this is not Erin.  And I

3  also worked as a licensed clinical social worker for over 33

4  years.  I'm on disability now.  I had to do a lot of home

5  studies, had to study people for different things, like

6  adoptions, just part of the job that I had to do, and never

7  in my wildest imaginations would I ever see Erin in this

8  position.

9  Q.   So she didn't display, to your knowledge or your

10 association with her or your friendship with her over the

11 past, say, five years any of the traits which appeared in the

12 testimony that you've heard about?

13 A.   No, absolutely not.

14      MR. KENT:  I have nothing further, Judge.

15      THE COURT:  Anything, Mr. Kern?

16      MR. KERN:  Nothing from the government, Your Honor.

17      THE COURT:  Thank you, Ms. Siemers.  You may step

18 down.

19      MR. KENT:  Judge, I would next call Ms. Sharma's

20 husband, Rajesh Sharma.

21      THE COURTROOM DEPUTY:  If you would, raise your

22 right hand, please.

23                      RAJESH SHARMA,

24 having been first duly sworn, was examined and testified as

25 follows:

```
 1              THE COURTROOM DEPUTY:  Please speak into the
 2    microphone.  Please state your full name and spell your last
 3    name.
 4              THE WITNESS:  Rajesh K. Sharma, S-h-a-r-m-a.
 5                         DIRECT EXAMINATION
 6    BY MR. KENT:
 7    Q.    Mr. Sharma, are you Erin Sharma's husband?
 8    A.    Yes, sir.
 9    Q.    How long have you been married to Erin Sharma?
10    A.    I believe since 1999.
11    Q.    And do you have a child with Ms. Sharma?
12    A.    Yes, sir.
13    Q.    What's your child's name?
14    A.    Tesha Sharma.
15    Q.    How old is Tesha?
16    A.    She turned nine a couple weeks ago.
17    Q.    Is Tesha in the courtroom with you today?
18    A.    Yes, she's sitting right there by her grandmother.
19    Q.    Why is she here today?
20    A.    She wants to see her mother.  She misses her mother.
21    They're very close.
22    Q.    What kind of mother has Erin been to her daughter?
23    A.    She's been -- she's a real good mother.  She's very
24    active with her, you know, doesn't push her, but encourages
25    her, you know, to try -- we've done horse riding, gymnastics,
```

swim lessons, Girl Scouts, have taken her to the church, you know.  Whatever my daughter wants to do, you know, she encourages it and goes out of her way to make sure she can do it.

Q.   Mr. Sharma, were you present in the courtroom during the trial?

A.   Yes, sir.

Q.   I just ask that to say, so you're aware of the evidence that was presented against your wife; is that correct?

A.   Yes, sir.

Q.   The Court, of course, accepts -- has to accept the jury's verdict as true, and the Court's made certain findings already, but could you help explain to Judge Fawsett the wife that you know or the kind of person that you know.  Is there anything different from the woman that you know versus the defendant who was found guilty in this case?

A.   Honestly, she's really not different when she was at work than when she was at home.  There's not all that difference.

          The person that they're describing is not who she was at home.  It's not who she was, that I know of, at work.  She was the one at work that the inmates looked for because if they needed something and nobody would help them, she would be the one to do it.  At home, she's the same.  If neighbors need something, you know, they know to come to

1    Erin.  You know, that's the person that she is.

2              The person that's been described in court, you

3    know, I'm not going to dispute.  I'm not going to go against

4    a jury.  I'm not going to go against anybody, you know.  I

5    don't understand what happened.

6    Q.   But that's not the person that you know, from your

7    experience with your wife?

8    A.   No, sir, that's not the person that I would marry.  I

9    wouldn't marry the person they talked about.

10   Q.   What do you know about -- you've mentioned -- again, I

11   don't want to get into the evidence in the case.  We're not

12   disputing the jury's verdict here.  But what do you know

13   about your wife's professional history?  What can you tell

14   the Court?  Was she a good correctional officer, to your

15   knowledge?  Was she commended by the Bureau of Prisons?

16   A.   A lot of times she was the person they said that I

17   should be.  She -- and she'll dispute it.  She'll say they

18   told her that she should be more like me.  But everybody that

19   worked with her enjoyed working with her.  She wasn't lazy.

20   She did her job.

21             She did get correctional officer of the month.

22   She was always doing the little side classes to try to make

23   herself a better officer.  She -- everybody that worked with

24   her liked working with her.  They knew that she would take up

25   their slack, you know.  They knew that she wasn't going to be

1    the one that caused problems.   There are problems in the

2    Bureau of Prisons, but she wasn't one of them.   She tried to

3    correct them.

4    Q.   Mr. Sharma, what is your job?

5    A.   I'm a -- currently I am a supervisor, supervising

6    lieutenant.

7    Q.   With the Bureau of Prisons?

8    A.   With the Bureau of Prisons.

9    Q.   How long have you been with the Bureau of Prisons?

10   A.   I've been with the Bureau of Prisons since November of

11   2000.

12   Q.   Is there anything else you would like to tell Judge

13   Fawsett before she decides what the appropriate sentence is

14   in this case?

15   A.   Just that she's a good person.   She's not the person

16   that was described.   We need her home.

17   Q.   Thank you, Mr. Sharma.

18            THE COURT:   Any questions, Mr. Kern?

19            MR. KERN:   Not from the government, Your Honor.

20   Thank you.

21            THE COURT:   Thank you, Mr. Sharma.

22            MR. KENT:   Judge, could I have a moment with Ms.

23   Sharma?

24            THE COURT:   Yes.

25            MR. KENT:   Your Honor, I just wanted to confer

```
 1    before we proceed, that there wasn't some particular

 2    statement she wanted to make; but on my advice, she's not

 3    going to make any statement.

 4              Of course, we -- I don't want this to sound hollow,

 5    but we both express, you know, our sorrow to the victim's

 6    family.

 7              I would ask the Court to consider -- the Court's

 8    made a finding that it's offense level 48, criminal history

 9    category I.  The guideline range is --

10              THE COURT:  49?  Is it 48?  It is 48.

11              MR. KENT:  Yes, ma'am.  I think you just misspoke.

12    But in either even --

13              THE COURT:  Let me make sure I did that correctly

14    in here.  One second.  Let me double-check.  Yes.

15              MR. KENT:  Judge, I don't want to belabor this.  By

16    "this," I mean the 3553(a) factors.  I think this is one of

17    those cases that's a very hard case for a judge.  It's a hard

18    case for everyone.  We all wish we weren't here under these

19    circumstances.  And the Court knows better than I do -- you

20    do sentencings on a regular basis -- the 3553(a) factors and

21    how to apply them.  But I do think this is one of those most

22    extraordinary cases where you've got a defendant who has been

23    convicted now of a very bad crime, but who -- I don't think

24    there's really any dispute -- is otherwise a very good

25    person.
```

1    I'm not getting into what kind of correctional

2    officer she was.  The Court's made the findings.  But we've

3    got everything in mitigation, and I'm not -- this is not

4    going to be -- whatever sentence the Court imposes, I'm not

5    going to be making an argument to the Eleventh Circuit that

6    the Court didn't procedurally consider the 3553(a) factors.

7    I'm not going to bother with that myself, because you know

8    these factors.

9    We have nothing in aggravation except the crime,

10   and it's a horrible crime and a man is dead.  And human life,

11   there's nothing with greater dignity and should be owed

12   higher respect than human life.

13   I agree with Mr. Delano.  His brother wasn't just

14   an inmate.  Those are -- all my clients are inmates.  I don't

15   consider them inmates.  He's a human being.  He deserved

16   respect and dignity.

17   But this woman, whatever she did that she's been

18   convicted of, otherwise in her life, she's led a good life.

19   She's a good mother.  She's a good wife.  She has a little

20   daughter who's here in the courtroom, not because we asked

21   her to be here, but because the little girl wanted to be

22   here, Judge.  She's old enough to understand what's going on

23   and she knows.

24   In the range of cases, I do think, whether -- the

25   Court's disagreed with me on the application of the

1   guidelines in terms of involuntary manslaughter, but I think

2   that the Court could perhaps be guided somewhat by what would

3   be an appropriate sentence for a case where a person has done

4   something, as you've said, with just extreme reckless

5   disregard that's resulted in a person's death.

6          The maximum penalty is life.  The Court has

7   discretion to impose whatever sentence less than that the

8   Court thinks is appropriate.  But is it -- I just ask this

9   question rhetorically but seriously:  Isn't some sentence

10  less than life appropriate in a case where the defendant in

11  every respect is a good person but for the crime that's been

12  committed?

13         Now, I would ask you to consider proportionality.

14  Of course, Mr. McCullah hasn't been indicted yet.  I assume

15  he will be.  I don't know if the government's going to seek

16  the death penalty on Mr. McCullah or not, but I ask the Court

17  to consider proportionality in terms of what Mr. McCullah did

18  and what Ms. Sharma did.

19         The Court -- I'm not arguing with the Court's

20  finding that she -- at this point I'm not -- that she acted

21  in a way with such disregard that it was malice aforethought,

22  but that is a level of intent less than the premeditation

23  that was involved on the part of Mr. McCullah, who beat this

24  man to death.

25         I mean, do we think that if Ms. Sharma was standing

1  there when it happened -- she did take the vacation -- that

2  she wouldn't have said, "Stop"?  I mean, this woman, I think

3  she would have.  Did she mean for it to happen?

4       She may, in the Court's view, qualify for second-

5  degree murder in terms of the guidelines; but I think in

6  terms of the sentence the Court would find appropriate, I'd

7  ask the Court to consider a sentence of 15 years under

8  3553(a).  That's sufficient but not more than necessary.  It

9  will teach the lessen that Mr. Delano ask that she be taught.

10 Fifteen years in federal prison is more than enough.

11      There's no question she's not going to be any risk

12 of recidivism.  This crime or no other crime like this will

13 ever be committed by this woman again.  Fifteen years is

14 adequate punishment for the offense.  It's adequately

15 serious.  It deters.  It teaches a lesson to her and to

16 everyone else.

17      Thank you, Judge.

18      THE COURT:  Thank you, Mr. Kent.

19      Mr. Kern.

20      MR. KERN:  Yes, Your Honor.  Thank you.  I know the

21 Court has viewed our filings.  I don't want to repeat what's

22 been said here.

23      THE COURT:  I'm sorry.  I can't hear you.

24      MR. KERN:  I'm sorry.  I know the Court has

25 reviewed the government's filings and is familiar with the

1    contents of them.  I just want to bring one or two points to

2    the Court's attention.  I guess I'm a little reluctant to do

3    so, because I don't feel that I can express what needs to be

4    expressed any better than Mr. Delano did a few moments ago.

5    And as he set forth his feelings, I detected two things of

6    importance:  Pain and questions.

7            It is very clear that the pain this event has

8    caused will linger far beyond today and into the future.  His

9    family has suffered a cruel deprivation, although they have

10   done nothing wrong.  A man died who had no business dying.

11   There's no reason why this crime ought to have happened, none

12   at all.  It appears that the pain of his family, of all the

13   good times that he might have enjoyed, never once factored

14   into the equation of the defendant's acts.

15           As Mr. Delano so clearly put it, the defendant, Mr.

16   Delano, the victim, was a number, not a person.  And it is

17   precisely that degree of depravity that justifies a stern

18   sentence in this case.

19           But perhaps even just as troubling are the

20   questions that Mr. Delano raised, questions of, how could

21   this be?  How someone take an oath to protect and then be the

22   agent by which a person entrusted to them suffers irreparable

23   harm, suffering death?

24           I don't know that there are good answers to that

25   question.  I don't know what to tell Mr. Delano.  When he

1  looks to the federal government to explain it, I don't know

2  what to tell him.

3       But today, this Court has the opportunity to make

4  it clear that the life even of a federal inmate, even in the

5  SHU of FCC-Coleman, counts just as much under the eyes of the

6  law as the lives of any other, and it should because the

7  Constitution and the benefit of our laws apply equally to

8  all.

9       The government submits the sentence of life is

10 commensurate with the harm that has been done.  It is

11 commensurate with the basic concept that those who would

12 cause the lives of others to be taken must be sternly

13 punished, and particularly so when those lives were uniquely

14 entrusted to them for their protection.

15      Mr. Delano's life and the loss of his family must

16 be reckoned equally with the loss that any citizen might

17 endure when faced with such a crime.

18      In order for this sentence to reflect the gravity

19 of the offense, to respect the dignity of Mr. Delano and his

20 family, and to send the message that all people are equal in

21 our system of law and under the Constitution, the government

22 respectfully submits that a sentence consistent with the

23 guidelines, that being a life sentence, is appropriate in

24 this case.  Thank you.

25      THE COURT:  I will go through factors that are

1    presented in the Presentence Report.  The defendant was born

2    April 24, 1976.  She is a citizen of the United States.  She

3    is married, has one child, and has some college.

4            The Court must impose a sentence that is sufficient

5    but not greater than necessary to comply with the purposes

6    set forth in Title 18, U.S. Code, Section 3553; and in

7    determining the particular sentence to be imposed, the Court

8    shall consider the nature and circumstances of the offense

9    and the history and characteristics of the defendant.

10           The charges and convictions are stated in the

11   Presentence Report in paragraphs one through four.  The

12   offense conduct is stated in paragraphs five through 16.  I

13   also incorporate by reference the testimony and exhibits that

14   were presented in the trial.

15           Defendant has been in custody since the date of the

16   jury verdict, paragraph 17.

17           As to victim impact, her actions resulted in the

18   death of Mr. Richard Delano, paragraph 18.

19           I have found that the defendant obstructed justice,

20   paragraph 19, by lying under oath during the course of this

21   trial.  She did not accept responsibility for her actions,

22   paragraph 20.

23           The advisory offense level computations is

24   contained in the Presentence Report at paragraphs 21 through

25   31.

1          The defendant has no prior criminal history,

2    paragraphs 32 through 34.

3          As to offender characteristics, the defendant's

4    personal and family data is described in paragraphs 35

5    through 40.  She was born in Fort Benning, Georgia.  Her

6    parents divorced when she was 18.  She has one brother, and

7    reports that her family was close.  Her father was in the

8    military.  Both parents raised her and both parents wrote

9    letters to the Court.

10          She has been married and has had one child, age

11    nine, and the family lives in Ocala.

12          As to physical conditions, she reports good

13    physical health, paragraph 41.  She reports no mental or

14    emotional problems, paragraph 42, but she has used an anxiety

15    medication since 2005.  She reports no substance abuse,

16    paragraph 43.

17          As to education and training, she reports being a

18    high school graduate, paragraph 44, who took an online course

19    in paralegal studies from Ashworth College in Norcross,

20    Georgia; and she has also worked as a pet sitter.  That is

21    contained in paragraphs 44 and 45.

22          There is no military history reported.

23          As to employment, paragraphs 46 through 50, she has

24    worked for the Bureau of Prisons in Coleman and in Edgefield,

25    South Carolina, as a corrections officer.  And she was the

owner of a pet sitting business.  She worked with the Florida

Department of Corrections as a corrections officer also.

Her financial condition is reported in paragraphs

51 through 52.  She has no ability to pay a fine, as reported

by the probation officer in paragraph 52.

The Court must consider the need for the sentence

imposed to reflect the seriousness of the offense.  This is

an extremely serious offense.  The defendant put a prisoner

under her control and entrusted to her care in a position to

be seriously injured or killed, and then she left town so she

could claim that she had nothing to do with the event that

she set in motion, which resulted in the prisoner's death.

The sentence must also promote respect for the law

and to provide just punishment for the offense.  I weigh this

factor very heavily.

The sentence must also afford adequate deterrence

to criminal conduct.  And in this regard, the Court weighs

heavily this factor.  Prisoners who are in the custody and

under the control of the various state and federal agencies

are entitled to believe that they will not be put in peril or

in jeopardy by the very persons charged with their care and

custody.

The sentence must protect the public from further

crimes of the defendant.  I do not believe that the defendant

would engage in other criminal activity, and this factor does

1   not weigh heavily.

2           The sentence must provide the defendant with needed

3   educational or vocational training, medical care or other

4   correctional treatment in the most effective manner.  No need

5   for medical care, correctional treatment or vocational

6   training or educational training has been presented to me in

7   the proceedings or in the Presentence Report for

8   consideration.

9           The Court must consider the need for the sentence

10  imposed, must also consider the kinds of sentences available

11  and the kinds of sentence and sentencing range established

12  for the crime of conviction.  And as I related during the

13  hearing, I have researched other cases for proportionality.

14          The sentencing options are described in paragraphs

15  53 through 69 of the Presentence Report.  The guidelines are

16  discretionary under Booker and Fanfan.

17          The Court must consider pertinent policy statements

18  issued by the Sentencing Commission and by congress.  The

19  need to avoid unwarranted sentence disparities among

20  defendants with similar records who have been found guilty of

21  similar conduct, again, I did research on this for the

22  purpose of avoiding unwarranted sentence disparities.

23          And the Court must consider the need to provide

24  restitution to any victim of the offense.  No restitution has

25  been stated in the presentation to the Court.

1          Ms. Sharma, are you prepared to be sentenced?

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  This Court has asked the defendant why

4   judgment should not now be pronounced, and after hearing the

5   defendant's response, the Court has found no cause to the

6   contrary.  The parties have made statements in their behalf

7   or have waived the opportunity to do so, and the Court has

8   reviewed the Presentence Report.

9          Pursuant to Title 18, United States Code, Sections

10  3551 and 3553, and the Sentencing Reform Act of 1984, it is

11  the judgment of the Court that the defendant, Erin Sharma, is

12  hereby committed to the custody of the Bureau of Prisons to

13  be imprisoned for a term of life in prison.

14          On release from imprisonment, defendant shall be

15  placed on supervised release for a term of three years.

16          The mandatory drug testing requirements of the

17  Violent Crime Control Act are waived; but the Court orders

18  the defendant to submit to random drug testing, not to exceed

19  104 tests per year.

20          If the defendant is released from prison on

21  supervised release, the defendant shall comply with the

22  standard conditions adopted by the court in the Middle

23  District of Florida and with the following special

24  conditions:  The defendant shall cooperate in the collection

25  of DNA as directed by the probation officer.  Based on the

defendant's limited financial status, the fine is waived.  In lieu of paying a fine, the defendant shall perform 75 hours of community service as a condition of supervised release, if she is released from prison.

It is further ordered that defendant shall pay to the United States a special assessment of $200, which is due immediately.

"The guideline range does not exceed 24 months," why was that put in there?

THE PROBATION OFFICER:  It's just boilerplate language, Your Honor.

THE COURT:  Okay.  The Court has considered the advisory sentencing guidelines and all the factors identified in Title 18, United States Code, Section 3553(a), 1 through 7; and the Court finds that the sentence imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

The defendant will be remanded to the custody of the United States Marshal to await designation by the Bureau of Prisons.

The Clerk should attach the sentencing statement to the Judgment and Commitment Order.

Having pronounced sentence, does counsel for the defendant or the government have objection to the sentence or to the manner in which the Court pronounced sentence other

1   than those objections previously stated?

2           MR. KENT:  Nothing other than what we've previously

3   argued, Judge.

4           MR. KERN:  Nothing from the government, Your Honor.

5           THE COURT:  Ms. Sharma, did you understand when I

6   explained how important it is to file your notice of appeal

7   timely?

8           THE DEFENDANT:  Yes, ma'am.

9           THE COURT:  And did you sign the Acknowledgement of

10  Right to Appeal form?

11          THE DEFENDANT:  Yes, ma'am.

12          THE COURT:  Mr. Kent, if you will, file that.

13          It would be up to Mr. Kent to file your notice of

14  appeal for you, and he will continue -- you've been appointed

15  now, haven't you?

16          MR. KENT:  Not appointed but I will file a notice

17  of appeal, yes, ma'am.

18          THE COURT:  All right.  So it will be your

19  responsibility to continue your representation on appeal,

20  unless you're relieved by an order of the court of appeals.

21          Ms. Sharma, is there anything that you feel should

22  have been stated here that either wasn't said the way you

23  wanted it to be said or wasn't said at all or is there any

24  question that you want to ask me?

25          MR. KENT:  Is there anything else that you wanted

1    said today that wasn't said or any arguments made, Erin?

2              (Discussion held off the record between the

3    defendant and Mr. Kent.)

4              MR. KENT:  Judge, the only thing, Ms. Sharma wanted

5    the Court to make a recommendation, if the Court does that.

6              THE COURT:  I don't make recommendations because

7    they are never followed, and it just results in

8    correspondence about why the Bureau of Prisons can't do what

9    I've asked, and I've just given up on it.  They will look at

10   the record and make the designation.

11             Also, I don't keep up with the number of people in

12   any particular prison to know when some prison, you know, is

13   full and so forth.

14             MR. KENT:  Was there anything else, Ms. Sharma?

15             THE DEFENDANT:  No.

16             MR. KENT:  No, ma'am.  That is it.

17             THE COURT:  I want to ask the defendant, is there

18   anything you want to ask me or anything you feel should have

19   been said that wasn't or should have been said differently?

20             THE DEFENDANT:  No.  I've talked to my attorney

21   about everything, ma'am.

22             THE COURT:  All right.  Mr. Kent, is there anything

23   further?

24             MR. KENT:  No, ma'am.  Thank you, Judge.

25             THE COURT:  And, Mr. Kern?

1          MR. KERN:  Not as to sentencing, Your Honor.  I

2     have a small housekeeping matter tangentially related.

3          THE COURT:  All right.

4          MR. KERN:  I just wanted the record to reflect

5     Friday afternoon it came to my attention that my office was

6     having trouble with one of our electronic files, and it

7     wasn't clear to me that the defense's version would

8     necessarily be working better.  Although they hadn't

9     complained of it, I went ahead and e-mailed a hopefully

10     functioning copy of the file in question to Mr. Kent, who has

11     informed me that he received it without difficulty.

12          THE COURT:  All right.

13          MR. KENT:  Yes, ma'am, that's correct.

14          THE COURT:  The case is concluded, then.

15          (The proceedings were terminated at 3:50 p.m.)

16                    - - - - - - - -

17               Reporter's Certification

18     I certify that the foregoing is a correct transcript from the

19     record of proceedings in the above-entitled matter.

20                         s/Diane Peede, RMR, CRR
                           Official Court Reporter
21                         United States District Court
       Date:   December 18, 2009     Middle District of Florida
22

23

24

25